# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KYUNG PALMER, )
)
     Plaintiff, ) Case No.     20 CV 2603
)
     v. )
)
CITY OF MARKHAM AND TERRY WHITE, )
) Honorable Joan B. Gottschall
     Defendants. )

## DEFENDANTS' LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS

### Introduction

1.     Plaintiff Kyung Palmer (plaintiff), a female former part-time police officer with the City of Markham Police Department, filed a three-count complaint against defendant City of Markham and defendant Police Chief Terry White alleging: (1) discrimination (based on her sex) under Title VII of the Civil Rights Act of 1964; (2) retaliation under Title VII after she had filed a charge with the Illinois Department of Human Rights (IDHR); and (3) and an Illinois state tort claim for intentional infliction of emotional distress (the only count against Terry White). Among her other employment-related discrimination claims, plaintiff contends in the complaint that the City terminated her employment as retaliation for her having filed a discrimination charge with IDHR. Defendants' Exhibit (Def. Ex.) C.

2.     On March 14, 2019, plaintiff filed a Charge of Discrimination alleging that, based on her sex, in or about October 2018, Chief Terry White reduced her hours from approximately 32 hours per week to 24 hours per week, that he involuntarily changed here work schedule (from Monday,

1

Tuesday, Wednesday to Wednesday, Thursday, Friday), that Chief White removed her from assignments, such as security at the City-owned roller rink, and that Chief White did not allow her to use compensatory time or paid-time off from December 21, 2018, through January 2, 2018, and from March 8, 2019, through March 20, 2019. Def. Ex. D, page 2, sect. II. In December 2019, plaintiff filed additional Charges of Discrimination alleging that the City and Chief White terminated her employment as a part-time officer, effective July 3, 2019, as retaliation. Def. Ex. E.

**3.** IDHR dismissed plaintiff's initial discrimination charge on January 30, 2020, for lack of substantial evidence. Def. Ex. F. IDHR dismissed plaintiff's retaliation charges on April 16, 2020, after plaintiff opted-out of further investigation of those claims. Def. Ex. G.

**City and Police Department**

**4.** City of Markham is a suburban municipality south of the City of Chicago governed by an elected mayor and city council. The City is organized into a number of departments, including a police department that employed full-time and part-time patrol officers. The police department is a para-military organization with a police chief as its head and a command staff hierarchy underneath the chief. Def. Ex. C. At the times relevant hereto, the City police department employed three, eight-hour daily duty shifts: 8 am to 4 pm, 4 pm to 12 am, and 12 am to 8 am. Def. Ex. A at 42, lines 7-14.

**5.** Police Chief Terry White has been with the Markham Police Department (MPD) since about 1991-1992. He has held various other positions or ranks with the police department including sergeant, lieutenant (his civil service rank), and deputy chief. Def. Ex. B at 11 (lines 5-24), 13 (lines 12-17), 14 (lines 1-24), and 15 (lines 1-24). In October 2018, Markham Mayor Roger

2

Agpawa promoted Terry White to Police Chief. Chief White replaced former police chief Mack Sanders. Def. Ex. B at 23 (lines 2-24), 24, and 26 (lines 1-5).

**Plaintiff and Part-time Officers' Duties, Compensation, and Restrictions**

6.      Plaintiff was hired at the MPD in 2010 as a part-time police officer. Def. Ex. A at 17, lines 7-10. Other than an hourly wage, plaintiff did not receive – and she was not entitled to – any other benefits from the City as a part-time patrol officer. Def. Ex. A at 42 (lines 21-24)-43 (lines 1-6); Def. Ex. B at 73 (lines 11-24), 75 (lines 1-20), 78 (lines 1-24), 79 (lines 1-11), and 80 (line 1); Def. Ex. I. The part-time officers were "at-will" employees, and they did not have a collective bargaining agreement with the City. Def. Ex. B at 39, lines 5-9. All officers are hired as patrol officers which is their primary duty. Def. Ex. B at 106, lines 3-18; Def. Ex. H.

7.      Part-time officers did not earn "comp" time or paid time-off like full-time officers. Def. Ex. B at 75 (lines 6-20), 79-80, and 81 (lines 3-4). Part-time officers were not eligible to work overtime, and Chief White could not recall any part-time officer working overtime under his administration. Def. Ex. B at 49, 101 (lines 12-16).

8.      When plaintiff started with the police department, she was told that part-time officers were assigned "as needed". At the time of her hire, plaintiff in fact understood that part-time officers were assigned hours "as needed". Def. Ex. A at 46 (lines 7-9), 50 (lines 10-18).

9.      Plaintiff has read MPD General Order 39.1 (entitled "Part-Time Officers Program"), which accurately describes the duties of a part-time officer and limits part-time officer hours per week to 30. Def. Ex. H; Def. Ex. A at 48-49 (lines 1-11). Section 39.1.3., subsection B, of the General Order states:

"all part-time officers are required to be available to work a minimum number of duty hours per week determined and set by the Chief of Police to fulfill department needs[.]" Def. Ex. H; Def. Ex. A at 50, lines 12-24.

10.    Markham City Ordinance, Section 33.19, entitled "part-time police officers", states part-time officers shall not work more than 30 hours per week. Def. Ex. I, sect. C.14.; Def. Ex. A at 51, lines 1-16.

11.    Prior to his becoming Police Chief in October 2018, Chief White generally believed that plaintiff had training sufficient to be a part-time officer, but he also believed that she could have asserted herself more. Chief White believed that her interactions with staff and citizens were "lacking" and that she did not seem compelled to help others when asked to do so. Def. Ex. B at 36 (lines 2-16), and 40 (lines 1-24)- 41 (lines 1-21). Following his appointment as Police Chief, his opinion of plaintiff as a sub-par part time officer did not change. Def. Ex. B at 43, lines 1-18.

**Anti-Discrimination Policy and Training in the Department**

12.    The police department underwent annual training regarding sexual harassment and discrimination. Def. Ex. B at 70 (lines 9-22)- 71 (lines 1-22).

13.    Although plaintiff could not recall whether she was given an anti-harassment or anti-discrimination policy at the time she was hired, plaintiff signed a declaration that she had been issued a workplace anti-harassment statement by the City on January 4, 2010. Def. Ex. A at 52 (lines 10-24)-53 (lines 1-17). Plaintiff attended and received a certificate for training entitled "Workplace Harassment: The Real Deal" on March 22, 2017. Def. Ex. A at 54, lines 8-24. Plaintiff recalled receiving other anti-harassment and anti-discrimination training from the police department, but she could recall how often or the last time she received such training. Def. Ex. A at 55, lines 9-23.

**Plaintiff's Discrimination Claims**

**14.**     Chief White denied ever making any employment-related decision involving plaintiff on the basis of plaintiff's sex. He denied ever retaliating against plaintiff. Def. Ex. B at 82, lines 1-12.

**Change in Scheduling and Hours**

**15.**     In her initial IDHR Charge, plaintiff complained about a reduction of her work hours that occurred after Terry White was appointed Police Chief (in or near October 2018). Def. Ex. D; Def. Ex. A at 88 (lines 3-21)-89 (lines 3-21). In her IDHR questionnaire response, plaintiff complained that her hours were reduced from 32 to 24 per week by Chief White on or about October 18, 2018. Def. Ex. D; Def. Ex. A at 89-90; 92 (lines 23-24)-93 (lines 1-8).

**16.**     When plaintiff was hired by the MPD, she told the police administration that she could not work Mondays through Wednesdays. The department administration was agreeable to that schedule. She needed to care for her daughter those days. Def. Ex. A at 58, lines 1-20. Whenever her work availability changed, plaintiff was required to submit that in writing to the department administration. Def. Ex. A at 61 (lines 3-24)-62 (lines 1-19).

**17.**     Someone in the administration would ask about her availability for work in the coming months, but she could not recall any specifics about with whom she spoke about scheduling. Def. Ex. A at 64-65 . The department administration would just tell her when she was scheduled to work, and if she had a conflict due to lack of childcare, she just showed up to work. Def. Ex. A at 63, lines 7-24.

**18.**     Plaintiff recalled that she had been told part-time officers could not work more than "32 hours" per week, but she could not recall who told her that. Def. Ex. A at 47 (lines 6-16), 51 (lines 12-21).

19.     When appointed, Chief White was aware of the laws and City ordinances limiting the weekly hours part-time officers could legally work to a maximum of 30 hours. Def. Ex. B at 48 (lines 18-24), and 87 (lines 18-24)- 88 (lines 1-16). With respect to the hours that part-time officers worked, Chief White testified that when he became Police Chief, one of his objectives was to ensure compliance with the law. Def. Ex. B at 49 (lines 8-15), 88 (lines 15-24), and 89 (lines 1-11).

20.     Chief White believed the prior police administration may have allowed part-time officers to work more than 30 hours, and he brought the police department, including all part-time officers, into compliance with laws governing employee hours. Def. Ex. B at 88 (lines 7-24)- 89 (lines 1-11).

21.     Plaintiff believes she had a conversation with Chief White after a change in her hours, and Chief White responded he did not need to notify her of a change. Def. Ex. A at 94 (lines 14-24)- 95 (lines 1-19). No one had a discussion with her about a state law limiting part-time officers to 30 hours per week. Def. Ex. A at 106, lines 4-10. Plaintiff did not believe that Chief White owed her an explanation when he reduced her hours. Def. Ex. A at 107, lines 13-18.

22.     Plaintiff identified three other part-time officers (all male officers) in the department: Gerald Jackson, Derrick Singleton and Fernando Valenzuela. Def. Ex. A at 97 (lines 9-22), 101 (lines 8-22)- 102 (lines 1-6). Plaintiff believed that no one else's hours were reduced after she saw the work schedule posted listing the schedule for the other part-time officers. She could not recall any other details about the schedule. Def. Ex. A at 96 (lines 1-18)- 97 (lines 1-8).

23.     Plaintiff talked to part-time Officer Singleton about his coming back from a vacation around that time, but she did not have any other conversations with him about work hours. Def.

Ex. A at 98 (lines 12-24)- 99 (lines 1-23). At some point part-time Officer Jackson told her that his hours were not reduced. Plaintiff recalls being aware that Jackson was becoming a full-time officer so she congratulated him. Def. Ex. A at 99 (line 24)- 100 (lines 1-24). She could not recall any other details about the timing or the content of the conversation with him other than it was after October 18, 2018. Def. Ex. A at 101, lines 2-7.

24.     Regarding part-time Officer Fernando Valenzuela, plaintiff did not know whether his hours were reduced at that time. Def. Ex. A at 101, lines 8-19).

25.     She was the only female part-time officer at the time her hours were reduced, but, other than that, plaintiff could not identify any other basis for her claim that Chief White's decision was based on her sex. Def. Ex. A at 102 (lines 8-23)- 103 (lines 1-6).

### "Promotion" to Full-Time Officer

26.     Plaintiff's claim in her complaint that a male officer should not have been promoted over her refers to part-time Officer Gerald Jackson becoming a full-time officer. Def. Ex. A at 108, lines 9-22.

27.     Plaintiff believes that she was more qualified than Jackson for a full-time position because she was hired first and because she believed that her transition to – and certification as – a full-time officer would only require a "refresher" course while Jackson would need to attend the full-time police officer academy. Plaintiff believed that a part-time officer normally could take a 2-week refresher course to be certified full-time if the department authorized it. Def. Ex. A at 113 (lines 1-20)- 144 (lines 1-20). Plaintiff recalled that Jackson told her he would have to go to the full-time academy to be certified a full-time officer. Plaintiff could not recall any other reasons

that she was more qualified than Jackson for a full-time position other than she believed worked there longer too. Def. Ex. A at 116 (lines 1-24), and 118-119 (lines 4-11).

28.     Plaintiff believed that Jackson had previously failed a full-time officer certification exam based on what Jackson had told her. She could not recall any other details about when Jackson told her that, but it was "years" ago. Def. Ex. A at 112, lines 2-23.

29.     Plaintiff recalled hearing Chief White say that women should not be police officers, and that is the reason she thinks her not receiving a "promotion" to full-time officer was sex discrimination. Def. Ex. A at 118 (lines 12-24)- 119 (line 1). Plaintiff explained that she did not hear this directly from Chief White. She recalled overhearing Chief White make this comment to another person, but she could not identify the time or date she heard it or the person to whom Chief White made the statement. Def. Ex. A at 212 (lines 4-24), 213 (lines 1-23)- 214 (lines 1-12).

### Change in Various Patrol Officer Assignments

30.     Plaintiff's claims about being removed from various assignments based on her sex refer to officer assignments at the Senior Center, the City roller rink, and City Hall. Def. Ex. A at 119, lines 4-22.

### City Hall

31.     The city hall assignment traditionally involved having a part-time officer sit outside of the mayor's officer as a security measure. At one point, it changed to also include sitting outside of the Water Department to help civilian staff dealing with angry residents. Def. Ex. B at 104, lines 13-24. This was a day-to-day assignment and not formally appointed duty or job. Def. Ex. B at 47, lines 1-7.

**32.**     Plaintiff recalled the city hall assignment consisted of opening and closing city hall and sitting there during the day. She could not recall when she started working that assignment. Def. Ex. A at 119 (lines 21-24)- 120 (lines 7-9). "City hall" was a Monday through Friday assignment. Plaintiff did know who worked the city hall assignment on shifts for which she was not present. Def. Ex. A at 122, lines 19-24.

**33.**     Plaintiff believes that Chief White removed her from the city hall assignment in 2019. She recalled learning of the change when the department schedule was posted. Def. Ex. A at 120 (lines 16-24)- 121 (line 1). She never had a conversation with Chief White about the change. Def. Ex. A at 120, lines 16-24.

**34.**     Chief White recalled that it was his predecessor, Chief Sanders, who removed plaintiff from that assignment due to poor performance because she had not been letting municipal employees into city hall on-time to punch-in for work. Def. Ex. B at 105, lines 10-21. Plaintiff was assigned to "patrol" duties by Sanders. Def. Ex. B at 42 (lines 13-19), and 105 (lines 10-21)- 106 (lines 3-18). Chief Sanders and a sergeant had looked into the complaints from city hall employees, and Chief Sanders decided that plaintiff would no longer work that assignment. Def. Ex. B at 105, lines 10-21.

**35.**     No officer has been assigned to work or sit at city hall since Chief Sanders' decision to not allow plaintiff that assignment. Def. Ex. B at 105, lines 14-23. To plaintiff's knowledge, no other officer received that assignment after she was removed from it. Def. Ex. A at 123, lines 7-12. Plaintiff did not lose any pay as a result of her not working the city hall assignment. Def. Ex. B at 107, line 1.

**Municipal court call**

**36.** The city court call in Markham generally adjudicated local ordinance and other cited violations, such as red-light camera violations, one day per month starting at 9 am until the call was finished. Def. Ex. B at 98, lines 1-23; Def. Ex. A at 124, lines 1-18. Initially, that was not a patrol division assignment, but to help with crowd control and the upset people coming for the court call, the officer who was assigned to work the city hall assignment eventually began to cover the city court call. Def. Ex. B at 98, lines 2-17; Def. Ex. A at 125, lines 2-7. As the crowds became more unruly, a decision was made to place a separate, more aggressive officer there for the court call. Def. Ex. B at 98, lines 2-17.

**37.** Chief White, prior to his becoming Police Chief, had been assigned to investigate a time falsification complaint against plaintiff while she was working the city court call. Plaintiff was suspected of leaving her on-duty assignment during working hours to contest a personal traffic ticket that she had received, and he did recommend discipline of her after investigating the claim. Def. Ex. B at 41-42. Chief White also was present for a court call on behalf of the City prosecution on one occasion when plaintiff was the assigned officer for the court call. When the crowd became "out of control", Chief White witnessed plaintiff fail to take any action. Def. Ex. B at 100 (lines 1-24)- 101 (lines 1-8). As a result, Chief White decided that plaintiff would not be assigned to the city court call thereafter. Def. Ex. B at 101, lines 1-8.

**38.** Plaintiff was placed back on regular "patrol". Def. Ex. A at 129, lines 1-20. Plaintiff never had a conversation with anyone about the change, and she did not ask anyone about it. Def. Ex. A at 128, lines 1-14.

**39.** Plaintiff recalled that Officer Gerald Jackson started handling the city court assignment. Def. Ex. A at 126, lines 1-19. Plaintiff believed that if Officer Jackson had not already been

scheduled to work on the day of the court call, he would cover the assignment and then earn overtime. Def. Ex. A at 127, lines 1-5.

40.     Chief White agreed Officer Jackson was sometimes assigned to the city court call, but not for the purpose of allowing him to earn overtime. Def. Ex. B at 101, lines 9-16. As a part-time officer, Jackson, like all part-time officers, was not eligible to work or earn overtime. Def. Ex. B at 101, lines 9-16.

### Senior Building

41.     Regarding the Senior Building assignment, it was not a permanent assignment. Either full-time or part-time officers could be assigned to work there by the police department on a day-to-day basis. It was not a permanent detail. Def. Ex. B at 96, lines 4-19; Def. Ex. A at 133, lines 18-23. Officers assigned there for their respective shifts would essentially work as security guards for the Senior Center building. A different officer would be assigned there for each shift (eight hours) each day of the week. Def. Ex. B at 96, lines 4-19.

42.     When she worked at the Senior Building assignment, plaintiff would review recordings of municipal red-light traffic violations. Def. Ex. A at 129 (lines 21-224)- 130 (lines 1-21). Someone from the department administration told her she was removed from the assignment, but she could not recall when or who told her that. Def. Ex. A at 131 (lines 22-24)- 132 (lines 1-19). She believed her removal from the center was sexual discrimination because she was the only female sitting there and because she got along well with the residents. Def. Ex. A at 133, lines 1-3. Plaintiff could not recall any officer who replaced her in the assignment. Def. Ex. A at 133, lines 4-17.

**43.**     Prior to his becoming Police Chief (in October 2018), Chief White was aware of complaints made at the police department about plaintiff's conduct at the Senior Building. The complaints generally involved allegations of unprofessional conduct against plaintiff, including arguments she had with certain nurses and senior residents, but he was not involved in interviewing complainants. Def. Ex. B at 41 (lines 3-7) and 97 (lines 2-18).

**44.**     Chief White did not remove plaintiff from any assignment at the Senior Building. Chief White believes that his predecessor, Chief Sanders, made that decision based on the complaints of plaintiff's unprofessional conduct. Def. Ex. B at 47 (lines 11-23) and 97 (lines 2-18).

**45.**     Plaintiff did not lose any compensation as a result of not working at the Senior Center. Def. Ex. B at 107, lines 1.

### Roller Rink

**46.**     The City acquired a roller rink in 2016 or 2017, and part-time officers were traditionally assigned to work there. Def. Ex. B at 101 (lines 17-24)- 102 (lines 1-6). It was a Saturday evening-only assignment for department officers that started at 8 pm and lasted four hours. Def. Ex. B at 101-102 (lines 1-6); Def. Ex. A at 134-35 .

**47.**     Plaintiff recalled being assigned to work at the roller rink, but she could not recall how many times she was assigned there or the time-period that she worked there. Def. Ex. A at 135 (17-24)- 136 (lines 1-19). Plaintiff could not identify when she was removed from the assignment. Def. Ex. A at 136 (20-24)- 137 (1-24). No one told her about the change, and she first saw the change on the shift schedule. Def. Ex. A at 136 (20-24)- 137 (1-24). Plaintiff recalled receiving "comp" time for working the roller rink assignment. Def. Ex. A at 143, lines 3-23.

48.     Chief White recalled reports of plaintiff getting "into it" with juveniles when she had handled the roller rink assignment. Def. Ex. B at 41, lines 3-7. While Chief White was aware that staff at the roller rink had previously complained about plaintiff sitting in her squad car and not getting involved, he never specifically removed from the roller rink assignment. Plaintiff did not want to work Saturdays. Def. Ex. B at 102, lines 7-24.

49.     On October 18, 2018, after plaintiff received a department inquiry about her available work schedule, she submitted a memo to Chief White, stating that she was available to work Mondays through Thursdays from 7:45 am to 4 pm. Def. Ex. J; Def. Ex. A at 66, lines 1-23. She was not available Fridays, Saturdays, and Sundays due to child-care needs for her daughter. Def. Ex. A at 67 (lines 1-10), 144 (lines 9-12). Chief White also recalled that plaintiff had submitted a "to/from" memo to the department stating that she could not work Saturdays. Def. Ex. J; Def. Ex. B at 47 (lines 14-23)- 48 (lines 1-8), and 102 (lines 15-24). Because plaintiff declared she was unavailable for work on Saturdays, the department did not assign her to the roller rink thereafter. Def. Ex. B at 47 (lines 14-23)- 48 (lines 1-8), and 102 (lines 15-24).

50.     Plaintiff suspected that Officer Gerald Jackson received the assignment because of his support for the Markham Mayor's political campaign and friendship with Chief White. Jackson told her that he was friends with the Mayor and that the Mayor and Chief White owed him. Def. Ex. A at 138 (lines 4-24)- 140 (lines 1-23).

51.     Chief White recalled that while Officer Jackson would be assigned to the roller rink, he never earned overtime working there. Def. Ex. B at 103 (lines 2-19)- 104 (lines 7-12). If Jackson was working the roller rink assignment, the department adjusted his schedule to make sure he did not work more than 29 hours in the week. Def. Ex. B at 104, lines 7-12.

**Denied Paid Time-Off**

52.  Plaintiff identified three instances in her interrogatory answers when she claims that she was unfairly denied use of comp time: March 17, 2018, Christmas of 2018, and June 2018. Plaintiff denied being aware of other instances. Def. Ex. A at 168, lines 1-22; Def. Ex. K at No. 14. Plaintiff could not recall why she included three specific instances in her answer to the interrogatory seeking identification of all instances in which she was denied use of paid time-off. Def. Ex. A at 171, lines 1-20; Def. K at Nos. 14-15.

53.  With respect to her March 17, 2018 request, plaintiff could not recall whether or not that request was approved. Def. Ex. A at 170, lines 1-21. Similarly, plaintiff could not recall whether or not her other identified paid time-off requests were denied. Def. Ex. A at 171, lines 1-20. Plaintiff denied possessing any knowledge about specific male officers and whether or not they were approved to use comp time.  Def. Ex. A at 173, lines 15-18.

54.  Plaintiff believes that she had "comp" time banked and available to use for time-off on each occasion. Def. Ex. A at 172, lines 2-11. Plaintiff could not recall whether she ever had comp time approved by the department. Plaintiff could not identify anything that would refresh her memory on that issue. Def. Ex. A at 173 (lines 19-24)- 174 (lines 1-4).

55.  Someone from the department administration told her she did not have comp time available, but she could not recall who said that. Def. Ex. A at 172, lines 2-24. Plaintiff made these a part of her claim because she believed other officers were allowed to use comp time and she was not. Def. Ex. A at 173, lines 1-18.

56.  Chief White became aware of plaintiff's requests to use banked comp time. Her requests usually came around Christmas and the holidays. His administration investigated the timekeeping

procedures, and he concluded that no such "comp time" benefit existed for part-time officers. Def. Ex. B at 109, lines 1-22. They looked into whether the prior police chief's administration had allowed part-time officers to "bank" time and use it. Def. Ex. B at 74, lines 1-20.

57. If plaintiff could prove that the prior administration had allowed her to "bank" time, then Chief White let her use that time. Def. Ex. B at 74 (lines 1-20)- 76 (lines 15-22). Chief White allowed plaintiff to take time-off if she wanted it, but any denial of a request by plaintiff to use "paid" time-off was based on the fact that plaintiff did not have banked or comp time available to her. Def. Ex. B at 110, lines 1-11.

58. No denial of plaintiff's paid time-off requests was based on discrimination or retaliation against her. Def. Ex. B at 110, lines 1-11. Plaintiff was the only part-time officer Chief White could recall claiming to have earned or banked "comp" time. Def. Ex. B at 78, lines 7-17.

### Termination on July 3, 2019

59. Prior to her termination from the police department, plaintiff and the whole department were talking about rumors of changes and terminations. Plaintiff did not know the basis of those rumors. Def. Ex. A at 174 (lines 11-24)- 175 (lines 1-11).

60. Plaintiff later received a letter, dated July 3, 2019, from Chief White, and that was her first formal notice of her termination. The letter from Chief White referenced her position was cut due to City budget cuts. Def. Ex. L; Def. Ex. A at 175 (lines 12-24), 177 (lines 5-19). Her last day was July 3, 2019. Def. Ex. A at 177, lines 5-8. Plaintiff never had a discussion with Chief White about the letter or termination. Def. Ex. A at 177, lines 16-19.

61. Plaintiff believes her termination was retaliation because she thought the City had just received her initial IDHR Charge when all of the talk about changes started, and the City then let

go the part-timers except for Jackson. Def. Ex. A at 181, lines 3-14. Plaintiff denied having any other basis for her belief that her termination was retaliation. Def. Ex. A at 184, lines 5-16.

**62.** The City's human resources department sent plaintiff a proposed "Agreement and General Release" that she received sometime after July 3, 2019. Def. Ex. A at 193 (lines 16-24), 194 (lines 1-24), and 195 (lines 1-14); Def. Ex. M. Plaintiff had a conversation with "Ashley" in human resources about it when the signed release was due back. Plaintiff did not have any other conversations about it. Def. Ex. A at 194 (lines 21-24)- 195 (lines 1-23). Plaintiff did not sign it, and no one from the City ever followed-up with her about it. Def. Ex. A at 196 (lines 19-24)- 197 (lines 1-6). The Agreement also states that plaintiff's part-time position was eliminated. Def. Ex. M (see introduction paragraph and sect. I).

**63.** Chief White did not have any personal knowledge about the City's decision to eliminate the part-time police officer positions. Def. Ex. B at 50, lines 1-23. Chief White confirmed he had not been asked for any input or opinion on that decision, and he did not offer an opinion. Def. Ex. B at 50, lines 1-23. He was told that the City Council and City Treasurer had determined that the funds for the position were not available. It was an independent decision by the municipality due to fiscal constraints. Def. Ex. B at 50, lines 1-23.

**64.** Plaintiff recalled there were three part-time officers at that time: her, Jackson, and Valenzuela, but she did not recall having a conversation with them at the time. Def. Ex. A at 178, lines 2-14. Part-time Officer Valenzuela also was laid-off from Markham as he later confirmed to plaintiff when they both subsequently worked at the Harvey Police Department. Def. Ex. A at 182 (lines 1-24)- 183 (lines 1-9). Plaintiff believes that Officer Jackson was the only part-time officer allowed to continue working at Markham. Def. Ex. A at 178, lines 18-24. Plaintiff recalled later

having conversations with Jackson, and she recalled that Jackson said he was becoming a full-time officer. Def. Ex. A at 179 (lines 1-24)- 180 (lines 1-24).

**65.** Chief White was informed that the City Council had previously reached a settlement agreement with part-time Officer Gerald Jackson to restore him to full-time status to settle a discrimination claim Jackson had filed with IDHR. Jackson's claim involved a prior police administration's alleged treatment of him, but Chief White did not know the full details. Def. Ex. B at 51 (lines 11-24)- 52 (lines 1-22), and 92 (lines 1-24). Jackson was not able to obtain a full-time officer certification from the Illinois Law Enforcement Trainings and Standard Board, and he was not kept as a full-time officer by the City. Def. Ex. B at 51-52, 92 (lines 1-24)- 93 (lines 1-24). The Training and Standards Board establishes the minimum training and other applicable requirements and certifications for both part-time and full-time police officers in Illinois. Def. Ex. B at 86, lines 11-22.

**66.** Officer Gerald Jackson lost his part-time position at the same time plaintiff and all the other part-time officers lost their positions. Def. Ex. B at 93, lines 13-24. Chief White recalled there were 4 or 5 part-time officers at the time the position was eliminated in July 2019 due to fiscal constraints. Def. Ex. B at 51 (lines 1-10), and 58 (lines 19-24)- 59 (lines 1-22).

**Active Shooter "Training"**

**67.** Part of plaintiff's discrimination claim is that she was not allowed to participate in an "active shooting" drill for the police department. This drill was held at the beginning of 2019, and only certain officers were allowed to participate. Def. Ex. A at 185 (lines 2-24)- 186 (lines 1-17). The event involved coordinating with a school in session and simulating an active shooter situation in the classroom. Def. Ex. A at 185, lines 9-16.

**68.**    The police department and schools had conducted this drill on prior occasions, and plaintiff previously participated in them. Def. Ex. A at 186 (lines 18-24)- 187 (lines 1-6). Plaintiff could not recall the exact dates or how many times she had participated in active shooter drills for the department. She had participated in the drill on more than one occasion. Def. Ex. A at 189, lines 10-22.

**69.**    This was an event officers participated in and not considered "training." Def. Ex. B at 72 (lines 10-24)- 73 (lines 1-5). There were no set rules regarding running these events. Def. Ex. B at 72, lines 10-24. Typically, the day-shift officers from the department would participate because they would be the officers to respond to a real school-related incident. Def. Ex. B at 72, lines 10-224. The last few active shooter drills in which the department participated involved members of the department's SWAT team, tactical officers and instructors because a response required officers with knowledge and experience entering buildings and hallways, encountering multiple wounds, can close quarter combat situations. Def. Ex. B at 107 (lines 2-24)- 108 (lines 1-17).

**70.**    Plaintiff believes the 2019 drill was staffed with Caucasian officers who were "cool" with Chief White. Def. Ex. A at 187 (lines 11-24)- 188 (lines 1-14). She believes that part-time Officer Jackson was allowed to participate in the 2019 drill too. Def. Ex. A at 188, lines 18-23. Plaintiff was not aware that any female officers in the department were a part of the 2019 drill based on a consensus of the five or six female officers in the department at the time. Def. Ex. A at 191, lines 1-19.

**71.**    Chief White denied ever declaring female officers could not, or should not, be involved in the drills, especially because any officer might have to be involved in a real response. Def. Ex. B

at 108, lines 15-20. Chief White denied ever stating that plaintiff should not be involved because she is a woman or as retaliation against her. Def. Ex. B at 108, lines 15-20.

**Harassing or Belittling Language**

72.    Plaintiff heard Chief White say directly to her "are you supposed to be the police?". She could not recall the exact time of the comment or whether she asked Chief White what he meant. Def. Ex. A at 200 (lines 10-24)- 201 (lines 1-24). Plaintiff could not identify if this comment was made on more than one occasion or if there were others present. Def. Ex. A at 201, lines 1-24.

73.    Plaintiff overheard Chief White say "women are not supposed to be the police." She heard him say this in the police department, but she could not recall the date or any general timeframe. Plaintiff did not recall any other specifics about the comment, including who else was present or the circumstances in which the comment was made. Def. Ex. A at 202 (lines 6-24)- 203 (lines 1-12), and 212 (lines 6-23).

74.    Plaintiff heard Officer Matthew Carey (male) called her "ignorant" on one occasion. This was in the department during an argument when Officer Carey interjected in a conversation plaintiff was having with Officer Short. Plaintiff felt that was unacceptable because Officer Carey is a man. Def. Ex. A at 204 (lines 4-18), 207 (lines 4-22). Plaintiff was ordered to write a to/from memo about the incident. Plaintiff addressed the memo to Lt. Eric Blohm, dated April 10, 2019. Plaintiff explained in the memo that she and Officer Short were in engaged in "fun banter" when Carey, who had been on the prior shift, came in and started saying derogatory things to her while towering over her as she sat in a chair. Def. Ex. N; Def. Ex. A at 204-05 (lines 5-24), 208 (lines 2-20).

**75.** Plaintiff heard Chief White, after his appointment as Police Chief, say at a department roll call this will be a "nightmare" for some of you, but for others it will be great. Def. Ex. A at 210, lines 6-24. Chief White was addressing the whole shift, but plaintiff felt that he was addressing her. Def. Ex. A at 211, lines 1-13. Plaintiff did not have a conversation with Chief White regarding what he meant. Def. Ex. A at 211, lines 14-24. Plaintiff felt that Chief White was coming in with a vengeance against anyone who did not support him in his prior legal dealings against the City. Def. Ex. A at 212, lines 4-20.

**76.** Chef White denied ever referring to plaintiff as "stupid", stating that plaintiff should not be a police officer, stating that women in general should not be police officers, and stating that he would make the job unbearable for female police officers. Def. Ex. B at 60 (lines 1-24), 68 (lines 14-24), and 69 (line 1). Chief White denied ever disparaging female officers. Def. Ex. B at 68 (lines 14-24), and 69 (line 1).

**Starting employment at the Harvey Police Department on July 4, 2019**

**77.** She submitted an application for employment to Harvey in June 2019, prior to her separation from Markham. Def. Ex. A at 23 (lines 10-21), 34-36. Thereafter, also in June 2109, plaintiff was interviewed by Harvey Police Chief Winters. She was asked about working part-time, but she could not recall any other specific discussion about Markham during the interview. Def. Ex. A at 25 (lines 1-17), 29 (lines 4-16), and 31 (lines 2-20). Still in June 2019, plaintiff again met in-person with Chief Winters, and she was offered the full-time officer position. She accepted the offer, and she was given a start date of July 4, 2019 (the day after she was given a letter from Chief White stating her part-time position was eliminated). Def. Ex. L; Def. Ex. A at 32 (lines 3-23)- 33 (lines 1-10).

78. Chief Winters told plaintiff sometime in October 2019 that Chief Terry White had called him about her employment there. Def. Ex. A at 37-39 (lines 1-22). Chief Winters generally stated to plaintiff that he was not going to believe anything that Chief White said about her and that he believed she was a good police officer. Chief Winters has not referenced Chief White on any other occasion. Def. Ex. A at 37 (lines 14-22), 39 (lines 1-4). She believes that whatever Chief White said about her was "bad", but she does not have any other details. Def. Ex. A at 39, lines 9-22.

79. Chief White learned plaintiff had been hired by the Harvey Police Department months after she started there. Def. Ex. B at 63, lines 14-24. Chief White denied calling Chief Winters about plaintiff. Def. Ex. B at 64 (lines 20-24)- 65 (lines 1-7).

**Damages**

80. Plaintiff described experiencing "occasional stress, headaches, and sleeplessness" that only occurred whenever something about Markham came up. Def. Ex. A at 226 (lines 2-21), 228 (lines 1-4).

Respectfully submitted,
DEFENDANT CITY OF MARKHAM

*/s/ Michael J. Hayes*

One of its attorneys

Michael J. Hayes Jr.
Odelson, Sterk, Murphey, Frazier
& McGrath, Ltd.
3318 W. 95th St.
Evergreen Park, IL 60805
(708) 424-5678
mhayes@osmfm.com