**1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
KYUNG PALMER,              )
                          )
            Plaintiff,     )
                          )
      vs                   ) No. 20 CV 2603
                          )
CITY OF MARKHAM and TERRY  )
WHITE,                     )
                          )
            Defendants.    )
```

The deposition of KYUNG PALMER called

for examination pursuant to notice and pursuant to

the Federal Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions taken before MARI BETH KAWULIA,

Certified Shorthand Reporter within and for the

County of Cook and State of Illinois at 3318 West

95th Street, Chicago, Illinois, on July 28, 2021 at

the hour of 10:00 a.m.

MAUREEN K. NAGLE, CSR (708) 837-9883

---

**2**

1  APPEARANCES:
2    SAMUELS & ASSOCIATES, LTD
     MS. JEANETTE SAMUELS
3    3440 South Cottage Grove
     Suite 504
4    Chicago, Illinois 60616
     (872) 588-8726
5    sam@chicivilrights.com
     Appeared on behalf of the Plaintiff;
6
7    ODELSON STERK MURPHEY FRAZIER McGRATH, LTD
     MR. MICHAEL J. HAYES
8    3318 West 95th Street
     Evergreen Park,Illinois 60805
9    (708) 424-5678
     mhayes@osmfm.com
10      Appeared on behalf of the Defendant City
        of Markham;
11
12   DEL GALDO LAW GROUP, LLC
     MR. SEAN M. SULLIVAN
13   1441 South Harlem Avenue
     Berwyn, Illinois 60402
14   sullivan@dlglawgroup.com
        Appeared on behalf of the Defendant
15      Terry White.
16
17
18
19
20
21
22
23   REPORTED BY: MARI BETH KAWULIA
     CSR LI
24

DEFENDANT
EXHIBIT

A

---

**3**

1

2              I N D E X

3  WITNESS:

4  KYUNG PALMER

5    Direct Examination by Mr. Hayes............4
     Direct Examination by Mr. Sullivan.......240
6    Cross Examination by Ms. Samuels.........280
     Further Direct by Mr. Hayes.............286
7    Further Direct by Mr. Sullivan.........287
     Further Cross by Ms. Samuels...........289
8    Further Direct by Mr. Sullivan.........291

9  EXHIBIT                         PAGE

10   No. 1                          36
     No. 2                          19
11   No. 3                          71
     No. 4                          89
12   No. 5                          223
     No. 6                          43
13   No. 7                          52
     No. 8                          54
14   No. 9                          51
     No. 10                         48
15   No. 11                         145
     No. 12                         65
16   No. 13                         166
     No. 14                         204
17   No. 15     (didn't introduce)
     No. 16                         175
18   No. 17                         193
     No. 18                         197
19

20

21

22

23

24

---

**4**

1              (Witness duly sworn.)

2  WHEREUPON:

3              KYUNG PALMER,

4  called as a witness herein, having been first duly

5  sworn, was examined and testified as follows:

6              DIRECT EXAMINATION

7  BY MR. HAYES:

8      Q.    Would you state and spell name for the

9  record, please?

10 A.    Kyung Palmer.  First name K-y-u-n-g.

11 Last name P-a-l-m-e-r.

12         MR. HAYES:  Let the record reflect this

13 is the deposition of the Plaintiff, Kyung Palmer,

14 taken pursuant to notice and pursuant to the

15 Federal Rules of Civil Procedure and the applicable

16 local district rules.

17 BY MR. HAYES:

18     Q.    We have three basic ground rules I will

19 go through real quickly.  If you would please

20 remember to give verbal, audible responses, not

21 just gestures to my questions.  We need the verbal

22 response to translate to the written record which

23 you can see is being taken word for word here.

24         Second, you may anticipate what I'm

---

**5**

1 asking, but allow me to finish the question before
2 you begin your answer and I'll try and do the same
3 for you so we're not talking over each other and
4 making it difficult on our court reporter or making
5 a messy record.
6          Number three, if I ask a question
7 that's confusing, you don't know where I'm coming
8 from, please just let me know and I'll do my best
9 to rephrase it, okay?
10:06AM 10      A.    Okay.
11      Q.    Have you taken any medication today that
12 would affect your memory of, you know, your lawsuit
13 and the events we're going to be talking about that
14 stretch back over the last few years?
15      A.    No.
16      Q.    And what did you do to prepare for
17 today's deposition?
18      A.    Today?
19      Q.    At any time in anticipation for today.
10:07AM 20 Did you talk to anyone?  Did you look at any
21 documents?
22      A.    Spoke with my attorney about --
23          MS. SAMUELS:  Don't talk about what we
24 talked about.

**6**

1 BY MR. HAYES:
2      Q.    Yes.  I'm not interested in any details.
3 Other than speaking with your attorney, did you
4 speak with any other people about today's
5 deposition?
6      A.    No.
7      Q.    Just so I can be specific and make sure,
8 I'm going to just read off some names and make sure
9 whether you have or haven't talked to them in
10:07AM 10 anticipation for today's deposition, okay?
11      A.    Okay.
12      Q.    Dawson?
13      A.    No.
14      Q.    The Tolberts, either Roy or Domenica?
15      A.    No.
16      Q.    Muldrow?
17      A.    No.
18      Q.    Dashun Walker?
19      A.    Dashun.
10:07AM 20      Q.    Dashun, is that it?
21      A.    Yeah.  No.
22      Q.    Monique Woods?
23      A.    No.
24      Q.    You haven't talked to any of them prior

**7**

1 to coming today to discuss your case or about this
2 deposition?
3      A.    No.
4      Q.    Any documents that you looked at or
5 reviewed?
6      A.    Just the ones from my attorney.
7      Q.    You went over some documents with your
8 attorney?
9      A.    Yes.
10:08AM 10      Q.    Do you recall which -- what documents
11 those were?
12      A.    No.
13      Q.    When did you meet with your attorney,
14 again without giving me any specifics about what
15 you talked about?
16      A.    Last week.  I talked to her last week.
17      Q.    In that meeting you looked at some
18 documents with your attorney?
19      A.    Yes.
10:09AM 20      Q.    You don't recall what any of those are?
21      A.    No.
22      Q.    Okay.  Let's talk about some of your
23 background before we get into the details of the
24 lawsuit.  What is your date of birth?

**8**

1      A.    March 17th, 1988.
2      Q.    And where do you currently live?
3      A.    East Hazel Crest, Illinois.
4      Q.    How long have you lived there?
5      A.    Over seven years.
6      Q.    Over seven years?
7      A.    Yes.
8      Q.    And are you married?
9      A.    No.
10:09AM 10      Q.    Do you have any children?
11      A.    Yes.
12      Q.    Can you just give me their names and
13 ages?
14      A.    Kameron Downs 13.  That's spelled with a
15 K.
16      Q.    Just one child?
17      A.    Yes.
18      Q.    And does Kameron live with you?
19      A.    Yes.
10:09AM 20      Q.    And high school, what high school did
21 you go to?
22      A.    Thornwood High School.
23      Q.    Thornwood?
24      A.    Uh-huh.

1   Q.   And you graduated from Thornwood?

2   A.   **Yes.**

3   Q.   What year was that?

4   A.   **2006.**

5   Q.   Did you attend any college after

6 Thornwood?

7   A.   **Yes.**

8   Q.   What college did you go to?

9   A.   **I went to South Suburban for two and**

10:10AM 10 **then I went to Governors State.**

11   Q.   You said South Suburban for two. For

12 two years?

13   A.   **Yes.**

14   Q.   And what years were those?

15   A.   **I don't recall.**

16   Q.   You graduated in '06 from Thornwood.

17 Did you go right into college or was there --

18   A.   **Yes.**

19   Q.   -- a gap? I don't need you to pinpoint

10:10AM 20 exactly, but sometime around 2007, 2008 you went to

21 South Suburban?

22   A.   **Yes.**

23   Q.   What did you study at South Suburban?

24   A.   **Pre-med and nursing.**

1   Q.   Pre-med and nursing?

2   A.   **Yes.**

3   Q.   Did you take any courses there related

4 to law enforcement or criminology, anything like

5 that?

6   A.   **At South Suburban?**

7   Q.   Correct?

8   A.   **No.**

9   Q.   In other words, nothing related to law

10:11AM 10 enforcement of any kind?

11   A.   **Not that I remember.**

12   Q.   And then you -- I'm sorry, you said

13 after that you went to?

14   A.   **Governors State.**

15   Q.   Governors State. And what years were

16 you at Governors State?

17   A.   **I don't recall.**

18   Q.   Did you go right into Governors State

19 after transferring from South Suburban? Transfer

10:11AM 20 might be the wrong word.

21   A.   **Not that I recall, no.**

22   Q.   Was it close in time? Was there a gap

23 of a few years between attending both of those

24 institutions?

1   A.   **There probably was a gap.**

2   Q.   Did you graduate or receive a degree

3 from Governors State?

4   A.   **Yes.**

5   Q.   What degree did you get?

6   A.   **Criminal justice bachelors.**

7   Q.   And do you recall what year you

8 graduated?

9   A.   **2014.**

10:12AM 10   Q.   And how many years did you attend

11 Governors State?

12   A.   **Two.**

13   Q.   At the time that you -- We'll get into

14 your experience with Markham, but to jump around a

15 little bit, you started with the Markham Police

16 Department in 2010; is that correct?

17   A.   **Yes.**

18   Q.   So your attendance at Governors State to

19 study criminal justice was after you started at the

10:12AM 20 Markham Police Department?

21   A.   **Yes.**

22   Q.   Okay. Other than your bachelors from

23 Governors State and outside of any training you

24 might have done with Markham, did you take any

1 other type of graduate courses or programs of any

2 kind?

3   A.   **In school?**

4   Q.   Right. Any other schooling outside of

5 the bachelors degree we just talked about. Did you

6 have any additional graduate studies of any kind?

7   A.   **No.**

8   Q.   What about any other type of technical

9 training or anything like that, certificates of any

10:13AM 10 kind?

11   A.   **Yes.**

12   Q.   You have had other training?

13   A.   **I'm state certified.**

14   Q.   Certified --

15   A.   **Police officer, full-time.**

16   Q.   So other than your profession as a

17 police officer.

18   A.   **No.**

19   Q.   Any other technical schools of any kind

10:13AM 20 or anything like that?

21   A.   **No.**

22   Q.   Do you have any military experience?

23   A.   **No.**

24   Q.   Okay. Again I'm going to focus prior to

1    your start with the Markham Police Department.
2    Take me through or list the employers that you
3    worked for in the timeframe before you started at
4    Markham, and if you want to go reverse
5    chronological order, you know, whatever makes sense
6    to you.
7        A.    **Before I started at Markham?**
8        Q.    Correct.
9        A.    **When I was at South Suburban, I did work**
10   **study.**
11       Q.    Can you stay that again?
12       A.    **While I attended at South Suburban, I**
13   **did work study.**
14       Q.    Work study?
15       A.    **Uh-huh.**
16       Q.    Where was that at?
17       A.    **At the school.**
18       Q.    At South Suburban?
19       A.    **Yes.**
20       Q.    And what field was the work study in?
21       A.    **Childhood education.**
22       Q.    Childhood?
23       A.    **Yes.**
24       Q.    Were you paid for that?

1        A.    **Yes.**
2        Q.    Do you recall what your pay was or
3    wage?
4        A.    **No.**
5        Q.    Any other employers that you had prior
6    to your start with Markham in that whatever how
7    many years before you started with the police
8    department?
9        A.    **I worked at daycare.**
10       Q.    You worked at daycare?
11       A.    **Uh-huh.**
12       Q.    And do you recall the name of the
13   facility you worked for?
14       A.    **No.**
15       Q.    Or company?
16       A.    **No. It's no longer out there.**
17       Q.    And do you recall where it was, what
18   location?
19       A.    **In Hazel Crest.**
20       Q.    Again this would have been before
21   starting with Markham?
22       A.    **Yes. I was in college.**
23       Q.    At South Suburban?
24       A.    **Yes.**

1        Q.    Okay. It appears that at some point,
2    while you were at South Suburban anyway, you were
3    looking to maybe go into education of some kind?
4        A.    **No.**
5        Q.    You were not?
6        A.    **No.**
7        Q.    Was there a purpose to taking the
8    childhood education study and working at the
9    daycare?
10       A.    **Yes.**
11       Q.    What was the purpose? What was your
12   goal?
13       A.    **My daughter.**
14       Q.    For your daughter?
15       A.    **Yes.**
16       Q.    So it wasn't for employment purposes, it
17   for rearing your child?
18       A.    **And employment.**
19       Q.    And employment. So it was to pay the
20   bills while you were raising your child?
21       A.    **Yes.**
22       Q.    Well, were you looking to continue in
23   education or child care at that point?
24       A.    **No.**

1        Q.    What were your long-term goals when you
2    were taking or working child care at South
3    Suburban? What were you pursuing a degree for
4    while you were attending at that time?
5        A.    **Nursing, to help people. That was my**
6    **goal, to help people.**
7        Q.    And at some point though you switched
8    from a potential career in nursing to law
9    enforcement?
10       A.    **Yes.**
11       Q.    Do you recall when that was?
12       A.    **About, I don't know, '07 or '08.**
13       Q.    How about just prior to working and
14   becoming employed by the Markham Police Department,
15   were you working somewhere else at the time that
16   you applied for employment with Markham?
17       A.    **No.**
18       Q.    You were not employed at that time?
19       A.    **Not that I recall, no.**
20       Q.    Prior to working for Markham, had you
21   ever been fired from any job?
22       A.    **No.**
23       Q.    And prior to starting with Markham, had
24   you worked any type of -- any other job, civilian

1    or otherwise, in a police department or with
2    another municipality?
3        A.    No.
4        Q.    How about any jobs that involved
5    security of any kind?
6        A.    No.
7        Q.    I think we had established that you
8    started at Markham in 2010. Do I have that
9    correct?
10:18AM 10   A.    Yes.
11       Q.    And at the time that you applied for
12   employment at the Markham Police Department, did
13   you apply to any other police departments at that
14   time?
15       A.    I don't recall.
16       Q.    Is there anything that would refresh
17   your memory about whether you applied to other
18   departments?
19       A.    No.
10:19AM 20   Q.    Just so I can followup on that line of
21   questioning, do you recall ever being turned down
22   or rejected by another police department prior to
23   getting employment with Markham?
24       A.    Yes.

1        Q.    You don't recall or --
2        A.    I don't recall.
3        Q.    Is there a particular reason why you
4    submitted an application for employment at Markham?
5        A.    Yes.
6        Q.    What was that?
7        A.    I grew up in the City of Markham.
8        Q.    You grew up there?
9        A.    Yes.
10:20AM 10   Q.    Were you living in Markham at the time?
11       A.    Yes.
12       Q.    When did you move to Hazel Crest? Do
13   you know the specific year?
14       A.    No.
15       Q.    Did you move directly from Markham to
16   Hazel Crest?
17       A.    No.
18       Q.    Where did you live? Where else did you
19   live?
10:20AM 20   A.    Richton Park.
21       Q.    Say it again, please.
22       A.    Richton Park.
23       Q.    You moved there while you were employed
24   with Markham, correct?

1        A.    Yes.
2        Q.    From Markham and then moved to Hazel
3    Crest at some point?
4        A.    Yes.
5        Q.    Are you employed right now?
6        A.    Yes.
7        Q.    Where are you employed?
8        A.    Harvey Police Department.
9        Q.    When did you start with Harvey?
10:21AM 10   A.    July of 2019.
11       Q.    Are you a full-time officer there?
12       A.    Yes.
13       Q.    You were hired as full-time?
14       A.    Yes.
15       Q.    And what's your salary at Harvey, your
16   present salary?
17       A.    Around 52,000.
18       Q.    You say around 52,000?
19       A.    Uh-huh.
10:21AM 20   Q.    Let me quickly take a look at what I
21   marked as City Exhibit 2 which is in front of you.
22   As we go forward, we'll be talking probably about
23   Nos. 1 and 2 the most, but if you take a look at
24   No. 2, which for the record is titled Plaintiff's

1    Response to Defendants' Interrogatories. I'm
2    going to direct you to Question 12, Question and
3    Answer 12.
4             First let me ask you while we're
5    doing this, would you take a look at the last page
6    of Exhibit 2? It might be easier if you take the
7    clip off there. There's a number of different
8    exhibits there so that might help if you flip it
9    around. Exhibit 2, that last page says
10:22AM 10   verification. Do you see that page?
11       A.    Yes.
12       Q.    Okay. There's a signature on that page,
13   right?
14       A.    Yes.
15       Q.    Okay. Is that your signature there?
16       A.    Yes.
17       Q.    And these interrogatory answers, did you
18   get a chance to review them before you put your
19   signature on that verification page?
10:22AM 20   A.    Yes.
21       Q.    So as we sit here, at the time you put
22   your signature on the verification, these answers
23   that you provided to these questions were true and
24   accurate; is that correct?

1    A.    Yes.

2    Q.    Back to Question and Answer No. 12. The

3    question was about employment and you referenced

4    the Harvey Police Department at $56,000 per year.

5    Do you see that there?

6    A.    Yes.

7    Q.    You just mentioned you thought you

8    earned 52,000. Do you recall which number it is?

9    A.    No, I don't know the amount.

10:24AM 10    Q.    Between those numbers, you couldn't tell

11    which one it is? Do you know why you came up with

12    56,000 there and are recalling 52,000 today?

13    A.    Because I looked on a website. I looked

14    on my income.

15    Q.    Okay. For when you answered the

16    interrogatories?

17    A.    What you mean?

18    Q.    Well, you referenced that you went on to

19    a website to look up your income. Is that when you

10:24AM 20    were answering these interrogatories?

21    A.    Yes.

22    Q.    And then the number -- I take it that

23    you saw the number 56,000 for your salary?

24    A.    For me.

1    Q.    Okay. Is that your present salary,

2    56,000 at Markham or, excuse me, at Harvey?

3    A.    As of today --

4    Q.    I don't need the exact cent, but you're

5    earning approximately 56,000?

6    A.    Yes.

7    Q.    Or at least that much?

8    A.    Yes.

9    Q.    And these answers, they were answered

10:25AM 10    approximately two years after you started at

11    Harvey. Do you recall how much you were earning at

12    the time you started with Harvey? What was your

13    salary at the start, if you know?

14    A.    It was lower than this, I know that.

15    Q.    Do you have just a rough estimate of how

16    much lower or how much it's gone up in the

17    approximately two years since your start there?

18    A.    An approximate number?

19    Q.    Just a range. Has it gone up 5,000,

10:25AM 20    2,000?

21    A.    Probably --

22    Q.    If you don't remember, again I'm not

23    asking you to guess.

24    A.    You want the specific number, I don't

1    know that.

2    Q.    Just an approximation, but we know that

3    it's gone up since you started?

4    A.    Yes, it has.

5    Q.    So it was something a little lower than

6    56,000, but as we sit here today, you don't recall

7    the starting salary or how much it's gone up?

8    A.    I don't know the definite starting

9    salary as of today, no.

10:26AM 10    Q.    And did you submit a written application

11    for employment with Harvey?

12    A.    Yes.

13    Q.    Okay. Do you recall when you submitted

14    that application?

15    A.    It was sometime in June.

16    Q.    In June of 2019?

17    A.    Yes.

18    Q.    So it was prior -- you submitted the

19    application to Harvey while you were still employed

10:27AM 20    with Markham?

21    A.    Yes.

22    Q.    And do you still have a copy of the

23    application you submitted to Harvey?

24    A.    No.

1    Q.    Describe for me the process. You

2    submitted a written application to Harvey. What

3    happened next in terms of the hiring process?

4    A.    I got called for an interview.

5    Q.    Do you recall who called you?

6    A.    No.

7    Q.    Was it someone from the police

8    department?

9    A.    Yes.

10:27AM 10    Q.    But you don't recall who?

11    A.    The exact name, no.

12    Q.    And do they have a police and fire

13    commission there in Harvey?

14    A.    Yes.

15    Q.    And do you recall whether it was someone

16    in the police department or someone who was with or

17    representing the board of fire and police

18    commissioners that first talked to you?

19    A.    I don't recall.

10:28AM 20    Q.    And so you were called to come in from

21    an interview and you went into Harvey for an

22    in-person interview?

23    A.    Yes.

24    Q.    Do you recall who you -- who interviewed

1  you?
2  A.  Yes.
3  Q.  Who was that?
4  A.  Chief Winters.
5  Q.  Can you spell his last name for us?
6  A.  Like the season winter.
7  Q.  Winters?
8  A.  Yes.
9  Q.  I understand.  Chief Winters and you
10:28AM 10  were going to say someone else I think.
11  A.  Ms. Anderson, Dr. Anderson.
12  Q.  Dr. Anderson?
13  A.  Yes.
14  Q.  Is Dr. Anderson a man or a woman?
15  A.  A woman.
16  Q.  And do you know who she was employed by?
17  A.  By the City of Harvey.
18  Q.  By the City of Harvey?
19  A.  Yes.
10:28AM 20  Q.  Do you know what her position is there
21  or was?
22  A.  No.
23  Q.  And did you know either of them prior to
24  applying to Harvey?

1  A.  No.
2  Q.  Did you know anyone at the police
3  department personally prior to applying for a job
4  there?
5  A.  Yes.
6  Q.  Yes, you did?
7  A.  Yes.
8  Q.  Who did you know there?
9  A.  Sergeant Thompson.
10:30AM 10  Q.  Thompson?
11  A.  Yes.
12  Q.  How did you know Sergeant Thompson?
13  A.  We worked off duty jobs together.
14  Q.  Okay.  Where was that at?
15  A.  Walmart.
16  Q.  And were you currently working at
17  Walmart in June of 2019 when you applied to Harvey?
18  A.  Yes.
19  Q.  And you were a security guard at
10:30AM 20  Walmart?
21  A.  Yes.
22  Q.  And was Sergeant Thompson also a
23  security guard at Walmart?
24  A.  Yes.

1  Q.  Do you recall how long you worked with
2  him at Walmart, how long you knew him?
3  A.  I can't recall.
4  Q.  Is Sergeant Thompson someone who is a
5  work colleague or did you also know him socially as
6  a friend or otherwise?
7  A.  No, just working together.
8  Q.  Is he the one that advised you about
9  Harvey potentially hiring full-time officers?
10:31AM 10  A.  No.
11  Q.  How did you learn about the opening at
12  Harvey?
13  A.  I sent an application.
14  Q.  You just sent an application?
15  A.  Yes.
16  Q.  Did you talk to Sergeant Thompson at all
17  about applying there?
18  A.  No.
19  Q.  Never mentioned to him one way or the
10:31AM 20  other that you were seeking employment and that you
21  were submitting something to Harvey?
22  A.  No.
23  Q.  Is Sergeant Thompson still with the
24  Harvey Police Department?

1  A.  Yes.
2  Q.  And has he -- is he your supervisor or
3  who is your supervisor I should ask at Harvey, your
4  immediate supervisor?
5  A.  Sergeant Thompson and Sergeant Neal are
6  my immediate shift supervisors.
7  Q.  They are currently your supervisors?
8  A.  Was at the time I worked there.
9  Q.  And are you not active at the moment at
10:32AM 10  the Harvey Police Department?
11  A.  I'm injured on duty.
12  Q.  So you're off duty?
13  A.  Yes.
14  Q.  Due to a duty related injury?
15  A.  Yes.
16  Q.  And when was the last time you were on
17  duty or at work?
18  A.  September 13th of last year.
19  Q.  September 13th?
10:32AM 20  A.  Yes.
21  Q.  Of last year, 2020?
22  A.  Yes.
23  Q.  And so you've been off completely due to
24  an injury since that time?

1    A.    Yes.

2    Q.    And do you have a timeframe for going

3    back at the present?

4    A.    No.

5    Q.    During the interview with Chief Winters

6    and Dr. Anderson, did they ask you at all about

7    your employment with Markham?

8    A.    Yes.

9    Q.    And what did you talk about during the

10:33AM 10    interview regarding Markham?

11    A.    **That I was working for them full-time or**

12    **part-time.**

13    Q.    Okay.  And anything else that you can

14    recall you talked about during the interview with

15    respect to your employment with Markham?

16    A.    **Not that I recall.**

17    Q.    And did you talk about during the

18    interview any of the charges of discrimination?  I

19    think you had one pending, one charge of

10:34AM 20    discrimination pending at the time that you

21    interviewed with Harvey.  Did you reference that at

22    all during the interview process?

23    A.    **No.**

24    Q.    And did you discuss any of the events or

1    occurrences or things in the allegations that are

2    contained in your amended complaint?

3    A.    **No.**

4    Q.    In the interview itself, I know you

5    submitted the application in June of 2019, do you

6    recall when you had the interview at Harvey?

7    A.    **In June, somewhere around June.**

8    Q.    And again this was prior -- while you

9    were still employed with Markham, you were

10:35AM 10    interviewed at Harvey; is that correct?

11    A.    **Yes.**

12    Q.    And following your interview with Chief

13    Winters and Dr. Anderson, what was the next step in

14    the hiring process there?

15    A.    **Background check.**

16    Q.    Then do you recall after that?

17    A.    **I don't recall the next step.**

18    Q.    Was there ever any testing or anything

19    that you had to do or followup interviews of any

10:36AM 20    kind that you can recall?

21    A.    **Not that I can recall.**

22    Q.    At some point you got an offer of

23    employment as a full-time officer at Harvey,

24    correct?

1    A.    Yes.

2    Q.    Do you recall when that was?

3    A.    **Sometime around June.**

4    Q.    Still in June of 2019?

5    A.    **Yes.**

6    Q.    And do you recall getting something in

7    writing or was it -- did someone contact you via

8    the phone?  How did they let you know that you were

9    being offered a job as a full-time officer?

10:36AM 10    A.    **They called me in.**

11    Q.    And who called you in?

12    A.    **I don't recall.**

13    Q.    Okay.  Was it Chief Winters?

14    A.    **I don't recall.**

15    Q.    Okay.  And so you went in and spoke to

16    someone face-to-face at Harvey?

17    A.    **Yes.**

18    Q.    Okay.  And we are again still in June of

19    2019?

10:37AM 20    A.    **Yes.**

21    Q.    Do you recall who you met with when you

22    went in face-to-face?

23    A.    **Yes.**

24    Q.    Who was that?

1    A.    **Dr. Anderson, Chief Winters came in for**

2    **a brief moment, HR.**

3    Q.    And they made you an offer of employment

4    during that meeting?

5    A.    **Yes.**

6    Q.    Do you recall did you accept the offer

7    at that moment or what else happened in that

8    meeting?

9    A.    **I accepted the offer.**

10:37AM 10    Q.    You don't recall the exact date of the

11    meeting but this was still June of 2019?

12    A.    **Yes.**

13    Q.    Did they give you a particular start

14    date?

15    A.    **Yes.**

16    Q.    What was your anticipated start date?

17    Was that given to you at that meeting when you

18    accepted?

19    A.    **Yes.**

10:38AM 20    Q.    What was the start date?

21    A.    **July 4th.**

22    Q.    July 4th?

23    A.    **Of 2019.**

24    Q.    They put you right to work on a

1 holiday?

2     A.    **Yes.**

3     Q.    I think you mentioned that you started

4 in July of 2019. Did you, in fact, start on

5 July 4th, 2019?

6     A.    **Yes.**

7     Q.    At the time that you started on

8 July 4th, 2019 were you certified as a full-time

9 officer?

10:38AM 10     A.    **No.**

11     Q.    Okay. You were certified as a part-time

12 officer at that time?

13     A.    **Yes.**

14     Q.    What did you do then to -- I assume you

15 since obtained your full-time certification?

16     A.    **Yes.**

17     Q.    Okay. On or after your July 4th start

18 date, what did you do in terms of becoming

19 certified as a full-time officer?

10:39AM 20     A.    **They sent me to the refresher course for**

21 **my state certification.**

22     Q.    They sent you to did you say a refresher

23 course?

24     A.    **Yes, two-week transitional course.**

1     Q.    Where was that at?

2     A.    **Somewhere in Southern Illinois.**

3     Q.    Southern Illinois?

4     A.    **Yes.**

5     Q.    It was something that you went down

6 there and you were there for the full two weeks?

7     A.    **We came home on the weekends.**

8     Q.    Do you recall how long after your

9 July 4th start date that you took the two-week

10:40AM 10 transition course?

11     A.    **Around August sometime, August or early**

12 **September.**

13     Q.    As a result of attending that course,

14 then you obtained a full-time certification?

15     A.    **Yes.**

16     Q.    Jumping back for a second to the

17 application process when you submitted a written

18 application to Harvey, did you put any references

19 in your written application?

10:40AM 20     A.    **Yes.**

21     Q.    Okay. Who were your references listed

22 in the application?

23     A.    **I don't recall.**

24     Q.    Was it anyone from the Markham Police

1 Department?

2     A.    **I don't recall.**

3     Q.    You said you didn't have a copy of the

4 application, but you would defer to -- whoever is

5 listed in the copy, you would defer to that in

6 terms of who your references were?

7     A.    **Can you repeat the question?**

8     Q.    As you sit here today, you have no

9 recollection of the references you put into your

10:41AM 10 written application, correct?

11     A.    **That's correct.**

12     Q.    Okay. So I assuming Harvey has a copy

13 of that application and you would defer to that --

14 whatever the copy is, you would defer whoever is

15 listed in there as the people that you used as your

16 references during the application process?

17     A.    **Yes.**

18     Q.    But you don't recall any of the names or

19 whether any of them were from the Markham Police

10:41AM 20 Department?

21     A.    **No.**

22     Q.    Do you know whether Harvey followed up

23 with anyone you listed as a reference?

24     A.    **I don't recall.**

1     Q.    Did you discuss any references during

2 your interviews with Harvey?

3     A.    **No.**

4     Q.    Do you know whether Harvey Police

5 Department contacted anyone at the Markham Police

6 Department during the hiring process?

7     A.    **No, I have no knowledge of that.**

8     Q.    Have you been suspended or disciplined

9 at all since you started with Harvey?

10:42AM 10     A.    **No.**

11     Q.    Let's take a look at Exhibit No. 1 in

12 front of you which for the record is titled the

13 amended complaint. You have that in front of you?

14     A.    **Yes.**

15     Q.    This is again City Exhibit 1. If you

16 would look at Paragraph 16, I will read it.

17 Paragraph 16 of the amended complains says, "for

18 example, after being hired by a subsequent police

19 department, Defendant White called her new employer

10:42AM 20 on more than one occasion and attempted to get her

21 fired." Do you see that allegation?

22     A.    **Yes.**

23     Q.    What is the basis of that allegation?

24 Why do you believe Defendant White, Chief White

**37**

1  called Harvey to try and get you fired?
2      A.    I was told directly by Chief Winters.
3      Q.    When did he tell you that?
4      A.    Sometime in October.
5      Q.    Would that be October of 2019?
6      A.    Yes.
7      Q.    What did he tell you about Chief White
8  calling Chief Winters about your employment?  What
9  were the specifics?
10:44AM 10     A.    He said that he's not going to believe
11  anything that he said about me, and he's going to
12  let my work speak for himself and that he believed
13  that I am a good police officer.
14     Q.    Was this just on one occasion where
15  Chief Winters brought up --
16     A.    Yes.
17     Q.    Chief White?
18     A.    Yes.
19     Q.    Did Chief Winters ever reference Chief
10:45AM 20  White at any other time you've been employed by
21  Harvey?
22     A.    No.
23     Q.    Your allegation is that Chief White
24  called Chief Winters, is that what he explained to

**38**

1  you, that this was a telephone conversation?
2      A.    Yes.
3      Q.    And your discussion with Chief White
4  about this was in October of 2019.  Did he tell you
5  when the phone call or the alleged phone call was
6  made by Chief White to Chief Winters?
7          MR. SULLIVAN:  I'm going to just -- I
8  caught that. You said Chief White when you meant
9  that her conversation was with Chief Winters.  You
10:45AM 10  misspoke.
11  BY MR. HAYES:
12     Q.    Let me rephrase it because I was
13  wondering if Chief Winters told you when did he get
14  the call from Chief White.
15     A.    You want -- Can you elaborate?
16     Q.    In Chief Winters telling you about this
17  call he received from Chief White, did he tell you
18  when that took place or how long before your
19  conversation with him that call took place?
10:46AM 20     A.    No.
21     Q.    Did he give you any details about where
22  it was or how long the call was, anything like
23  that?
24     A.    No.

**39**

1      Q.    Is there anything else you recall about
2  what Chief Winters told you about his call with
3  Chief White?
4      A.    No.
5      Q.    What you testified to is that Chief
6  Winters told you he received a call from Chief
7  White about you; is that correct?
8      A.    Yes.
9      Q.    And Chief Winters told you he's not
10:47AM 10  going to believe him, he's going to let your work
11  speak for itself and he thinks you're a good police
12  officer?
13     A.    Yes.
14     Q.    Any other details that you can recall?
15     A.    Whatever their conversation was about
16  was bad, so that's why he expressed that he would
17  let my work ethic speak for itself and that I am a
18  good officer and I have shown that since I started
19  with the Harvey Police Department.
10:47AM 20     Q.    Anything else that you can recall about
21  that conversation?
22     A.    No.
23     Q.    Okay.  Let's jump then to your
24  employment with Markham itself.  I know we

**40**

1  mentioned 2010 a couple times.  Do you recall your
2  specific hire date?
3      A.    No.
4      Q.    And you were hired as a part-time
5  officer?
6      A.    Yes.
7      Q.    Who was the police chief at that time
8  when you started?
9      A.    I don't recall.
10:48AM 10     Q.    Do you recall any of the other command
11  staff at the time you started with Markham?
12     A.    Yes.
13     Q.    Who was part of the command staff that
14  you remember?
15     A.    Tony DeBois, Jack Genius.
16     Q.    Do you recall his position?
17     A.    I don't recall at that time.
18     Q.    And who else was part of the command
19  staff that you remember?
10:49AM 20     A.    I don't recall.
21     Q.    What about Terry White, was he employed
22  by Markham at the time you started as a part-time
23  officer?
24     A.    Not to my knowledge.

1   Q.   You don't recall him being part of the
2   command staff when you started?
3       A.   No.
4       Q.   Do you recall what your wage was at the
5   time you started as a part-time officer?
6       A.   No.
7       Q.   And again this is referencing at the
8   time you started.  Do you recall what shift you
9   were on or how many hours you were working at the
10  time when you started?
11      A.   When I started night shift.
12      Q.   Night shift?
13      A.   Night shift.
14      Q.   What hours would that have been?
15      A.   It fluctuated.
16      Q.   Was there three shifts at the time you
17  started with Markham?
18      A.   Yes.
19      Q.   And there's still three shifts today,
20  correct?
21      A.   I don't recall what they are doing
22  today.
23      Q.   Excuse me.  Thank you.
24           At least up to the point where you

1   left employment with Markham in 2019, had they
2   always used three shifts?
3       A.   Yes.
4       Q.   You referenced when you started you were
5   on the -- did you call it a night shift?
6       A.   Yes.
7       Q.   I know it may have fluctuated a little
8   bit.  Can you just describe how the shifts work?
9   Generally what timeframe were the three shifts and
10  how were they referred to?
11      A.   Back then it was 8 to 4, 4 to 12, 12 to
12  8.
13      Q.   Which one was the night shift?
14      A.   12 to 8.
15      Q.   So that's the shift you were working on
16  when you started?
17      A.   Yes.
18      Q.   But do you recall how many hours per
19  week you were working generally at that time?
20      A.   I cannot recall it.
21      Q.   Other than your wage -- You were paid an
22  hourly wage as a part-time officer; is that
23  correct?
24      A.   Yes.

1   Q.   Other than your wage, did you receive
2   any other benefits as a part-time officer?
3       A.   As in like health?
4       Q.   Health insurance, anything like that,
5   pension.
6       A.   No.
7       Q.   Do you recall how many part-time
8   officers there were when you started in 2010,
9   including yourself?
10      A.   I don't recall the exact number.
11      Q.   Was Jerald Jackson a part-time officer
12  with Markham when you started?
13      A.   I don't recall.
14      Q.   When you were hired by Markham, were you
15  already certified as a part-time officer?
16      A.   No.
17      Q.   So you went through certification after
18  you started?
19      A.   Yes.
20      Q.   Do you recall when and where and how you
21  were certified as a part-time officer?
22      A.   I don't know the exact date.
23      Q.   Let's take a look at Exhibit 6 in front
24  of you which is a two-page exhibit, City Exhibit 6.

1   I'll direct you to the second page first, I guess.
2   Is that your part-time certification?
3       A.   Yes.
4       Q.   I believe it's dated the 4th day of
5   December 2010.  Do you see that at the bottom?
6       A.   Yes.
7       Q.   Would you have attended then any
8   certification training or process prior to this
9   date?
10      A.   Yes.
11      Q.   You don't recall where the training was
12  or how long you participated in or any details
13  about that?
14      A.   We went to Moraine Valley College.  It
15  was called NEMRT.
16      Q.   NEMRT?
17      A.   Yes.
18      Q.   Did you attend there with any other
19  part-time officers from Markham?
20      A.   Yes.
21      Q.   Who were the other persons that attended
22  that training or certification with you?
23      A.   Monique Woods, Kanoa (phonetic) Hughes.
24      Q.   Hughes?

1      A.     Yes.
2      Q.     What was her -- That's a woman,
3 Ms. Hughes?
4      A.     No, that's a man.
5      Q.     I'm sorry, I misheard the first name so
6 can you state that again?
7      A.     Kanoa.
8      Q.     Can you spell that?
9      A.     I don't know how to spell that.
10:55AM 10      Q.     So it's Mr. Hughes, that was a man?
11      A.     Yes.
12      Q.     And?
13      A.     Monique Woods, that's a female.
14      Q.     She's a female.
15            And you attended training with them.
16 Any other part-timers?
17      A.     Tommy Worsak.
18      Q.     Anyone else that you can recall?
19      A.     I can't recall anybody else.
10:55AM 20      Q.     During the hiring process with Markham,
21 were you told anything by the police department or
22 HR about the hours or duties of part-time officers,
23 what the job would entail?
24      A.     At that time of -- at the time they

1 hired me?
2      Q.     Correct. Do you recall any discussion
3 about what the job would be or how many hours it
4 would be?
5      A.     What the job would entail, that's about
6 it.
7      Q.     Do you recall the specifics of what they
8 told you?
9      A.     That we would be as needed.
10:56AM 10      Q.     Do you recall who was telling you this
11 or who you were interviewing with when this
12 discussion was had?
13      A.     I don't recall who I was interviewing
14 with.
15      Q.     Was it anyone that's still at the police
16 department, Markham Police Department, or at least
17 as of the day you left?
18      A.     I don't recall.
19      Q.     So other than them telling you that a
10:57AM 20 part-time officer would basically be assigned as
21 needed or where needed, do you recall any other
22 specifics?
23      A.     I don't recall.
24      Q.     Did you have any discussion either

1 before or at the time of your hiring as a part-time
2 officer about the hours the job would entail or
3 that there was a limitation on the number of hours
4 that a part-time officer would work?
5      A.     Yes.
6      Q.     And what did they tell you about the
7 hours or limitations in the hours?
8      A.     We could not work no more than 32.
9      Q.     32 hours was the maximum?
10:58AM 10      A.     Yes.
11      Q.     Do you recall who told you that?
12      A.     No, I don't recall.
13      Q.     But that was a discussion you had again
14 at the time that you were in the hiring process for
15 Markham?
16      A.     Yes.
17      Q.     At the time you were hired, did you
18 receive any copies of the police department's
19 general orders?
10:58AM 20      A.     I don't recall.
21      Q.     You are aware though that a police
22 department had general orders, correct?
23      A.     Yes.
24      Q.     And those regulated both full-time and

1 part-time officer job duties and so forth,
2 correct?
3      A.     Yes.
4      Q.     But you don't recall whether you
5 received a copy of those at the start?
6      A.     No.
7      Q.     Let's take a look at -- Keep Exhibit 6
8 kind of in front of you, but let's go to
9 Exhibit 10, City Exhibit 10.
10:59AM 10            For the record, this is titled City
11 of Markham Police Department General Order 39.1,
12 and subject, part-time officer program. Do you
13 have that exhibit in front of you?
14      A.     Yes.
15      Q.     Have you ever seen this general order
16 before?
17      A.     Yes.
18      Q.     You've read this?
19      A.     Yes.
10:59AM 20      Q.     I'm just going to direct your attention
21 to a couple of areas. Under procedures on the
22 first page, you see kind of a subparagraph there.
23 It references, the part-time officer program will
24 function and support community policing and

1   support -- and other support service activities.
2   This service includes, but not limited to, traffic
3   direction, special events and parades, business and
4   residential walking patrols or high visibility and
5   community interaction and assigned patrol duties.
6   Do you see that reference?
7       A.   Yes.
8       Q.   Okay.  Is that an accurate depiction or
9   description of your duties as a part-time officer
11:00AM 10 at Markham, at least in part?
11      A.   Yes.
12      Q.   If you turn to the page, the second page
13  of the exhibit, Section 39.1.3 entitled status
14  requirements and benefits.  Subparagraph D, do you
15  see that there?
16      A.   Yes.
17      Q.   Okay.  And for reference it says, "all
18  part-time officers are required to be available to
19  work a minimum number of hours of duty per week
11:01AM 20 determined and set by the chief of police to
21  fulfill department needs."
22      A.   Yes.
23      Q.   Do you see that there?
24      A.   Yes.

1       Q.   Again that was your understanding when
2   you were hired, right, by Markham that is one of
3   the regulations controlling part-time officers and
4   their hours, correct?
5       A.   At that time that was not my
6   understanding.
7       Q.   Okay.  You're talking again at the time
8   of your hire?
9       A.   My hiring.
11:01AM 10      Q.   What was your understanding at the time
11  of your hire that was different than that
12  provision?
13      A.   That would be as needed when I was first
14  hired.
15      Q.   But you understood that it was the chief
16  of police that determined what the department
17  needs; is that correct?
18      A.   Yes.
19      Q.   And that is stated in 39.1.3,
11:02AM 20 Subsection B, correct?
21      A.   Yes.
22      Q.   Would you take a look at Exhibit 11?  I
23  got the wrong records here.  Will you take a look
24  at Exhibit 9?

1            For the record, this is City
2   Exhibit 9 entitled Markham Illinois Code of
3   Ordinances, Section 33.19, part-time police
4   officers.  Do you have that in front of you?
5       A.   Yes.
6       Q.   If you look down at Subparagraph C(14)
7   at the bottom of the page.
8       A.   Yes.
9       Q.   Before I get to that, have you ever seen
11:03AM 10 this ordinance before?
11      A.   No.
12      Q.   You haven't, okay.  Subparagraph C(14)
13  it says, "part-time police officer shall work no
14  more than 30 hours per week or as may be regulated
15  by statute."  Do you see that there?
16      A.   Yes.
17      Q.   You believed or you were told at the
18  beginning when you started with Markham that you
19  couldn't work more than 32 hours a week; is that
11:04AM 20 correct?
21      A.   Yes.
22      Q.   Have you ever seen a regulation, whether
23  this or anything else, referencing a lower number
24  of maximum hours such as 30?  Have you ever had a

1   discussion that 32 is not correct, that the actual
2   number is 30?  That's probably a better way to say
3   it.
4       A.   No.
5       Q.   At the time that you started with the
6   Markham Police Department, did they give you any
7   type of anti-discrimination or anti-harassment
8   policies?
9       A.   I don't recall.
11:04AM 10      Q.   Let's take a look at City Exhibit No. 7.
11  Do you see up near the top of the document which it
12  doesn't have a title, but I'll read the text at the
13  top.  "I understand that my signature below
14  indicates that I have received and understand the
15  above statements and have received a copy of the
16  City of Markham Workplace Harassment statement."
17  This isn't attached to anything.  It's just this
18  one single page, this exhibit.  Do you have that in
19  front of you?
11:05AM 20      A.   Yes.
21      Q.   Okay.  And there's employee printed
22  name and then employee signature underneath that
23  text.
24      A.   Yes.

1   Q.   Is that your signature there?

2   A.   **Yes.**

3   Q.   It's dated January 4th, 2010?

4   A.   **Yes.**

5   Q.   Okay. Reading that, do you recall now

6 whether you ever received a workplace harassment

7 statement issued to you by the City of Markham?

8   A.   **Yes, I signed for it.**

9       MR. SULLIVAN: I'm sorry, I didn't hear

11:06AM 10 you.

11       THE WITNESS: Yes.

12 BY MR. HAYES:

13   Q.   Seeing this document, City Exhibit 7,

14 you don't have any reason to believe that this was

15 incorrect or you didn't receive this statement on

16 or near the date that it mentions?

17   A.   **This is correct.**

18   Q.   Would you still have a copy of it?

19   A.   **No.**

11:06AM 20   Q.   During your employment with Markham, did

21 you receive any type of anti-harassment or

22 anti-discrimination training?

23   A.   **Yes.**

24   Q.   Do you recall how often you received

1 that training or how many times you received that

2 training?

3   A.   **No.**

4   Q.   Prior to your leaving Markham, do you

5 recall the last time you received any type of

6 anti-harassment training?

7   A.   **I don't recall the last time.**

8   Q.   If you would take a look at City Exhibit

9 No. 8. For the record, it's a one-page exhibit.

11:07AM 10 The plaintiff Bates stamp on it is 825, and in the

11 text of the document workplace training network

12 certificate of completion references you, and it

13 says, "Workplace Harassment: The Real Deal", date

14 of completion March 22nd, 2017. Do you see that in

15 front of you?

16   A.   **Yes.**

17   Q.   Is that something that now seeing the

18 certificate that you can recall?

19   A.   **Yes.**

11:08AM 20   Q.   You don't dispute that you received

21 workplace harassment training through the police

22 department?

23   A.   **No.**

24   Q.   You're not disputing that?

1   A.   **I am not disputing that.**

2   Q.   Certainly you took this training or

3 received this training?

4   A.   **Yes.**

5   Q.   And do you recall having now looked at

6 this any types of other anti-harassment courses or

7 training that you received?

8   A.   **Yes.**

9   Q.   There were other classes that you took

11:08AM 10 or I should say training you received?

11   A.   **That I recall.**

12   Q.   That you do recall?

13   A.   **Yes.**

14   Q.   And do you recall the specifics of any

15 of those?

16   A.   **No.**

17   Q.   Or how often you would receive them?

18   A.   **No.**

19   Q.   And do you recall whether since the date

11:09AM 20 on Exhibit 8, which was March 22nd, 2017, and your

21 last day with Markham whether you received any

22 additional training between those two dates?

23   A.   **I do not recall.**

24   Q.   You don't recall one way or the other?

1   A.   **No.**

2   Q.   Let's head back to Exhibit No. 6 for a

3 moment. Again this is the two-page exhibit, your

4 part-time certification is the second page, and if

5 you take a look at the first page, this is entitled

6 for the record Illinois Law Enforcement Training

7 and Standards Board, Part-Time Basic Training,

8 General Information, and then there's a box with

9 some information filled in underneath that. Do you

11:09AM 10 see the box?

11   A.   **Yes.**

12   Q.   I had asked you some questions whether

13 or what anyone referenced in terms of the number of

14 hours you would work or be limited as a part-time

15 officers with Markham. Your answer was you were

16 told that 32 was the maximum, correct?

17   A.   **Yes.**

18   Q.   If you look in the box on the right-hand

19 side, about halfway down there's a box that says

11:10AM 20 average hours worked per week and someone has

21 filled a 20 in there. Do you see that there on the

22 document at least?

23   A.   **Yes.**

24   Q.   Have you ever seen this document

**57**

1 before?

2 A. Not the top one.

3 Q. Okay. There's a signature of Wade

4 Ingram as chief administrator of the agency towards

5 the bottom of the document. Do you see that?

6 A. Yes.

7 Q. Do you recall Wade Ingram being the

8 chief of police when you started with Markham?

9 A. Yes.

11:10AM 10 Q. Do you recall ever having a conversation

11 with him or anyone else that the average hours a

12 week would be 20 hours per week?

13 A. No.

14 Q. Let's go back to the time that you

15 started with Markham as a part-time officer. Did

16 you ever communicate to the police department when

17 you started that you weren't available for a

18 certain number of hours or on certain days of the

19 week?

11:11AM 20 A. Yes.

21 Q. Again this is referencing when you

22 started with Markham, okay? What did you tell them

23 about your availability when you started as a

24 part-time officer?

**58**

1 A. I could work the weekends, Thursday,

2 Friday, Saturday, Sunday.

3 Q. Could you repeat that?

4 A. Thursday, Friday, Saturday, Sunday.

5 Q. Okay. And what about those days, you

6 were unavailable to work?

7 A. I was able to work.

8 Q. You were able to work Thursday, Friday,

9 Saturday, Sunday?

11:12AM 10 A. Yes.

11 Q. Were you asked at the time if you had a

12 preference or any days you were unavailable?

13 A. No.

14 Q. That's just something you offered in

15 terms of when you were seeking employment there,

16 but those were the dates that you were available?

17 A. Yes.

18 Q. How come you weren't available at that

19 time Mondays, Tuesdays and Wednesdays?

11:12AM 20 A. Because of my daughter.

21 Q. What specifically about your daughter

22 that Mondays, Tuesdays, Wednesdays were unavailable

23 but the other days weren't?

24 A. Dealing with my daughter's health

**59**

1 issues, her being special needs.

2 Q. So based on care issues for your

3 daughter, that limited the days of the week that

4 you were available to work?

5 A. Yes.

6 MS. SAMUELS: Wait until he's done asking

7 you a question so I can object.

8 BY MR. HAYES:

9 Q. Did the department indicate that they

11:13AM 10 were okay with that?

11 A. Yes.

12 Q. Again the distinction between days you

13 were available and -- days you were available for

14 work in the department and days you weren't

15 available, was that related to having a caregiver

16 with your daughter?

17 A. Yes.

18 Q. I'm sorry?

19 A. Yes.

11:13AM 20 Q. Did those days change at all after you

21 started with Markham?

22 A. Yes.

23 Q. Okay. From the beginning when you were

24 unavailable Monday, Tuesday and Wednesday, when and

**60**

1 how did that next change in terms of your

2 availability?

3 A. At one point I had an open schedule.

4 Q. You had an open schedule?

5 A. Yes.

6 Q. Without limitations?

7 A. Yes.

8 Q. And what changed in your personal life

9 or with the care of your daughter that allowed you

11:14AM 10 to be unrestricted availability?

11 A. I had extra help.

12 Q. Extra help at home?

13 A. Yes.

14 Q. Someone lived in the home with you?

15 A. No.

16 Q. But someone was available any day of the

17 week to come into the home depending on your

18 schedule?

19 A. Yes.

11:15AM 20 Q. Do you recall what timeframe that was,

21 how long after your start date that that was, that

22 change?

23 A. No.

24 Q. How long did that last for when you were

1    available any day of the week?

2        A.    I don't recall.

3        Q.    At some point did it change again where

4    you again had restrictions on your availability?

5        A.    Yes.

6        Q.    When was that?

7        A.    I don't recall.

8        Q.    Do you recall how it changed though,

9    what days you became unavailable and the reasons

11:15AM 10    for that?

11        A.    The reason, yes.

12        Q.    What was the reason?

13        A.    The care of my daughter.

14        Q.    So whatever care your daughter was

15    receiving or had available that changed?

16        A.    Yes.

17        Q.    That again limited the days that you

18    were available to work?

19        A.    Yes.

11:16AM 20        Q.    Do you recall then what days became

21    unavailable as result of that change?

22        A.    I don't recall.

23        Q.    At the time that your availability to

24    work would change, would you contact someone at the

---

1    Markham Police Department to tell them about that

2    change?  How was that communicated to your

3    employer?

4        A.    Written, in written form.

5        Q.    You would submit a memo or a letter of

6    some type?

7        A.    You have to.

8        Q.    Who would you submit it to?

9        A.    Administration.

11:17AM 10        Q.    Was there a particular person during

11    your employment with Markham that was the kind of

12    the contact person for scheduling for part-timers?

13        A.    Not that I recall.

14        Q.    No one specific.  When you say

15    administration, are you talking about the chief of

16    police, deputy chief, a lieutenant?

17        A.    That's the administration.

18        Q.    Just anyone in the administration?

19        A.    Yes.

11:17AM 20        Q.    Every time your availability would

21    change, you would submit a memo or letter of some

22    kind to the police department administration

23    advising them of the days you were no longer

24    available, correct?

---

1        A.    No.

2        Q.    That's incorrect?

3        A.    Not every time my availability would

4    change, no.

5        Q.    Not when your availability would change?

6        A.    No.

7        Q.    How would you communicate to the police

8    department that you could no longer work on certain

9    days?

11:18AM 10        A.    It would have to be written in a memo.

11        Q.    Any time you had a change in

12    availability for your work for personal reasons,

13    you would submit that to the police department?

14        A.    No.

15        Q.    I'm having a disconnect here.  I think

16    I'm clarifying what you're saying and then it

17    appears I'm missing something here.

18            When the care for your daughter

19    would change and then your availability would

11:18AM 20    change at work, how would you go about

21    communicating that to the Markham Police

22    Department?

23        A.    I didn't.  I just came to work.  I

24    worked the days I was given.

---

1        Q.    Okay.  Well, let's go over scheduling

2    for part-timers then generally.  In terms of what

3    shift or hours you would work, was there certain

4    times of year that would be determined?  Did you

5    get to pick certain days or shifts or were you just

6    told what days or shifts you had?

7        A.    Just told.

8        Q.    So you were just scheduled?

9        A.    Yes.

11:19AM 10        Q.    We have gone over several periods where

11    your availability to work changed where you weren't

12    available to work certain days.  For example, when

13    you started, Mondays, Tuesdays and Wednesdays you

14    were unavailable, correct?

15        A.    Correct.

16        Q.    So what would you do then if you were

17    scheduled on one of those days?

18        A.    Show up to work.

19        Q.    So even if you were unavailable because

11:19AM 20    of childcare needs, you would show up at work

21    anyway?

22        A.    I would show up to work.

23        Q.    Okay.  The schedule wasn't -- you

24    weren't scheduled to conform with your

---

1  availability?

2      **A.**    **Can you reword that question?**

3      **Q.**    Yes.  When they scheduled part-timers,

4  did they ask you, you know, for the next six months

5  what's your availability?

6      **A.**    **Yes.**

7      **Q.**    Okay.  So who would ask you that?

8      **A.**    **Someone from the administration.**

9      **Q.**    Can you recall anyone specifically over

11:20AM 10  the years who you've had that specific conversation

11  with?

12      **A.**    **That I directly had that conversation**

13  **with?**

14      **Q.**    Correct.

15      **A.**    **I don't recall at this time.**

16      **Q.**    Let's take a look at City Exhibit

17  No. 12.  We may reference this again down the line

18  a little bit, but we had been talking kind of

19  throughout earlier in your career with Markham

11:21AM 20  about your scheduling and availability and how that

21  would change, correct?

22      **A.**    **Yes.**

23      **Q.**    Here we have City Exhibit 12.  It's a

24  one-page document entitled Markham Police

1  Department Memorandum.  It's to Chief White and it

2  says it's from Officer Palmer, and it's regarding

3  availability, and it's dated October 18th, 2018.

4      **A.**    **Yes.**

5      **Q.**    Do you see all that there?

6      **A.**    **Yes.**

7      **Q.**    For the record, it says in the body of

8  the memo, "this memo is in reference to your

9  request for me to submit my availability.  My

11:22AM 10  availability is Monday through Thursday 0745 to

11  1600 hours.  Please advise if you have any

12  questions."  Submitted by you, correct?

13      **A.**    **Yes.**

14      **Q.**    You drafted this memo, correct?

15      **A.**    **Yes.**

16      **Q.**    And you submitted this to Chief White

17  about your availability going forward from

18  October 18, 2018, correct?

19      **A.**    **Yes.**

11:22AM 20      **Q.**    At least in this memo you're saying

21  you're only available Mondays through Thursdays,

22  correct?

23      **A.**    **Yes.**

24      **Q.**    First let me ask you:  Why is it that this

1  time on October 18, 2018 you weren't available

2  Fridays, Saturdays and Sundays?

3      **A.**    **Due to the care of my daughter.**

4      **Q.**    Okay.  So your daughter, she has special

5  needs and needs someone with her, correct?

6      **A.**    **Yes.**

7      **Q.**    Okay.  And for the care of your

8  daughter, you weren't available Friday, Saturday

9  and Sunday?

11:22AM 10      **A.**    **Yes.**

11      **Q.**    Okay.  At this time did you also have

12  part-time or secondary employment?

13      **A.**    **Yes.**

14      **Q.**    Where were you working on October 18,

15  2018 outside of Markham Police Department?

16      **A.**    **Walmart, doing security at Walmart.**

17      **Q.**    So we talked about that job a little,

18  correct?

19      **A.**    **Yes.**

11:23AM 20      **Q.**    Do you recall the date range that you

21  were working security for Walmart?

22      **A.**    **I do not recall.**

23      **Q.**    Do you recall the last date that you

24  worked security for Walmart?

1      **A.**    **I do not recall the dates.**

2      **Q.**    And what days did you -- In October of

3  2018, what days did you work for Walmart as a

4  security guard?

5      **A.**    **I do not recall.**

6      **Q.**    Okay.  Would Walmart have a written

7  schedule of the days you worked?

8      **A.**    **I do not recall.**

9      **Q.**    Do you recall how often or how many days

11:23AM 10  a week or how many hours you worked for Walmart in

11  October of 2018?

12      **A.**    **I do not recall.**

13      **Q.**    Did you ever work for Walmart on

14  Fridays, Saturdays and Sundays?

15      **A.**    **I do not recall.**

16      **Q.**    I will even ask more specifically about

17  in October or November of 2018, did you work for

18  Walmart on Fridays, Saturdays and Sundays?

19      **A.**    **I do not recall.**

11:24AM 20      **Q.**    Okay.  City Exhibit 12 references your

21  availability, but it doesn't reference why you're

22  not available the other dates, correct?

23      **A.**    **Correct.**

24      **Q.**    You've mentioned certainly the

1   understandable childcare needs. Did you ever
2   advise the City of Markham that you couldn't work
3   certain days because of your secondary employment
4   at Walmart or elsewhere?
5   **A.**   **No.**
6   **Q.**   Secondary employment was never a reason
7   you couldn't be scheduled certain days?
8   **A.**   **Correct.**
9   **Q.**   And the police department knew you were
11:25AM 10   working Walmart security, correct?
11   **A.**   **Yes.**
12   **Q.**   Did you need to receive permission to
13   work a secondary employment?
14   **A.**   **Yes.**
15   **Q.**   Okay. And in notifying Markham that you
16   were working as a security guard at Walmart, did
17   you have to tell them what days, what times you
18   were working for Walmart?
19   **A.**   **I do not recall.**
11:25AM 20   **Q.**   City Exhibit 12, is this the only memo
21   like this that you submitted to the administration
22   regarding your availability?
23   **A.**   **I do not recall.**
24   **Q.**   Okay. So we were talking -- more

1   specifically prior to this date, but earlier in
2   your career with Markham, as your availability
3   changed, how did you communicate that to the
4   Markham Police Department? I think you mentioned
5   writing a letter or a memo, right?
6   **A.**   **Uh-huh.**
7   **Q.**   Is that correct?
8   **A.**   **Yes.**
9   **Q.**   Is this the memo you were thinking of or
11:26AM 10   talking about?
11   **A.**   **Yes.**
12   **Q.**   Okay. And this specific memo, City
13   Exhibit 12?
14   **A.**   **Yes.**
15   **Q.**   Okay. But you don't recall specifically
16   whether you've ever written any other memo like
17   this prior to October 2018 to the administration
18   about your availability at work?
19   **A.**   **I don't recall.**
11:26AM 20   **Q.**   I think we covered this, but I want to
21   clarify. In terms of when you started with Markham
22   how a part-timer was scheduled, that was just
23   something that someone in the administration put
24   together a schedule for part-timers; is that

1   correct?
2   **A.**   **Yes.**
3   **Q.**   Okay. And you didn't have specific
4   inputs about not working certain days or certain
5   times?
6   **A.**   **No.**
7   **Q.**   Did you keep any personal records for
8   how many hours you worked per week throughout your
9   tenure with Markham?
11:27AM 10   **A.**   **No.**
11   **Q.**   You don't have a document we can go back
12   and reference and it shows how many hours you
13   worked per week in 2010 versus 2011 versus 2012,
14   nothing like that?
15   **A.**   **Not that I recall.**
16   **Q.**   Let's take a look at Exhibit 4. Excuse
17   me, City 3, City Exhibit 3. You have that in front
18   of you?
19   **A.**   **City 3?**
11:29AM 20   **Q.**   Yes.
21   **A.**   **Yes.**
22   **Q.**   It's entitled charge of discrimination
23   at the top, correct?
24   **A.**   **Yes.**

1   **Q.**   And it's a few pages, this exhibit. Is
2   this the charge of discrimination that you filed
3   with the Department of Human Rights back in March
4   of 2019?
5   **A.**   **Yes.**
6   **Q.**   Prior to your filing this charge, did
7   you talk to any of the other police officers,
8   full-time or part-time, about filing a
9   discrimination charge?
11:29AM 10   **A.**   **Before I filed this?**
11   **Q.**   Correct.
12   **A.**   **No.**
13   **Q.**   Let me be more specific here, but
14   Monique Woods, did you have any conversation with
15   her at any time prior to filing this charge about
16   filing it or that you were going to file it?
17   **A.**   **No.**
18   **Q.**   How about either Domenica Tolbert or Roy
19   Tolbert?
11:30AM 20   **A.**   **No.**
21   **Q.**   And how about Officer Dawson, did you
22   ever talk to her about filing a charge of
23   discrimination?
24   **A.**   **Yes.**

1    Q.    You did talk to her prior to filing

2    this; is that correct?

3    A.    **Yes.**

4    Q.    Okay.  And when did you talk to her?

5    A.    **I don't recall.**

6    Q.    Do you recall how long it was before you

7    filed this, it's dated March 14, 2019, that you

8    discussed this charge or that you were filing a

9    charge?

11:31AM 10    A.    **It was after March 14th.**

11    Q.    You talked to Officer Dawson about this

12    charge after it was filed?

13    A.    **Yes.**

14    Q.    Do you recall the specifics of what you

15    talked to her about?  What did you say?  What did

16    she say?

17    A.    **No.**

18    Q.    And what was the reason that you spoke

19    to Officer Dawson about your charge of

11:31AM 20    discrimination?

21    A.    **That I was scared.**

22    Q.    Okay.  And what were you scared about?

23    A.    **Retaliation.**

24    Q.    Scared about retaliation?  You expressed

1    to her you were afraid of retaliation for the

2    filing of the charge?

3    A.    **Yes.**

4    Q.    Did you discuss any other particulars

5    about the charge or anything else that you can

6    recall?

7    A.    **No, not that I can recall.**

8    Q.    Where was that conversation at?

9    A.    **I don't recall.**

11:32AM 10    Q.    Do you recall how long after you filed

11    the charge that you talked to her about it?

12    A.    **I don't know.**

13    Q.    Why did you talk to Officer Dawson?

14    What was the purpose of speaking with her about it

15    specifically?

16    A.    **To vent.**

17    Q.    To vent?

18    A.    **Because I was scared of retaliation.**

19    Q.    Then why did you talk to Officer Dawson

11:32AM 20    instead of some other officer?

21    A.    **Because she worked at Markham 20 plus**

22    **years.**

23    Q.    At least in March of 2019, were you

24    friendly with Officer Dawson?

1    A.    **Yes.**

2    Q.    And did you see her socially as a friend

3    outside of the department?

4    A.    **Not often.**

5    Q.    Occasionally but not often?

6    A.    **Yes.**

7    Q.    Where would you see her socially outside

8    of the department?

9    A.    **Motorcycle club.**

11:33AM 10    Q.    Are you both members of this club?

11    A.    **Different clubs.**

12    Q.    You were member of two separate

13    motorcycle clubs?

14    A.    **Yes.**

15    Q.    You would see her at some event where

16    the two clubs interacted?

17    A.    **Yes.**

18    Q.    What club do you belong to?

19    A.    **Ruff Ryders.**

11:34AM 20    Q.    What club did she belong to?

21    A.    **She belonged to the Ruff Ryders at first**

22    **and then she moved to I think they are called the**

23    **Fierce Angels.**

24    Q.    Other than seeing her occasionally at a

1    motorcycle club event, did you see her socially as

2    a friend on other occasions?

3    A.    **Occasionally, yes.**

4    Q.    What other occasions did you see her at?

5    A.    **Barbecues.  That's all I can remember.**

6    Q.    Would there be any other Markham police

7    officers either at the motorcycle club events or

8    the barbecues where you interacted and saw Officer

9    Dawson?

11:35AM 10    A.    **Yes.**

11    Q.    Who else would be there?

12    A.    **At which event?**

13    Q.    I'm sorry?

14    A.    **Which event?**

15    Q.    Let's start with the motorcycle club

16    events, what other Markham officers did you

17    socialize with at those events?

18    A.    **James Walker, Maurice Brown.  That's all**

19    **I can remember right now.**

11:36AM 20    Q.    You wouldn't have -- You didn't have any

21    discussions with those other officers about your

22    charge of discrimination or this lawsuit?

23    A.    **No.**

24    Q.    Officer Dawson is the only one you

```
 1   talked to about your charge of discrimination?
 2      A.    Yes.
 3      Q.    And that was to vent about fear of
 4   retaliation, correct?
 5      A.    Yes.
 6      Q.    You don't recall any other specifics?
 7      A.    No.
 8      Q.    Okay. Did she discuss her charge of
 9   discrimination and/or lawsuit with you?
11:36AM 10   A.    No.
11      Q.    She did not?
12      A.    Not at that time, no.
13      Q.    Okay. And not at the time or before
14   the time that you filed your charge of
15   discrimination?
16      A.    Right.
17      Q.    You've since talked about her lawsuit
18   and charge of discrimination?
19      A.    Not recently.
11:37AM 20   Q.    Okay. When did you talk to her about
21   the charge and her lawsuit?
22      A.    I don't recall the exact date.
23      Q.    Was it more than one conversation about
24   it?
```

```
 1      A.    I don't recall.
 2      Q.    Do you recall how long ago it was? One
 3   year? Two years? Six months?
 4      A.    About two years.
 5      Q.    Since you had a conversation with her
 6   about her charge, discrimination charge; is that
 7   correct?
 8      A.    Yes.
 9      Q.    And when the last time you spoke to
11:37AM 10   Officer Dawson prior to today?
11      A.    A long time.
12      Q.    I'm not asking exact date, but can you
13   give me an estimate? Was it more than six months?
14      A.    Yes.
15      Q.    Was it more than a year or no?
16      A.    Yes.
17      Q.    It was over a year ago the last time you
18   spoke with Officer Dawson?
19      A.    A year or so, yes.
11:38AM 20   Q.    I'm sorry?
21      A.    A year or so, yes.
22      Q.    You don't speak to her on the phone or
23   anything like that?
24      A.    No.
```

```
 1      Q.    And was that this conversation that she
 2   talked to you about her charge of discrimination?
 3      A.    I don't recall.
 4      Q.    But you had one conversation with her
 5   about Dawson's charge of discrimination, is that
 6   correct, at least one?
 7      A.    Yes.
 8      Q.    What did she tell about her charge of
 9   discrimination, her lawsuit?
11:39AM 10   A.    I don't recall.
11      Q.    You recall it was the topic of
12   discussion, but you don't recall any specifics?
13      A.    Yes.
14      Q.    Was anyone else present for that
15   conversation other than you two?
16      A.    No.
17      Q.    We talked about the officers you
18   associated with at the motorcycle clubs. What
19   about the barbecues? Did you socialize sometimes
11:39AM 20   with Officer Dawson at barbecues? Any other
21   Markham Police Department officers who attend those
22   and you would socialize with?
23      A.    Tolbert, both Roy and Domenica.
24      Q.    Both Roy and Domenica?
```

```
 1      A.    Yeah. Dashun Walker, Nicole Wilkins.
 2         MR. SULLIVAN: Say that name again.
 3         THE WITNESS: Nicole Wilkins.
 4         MR. SULLIVAN: Thank you.
 5   BY THE WITNESS:
 6      A.    I can't recall anybody else right now.
 7   BY MR. HAYES:
 8      Q.    Okay. But you would socialize with them
 9   and Officer Dawson at barbecues?
11:40AM 10   A.    Yes.
11      Q.    And would one person be hosting these
12   barbecues?
13      A.    Yes.
14      Q.    Who was the host?
15      A.    It was different hosts.
16      Q.    Okay. It wasn't always the same person?
17      A.    Exactly.
18      Q.    Okay. Did you ever host them?
19      A.    No.
11:41AM 20   Q.    What about the Tolberts?
21      A.    Yes.
22      Q.    Okay. This would be at their house?
23      A.    Yes.
24      Q.    How many barbecues did you go to at
```

1  Domenica and Roy Tolbert's house?
2  A.  **I don't recall.**
3  Q.  Was it more than one?
4  A.  **Yes.**
5  Q.  Was it more than two?
6  A.  **Yes.**
7  Q.  Was it more than five?
8  A.  **Yes.**
9  Q.  Was it more than ten?
11:41AM 10  A.  **I don't recall.**
11  Q.  Certainly more than five but you're not
12  sure if it's more than ten?
13  A.  **Yes.**
14  Q.  Okay.  At any of those -- Was officer
15  Dawson at all of these barbecues?
16  A.  **No.**
17  Q.  Okay.  What about Dashun Walker?
18  A.  **No.**
19  Q.  They would be at some of these
11:42AM 20  barbecues, correct?
21  A.  **Yes.**
22  Q.  Some combination of these officers?
23  A.  **Yes.**
24  Q.  Do you recall when the last barbecue was

1  you attended at Domenica and Roy Tolbert's home?
2  A.  **I do not recall.**
3  Q.  So it's been more than a year?
4  A.  **I don't recall.**
5  Q.  More than six months?  More than two
6  years?  Can you put any type of timeframe on it?
7  A.  **I don't recall.**
8  Q.  Did you ever talk with Domenica and Roy
9  Tolbert about your charge of discrimination at
11:42AM 10  these barbecues?
11  A.  **No.**
12  Q.  Okay.  Did they ever -- Did Domenica or
13  Roy ever talk to you about their charges of
14  discrimination against Markham?
15  A.  **Yes.**
16  Q.  Okay.  Let's start with Domenica
17  Tolbert.  What did she tell you about her charge of
18  discrimination against Markham?
19  A.  **That she had filed charges.**
11:42AM 20  Q.  She let you know she, in fact, had filed
21  charges?
22  A.  **Yes.**
23  Q.  Did she give you any other specifics?
24  A.  **No.**

1  Q.  Was this at one of those barbecues?
2  A.  **I don't recall.**
3  Q.  Was it just this one occasion that she
4  brought it up or were there other occasions where
5  she discussed her charges of discrimination with
6  you?
7  A.  **I don't recall.**
8  Q.  Was there anyone else present on this
9  one occasion that you recall that she mentioned she
11:43AM 10  had filed the charge of discrimination other than
11  you and her?
12  A.  **I don't recall.**
13  Q.  Do you recall where it was at, that
14  conversation?
15  A.  **I don't recall.**
16  Q.  What about Roy Tolbert, did he ever talk
17  to you about his EEOC charge of discrimination
18  against the City of Markham?
19  A.  **No.**
11:44AM 20  Q.  No discussion about that?
21  A.  **No.**
22  Q.  What about Dashun Walker, did he talk to
23  you about his charge of discrimination against the
24  city?

1  A.  **No.**
2  Q.  Never -- No details of any kind
3  regarding his charge?
4  A.  **No.**
5  Q.  And did you ever share anything with him
6  about your charge of discrimination?
7  A.  **That I filed.**
8  Q.  Just that you had filed?
9  A.  **Yes.**
11:44AM 10  Q.  Do you recall when that was?  Was that
11  near the time that you had filed it?
12  A.  **I don't recall.**
13  Q.  Do you recall what the location of where
14  you talked to him about your charge of
15  discrimination was?
16  A.  **I don't recall.**
17  Q.  What about Nicole Wilkins, did you talk
18  to her about your charge at any time?
19  A.  **No.**
11:44AM 20  Q.  Maurice Brown, I don't think I covered
21  him, did you talk to him about your charge of
22  discrimination or lawsuit?
23  A.  **No.**
24  Q.  Did he ever talk to you about his

1    lawsuit against the City of Markham?
2        A.    No.
3        Q.    Okay.  The charge that you identified,
4    City Exhibit No. 3, is it your understanding that
5    that charge was dismissed by the Department of
6    Human Rights, is that correct, or do you have a
7    different understanding of what the department did
8    with your charge?
9        A.    Can you repeat that?
11:45AM 10        Q.    Yeah.  What is your understanding of how
11    your charge of discrimination was resolved at the
12    Department of Human Rights?
13        A.    I don't have one.
14        Q.    You have no understanding of what the
15    result was of your filing the charge or whether
16    it's still pending?
17        A.    I am not understanding.
18        Q.    Have you ever -- Do you recall ever
19    seeing a dismissal notice from the Department of
11:46AM 20    Human Rights?
21        A.    I don't recall seeing a dismissal
22    notice.
23        Q.    You filed two other charges of
24    discrimination with the Department of Human Rights

1    after Exhibit 3; is that correct?
2        A.    Yes.
3        Q.    Okay.  And those were based on or
4    alleged that your discharge from Markham was
5    retaliation, correct?
6        A.    Yes.
7        Q.    Okay.  Those charges were -- you later
8    opted out of investigation of those charges; is
9    that correct?
11:47AM 10        A.    I don't recall.
11        Q.    Okay.  Do you recall ever signing
12    paperwork asking the Department of Human Rights to
13    stop any further investigation of the retaliation
14    charges that you filed?
15        A.    I don't recall.
16        Q.    Okay.  As we sit here today, do you have
17    an understanding of what the status is then of
18    those retaliation charges filed with the Department
19    of Human Rights based on your termination?
11:47AM 20        A.    I don't recall.
21        Q.    Let's turn to Exhibit No. 1.
22            MR. SULLIVAN:  Can we take five minutes
23    or two minutes to use the restroom?
24            MR. HAYES:  That's fine with me.

1            (Whereupon, a short break in
2            the proceedings was taken.)
3            We are back on the record.
4    BY MR. HAYES:
5        Q.    So if you would take a look at Exhibit 1
6    which is the amended complaint, and
7    Paragraph 12(g).  I'm just going to look at this
8    for reference here.
9            Do you see there's a list of claims
12:06PM 10    you're making in this lawsuit, correct, in the
11    complaint?
12        A.    Yes.
13        Q.    And 12(g) it mentions reducing her work
14    hours is one of the claims you are making in this
15    case, correct, that is based on sex discrimination?
16        A.    Yes.
17        Q.    Okay.  Again let's reference City
18    Exhibit No. 2 which we talked about a couple times,
19    and Question 20, if you turn to that.  Do you have
12:07PM 20    that in front of you?
21        A.    Question 20 of Exhibit 2?
22        Q.    Exhibit 2, correct.
23            This will be addressing the question
24    or response or answer to No. 20.  If you can read

1    that and let me know when you're finished.
2        A.    Go ahead.
3        Q.    So you see Question 20, Interrogatory 20
4    asked you about the claim of your work hours being
5    reduced, right?  And referring specifically to the
6    amended complaint, Paragraph 12(g), okay?  Do you
7    see that there?
8        A.    Yes.
9        Q.    Okay.  And your response or your answer
12:08PM 10    was, "I cannot recall all specific dates, however,
11    I know it was related to sex because it happened
12    when he became the chief and he said that women
13    shouldn't be cops.  I was taken down to
14    24 hours/three days a week even though Jerald
15    Jackson was working more hours five days a week."
16            That was your answer to that
17    interrogatory, correct?
18        A.    Yes.
19        Q.    Which you verified with your signature,
12:08PM 20    correct?
21        A.    Yes.
22        Q.    So at the time you answered these
23    interrogatories, you were asked for the specific
24    instances, but you couldn't recall the dates; is

1    that accurate?
2        A.    Yes.
3        Q.    And when you say "he" or you reference
4    the chief, you're talking about Chief White in your
5    answer, correct?
6        A.    Yes.
7        Q.    And at least at this point of the
8    deposition, based on the things we have discussed,
9    do you have any refreshed recollection about the
12:09PM 10    dates that your hours was reduced that you're
11    complaining of in this lawsuit?
12        A.    **It happened after he became chief.**
13        Q.    Do you recall the date that Terry White
14    became the chief of police?
15        A.    **Sometime in October.**
16        Q.    October of 2018?
17        A.    **2018.**
18        Q.    Okay.  Your reduction in hours that you
19    are complaining of in this case was after that
12:09PM 20    time, correct?
21        A.    Yes.
22        Q.    Let's take a look at City Exhibit No. 4.
23    I will direct you to a specific part, but do you
24    recognize this document?

1        A.    **No.**
2        Q.    Do you recall ever seeing this before?
3        A.    **I cannot recall.**
4        Q.    Okay.  For the record, it has your name
5    at the top, correct?
6        A.    Yes.
7        Q.    And then it references No. 2019CF1525.
8    You see that, correct?
9        A.    Yes.
12:10PM 10        Q.    And halfway down on the right side
11    there's a stamp and it says IDHR intake May 9, '19
12    a.m. 11:20, do you see that there?
13        A.    Yes.
14        Q.    Never having seen this before, do you
15    know what this document is or do you know what its
16    purpose was?
17            Take your time to look through it,
18    page through it if you wish.  It's four or five
19    pages.
12:11PM 20        A.    **My human rights claim.**
21        Q.    It's related to your Department of
22    Humans Rights charge of discrimination, correct?
23        A.    Yes.
24        Q.    Do you recall getting a questionnaire

1    from the Department of Human Rights to answer or
2    details about your claim?
3        A.    Yes.
4        Q.    Okay.  And would this appear to be your
5    answers or answers prepared on your behalf related
6    to that claim and questionnaire?
7        A.    Yes.
8        Q.    Okay.  If you take a look, I think this
9    is on the second to last page, and the plaintiff
12:12PM 10    Bates stamp at the bottom is 978.  I want to look
11    at -- you can see the numbered paragraphs there,
12    X1, X2 and X3.  Do you see that towards the bottom
13    of the page there?
14        A.    X1.
15        Q.    X1, X2 and X3, the second to last page
16    of City Exhibit 4.
17        A.    Yes.
18        Q.    Okay.  Question X1 for reference it
19    says, "who reduced your work hours?"  And there's
12:12PM 20    an answer that says, (a) yes, my hours were reduced
21    by Chief Terry White."  Is that your response to
22    that question?
23        A.    Yes.
24        Q.    Okay.  And the next one, X2, asks, "When

1    were your hours," there's an error here, but it
2    says "When was your hours was reduced?"  There's an
3    answer underneath that says, "October 18th, 2018."
4    Do you see that answer there?
5        A.    Yes.
6        Q.    Okay.  Was that your response to the
7    date that your hours were reduced?
8        A.    Yes.
9        Q.    And that's the only date on there,
12:13PM 10    correct?
11        A.    Yes.
12        Q.    Question X3 says, "How many hours did
13    you regularly work each week before your hours were
14    reduced?  How many hours did you work after the
15    reduction?"  And then underneath there's an answer.
16    It says, "I had worked 32 hours plus.  I was
17    reduced to 24 hours per week."  Do you see that
18    there?
19        A.    Yes.
12:13PM 20        Q.    And that was your response to that part
21    of the questionnaire, correct, in this case?
22        A.    Yes.
23        Q.    So that's what you're complaining about
24    going from what you say to be 32 hours a week plus

1   down to 24 hours per week?
2       A.      Yes.
3       Q.      Starting on October 18th, 2018,
4   correct?
5       A.      Yes.
6       Q.      That's your claim in this case about
7   reducing work hours, correct?
8       A.      Yes.
9       Q.      And you haven't included any other
12:14PM 10  specific dates in either your answers to
11  interrogatories or in the questionnaire answer; is
12  that correct?
13      A.      Can you repeat that question?
14      Q.      Yes.  We've talked about the date of
15  October 18th, 2018.  I haven't seen any other date
16  listed in your interrogatory answers or your
17  questionnaire response; is that correct?  That's
18  the date you're complaining about, October 18th,
19  2018?
12:14PM 20  A.      Yes.
21      Q.      Did you have any conversation with Chief
22  White after your hours were reduced?
23      A.      Yes.
24      Q.      Okay.  When did you have that

1   conversation?
2       A.      I don't recall.
3       Q.      You don't recall?
4       A.      No.
5       Q.      It was on or near October 18th, 2018?
6       A.      I don't recall.
7       Q.      Do you recall if it was after that date?
8       A.      Yes.
9       Q.      You believe it was after October 18th?
12:15PM 10  A.      Yes.
11      Q.      And he's the chief of police at the
12  time?
13      A.      Yes.
14      Q.      What was the conversation?  What did you
15  say and what did Chief White say?
16      A.      It was pertaining to my hours.
17      Q.      Okay.  And did you ask him something?
18  What do you recall specifically about what was said
19  by you and by Chief White?
12:15PM 20  A.      I do not recall.
21      Q.      Looking again at City 4, if you will
22  turn to the last page or at the bottom of page,
23  second to last page.  X4 is the paragraph.  It
24  says, "List the reasons you were given for the

1   reduction in your hours."  The answer underneath
2   that says, "Chief White stated that he can just
3   change my hours when he wants to and doesn't have
4   to notify me of it."
5           Does that refresh your memory about
6   what Chief White said?
7       A.      Yes.
8       Q.      Okay.  And that's an accurate answer
9   from your point of view or you were accurately
12:16PM 10  trying to answer that question, correct?
11      A.      Yes.
12      Q.      Is that the conversation that you were
13  talking about where you approached him about the
14  reduced hours?
15      A.      Yes.
16      Q.      Okay.  So other than that, did he give
17  you any other explanation or say anything else to
18  you about the reduction in hours?
19      A.      Not that I recall.
12:16PM 20  Q.      If you did recall something, you would
21  have included it, right, in your interrogatory
22  answers or in the questionnaire response?
23      A.      Yes.
24      Q.      The next question, X5, said, "Did anyone

1   else have their hours reduced?  And there was an
2   answer, "no one but me."  Do you see that there?
3       A.      Yes.
4       Q.      And how do you know that no one else's
5   hours were reduced?
6       A.      The schedule was posted.
7       Q.      So did you retain a copy of that
8   schedule?
9       A.      I don't recall.
12:17PM 10  Q.      Okay.  How far out did the schedule go,
11  do you recall?  What timeframe was on the schedule
12  you saw that lead you to believe no one else's
13  hours were reduced?
14      A.      How far the schedule went out?
15      Q.      Correct.  Was it -- did it schedule
16  people for one week, two weeks, one month out?  How
17  far did the schedule go that you saw?
18      A.      I don't recall.
19      Q.      Would that schedule have been
12:17PM 20  posted on October 18th, 2018?
21      A.      I don't recall the exact date.
22      Q.      Okay.  But it was somewhere near that
23  date is when you saw a schedule -- saw your hours
24  were reduced?

1    A.    Yes.

2    Q.    And to your recollection, that schedule

3    didn't show anyone else's hours being reduced?

4    A.    **Not to my knowledge.**

5    Q.    Okay.  Is there any other documentation

6    that your claim is based on that no one else's

7    hours were reduced?

8    A.    **Not to my knowledge.**

9    Q.    Okay.  And the next question, X6, on

12:18PM 10    City Exhibit 4 you're asked, "Were there other

11    persons whose work hours should have been reduced

12    instead of yours but were not?"  And there's two

13    answers, (a) part-time officer Jerald Jackson who's

14    a male; (b), part-time officer Derrick Singleton

15    who's a male.

16          And again I'll ask kind of a similar

17    question, but how do you know their hours weren't

18    changed or reduced near that time, October 18,

19    2018?

12:18PM 20    A.    **I talked to Singleton, Officer**

21    **Singleton, and Jerald Jackson it was later posted**

22    **by calendar hours.**

23    Q.    Okay.  Was it the same calendar that you

24    referred to a few moments ago?

1    A.    **No.**

2    Q.    Was it a different calendar that showed

3    Jerald Jackson's schedule?

4    A.    **Yes.**

5    Q.    Do you ever recall how long after or for

6    what time period the schedule covered?

7    A.    **No.**

8    Q.    And based only on reviewing that

9    schedule, that lead you to believe that Jerald

12:19PM 10    Jackson's hours were not reduced?

11    A.    **Yes.**

12    Q.    Part-time Officer Derrick Singleton, you

13    said you spoke to him about his schedule.  What was

14    the conversation and when was it?

15    A.    **I don't recall when it was.  I just**

16    **recall asking him a question of was he coming**

17    **back.**

18    Q.    Was he coming back?

19    A.    **Yes.**

12:20PM 20    Q.    Okay.  Why did you ask him that

21    question?

22    A.    **He was on vacation.**

23    Q.    What was his response?

24    A.    **I don't recall.**

1    Q.    Any other specifics regarding that

2    conversation that you can recall?

3    A.    **No.**

4    Q.    What was it about his being on vacation

5    on that schedule that leads you to believe his

6    hours were not reduced?

7    A.    **The days that he normally would work it**

8    **had vacation on there.**

9    Q.    So you could see from the days where

12:21PM 10    vacation was listed for him, the days that he

11    normally would have been scheduled to work and then

12    took vacation, am I following that correctly?

13    A.    **Yes.**

14    Q.    That lead to you believe that his work

15    hours had not been changed?

16    A.    **Yes.**

17    Q.    Or reduced?

18    A.    **Yes.**

19    Q.    Anything else documentation-wise or

12:21PM 20    statement from someone that supports your knowing

21    Officer Singleton's hours were not reduced near

22    October 18, 2019?

23    A.    **No.**

24    Q.    For Jerald Jackson, the fact that you

1    saw a schedule near that time with his schedule on

2    it, anything else that lead you to believe that his

3    hours were not reduced near October 18, 2018?

4    A.    **He stated that.**

5    Q.    He told you?  So you had a conversation

6    with him as well?

7    A.    **Yes.**

8    Q.    And when and where was that

9    conversation?

12:22PM 10    A.    **I don't recall where.  I don't recall**

11    **the exact date and time.**

12    Q.    Okay.  It was at the police department?

13    A.    **I don't recall.**

14    Q.    Was it near October 18, 2018?

15    A.    **I don't recall.**

16    Q.    And what did you ask him specifically

17    inasmuch detail as you can remember?

18    A.    **Did his hours get cut.  He stated no.**

19    **And he was full-time so congratulating him on being**

12:23PM 20    **full-time.**

21    Q.    So he told you he became a full-time

22    officer?

23    A.    **Yes.**

24    Q.    And that inherently would have changed

1   his hours, correct?

2   **A.   Yes.**

3   Q.   Okay. You don't recall how close to

4   October 18th, 2018 that conversation was?

5   **A.   It was after October 18th.**

6   Q.   Do you recall how long after?

7   **A.   No.**

8   Q.   Okay. How many other part-time officers

9   were there at that time other than you, Derrick

12:23PM 10   Singleton, Jerald Jackson? This is October 2018.

11   **A.   Venezuela.**

12   Q.   Venezuela?

13   **A.   Yes.**

14   Q.   Do you know what his -- Was there any

15   change in his hours?

16   **A.   Not that I know of.**

17   Q.   You don't know one way or the other as

18   we sit here?

19   **A.   No.**

12:23PM 20   Q.   Any other part-time officers at that

21   time that were employed by Markham?

22   **A.   Not that I can remember.**

23   Q.   And I should have asked this, Valenzuela

24   or Venezuela?

1   **A.   Venezuela if I'm pronouncing it right.**

2   **It's probably Valenzuela.**

3   Q.   Do you know his first name?

4   **A.   Fernando.**

5   Q.   He's a male, correct, just for the

6   record?

7   **A.   Yes.**

8   Q.   But you don't know what his hours were,

9   if they went up and down at that time?

12:24PM 10   **A.   At that time, no.**

11   Q.   Okay. What makes you believe that the

12   reduction in your hours was based on your being a

13   female?

14   **A.   I was the only female part-time officer**

15   **at that time.**

16   Q.   The fact that you were the only

17   part-time female officer and your hours were

18   reduced?

19   **A.   Yes.**

12:24PM 20   Q.   Anything else other than that that

21   supports your allegation in the complaint that was

22   done based on sex discrimination?

23   **A.   That I'm the only female.**

24   Q.   I'm sorry?

1   **A.   I'm the only female.**

2   Q.   Okay. So other than that, nothing else

3   as we sit here that you believe supports that claim

4   of sex discrimination was the reason for the

5   reduction in your hours?

6   **A.   Not that I know of.**

7   Q.   And part of your claim was that you

8   went from four days to three days, correct, per

9   week?

12:25PM 10   **A.   Yes.**

11   Q.   Prior to the reduction, what days were

12   you working?

13   **A.   I don't recall.**

14   Q.   Okay. As of October 18th, 2018, do you

15   recall what was the change? Was there a change in

16   days? You mentioned a change in hours from 32 plus

17   to 24 or from four days to three, but do you know

18   how the days changed?

19   **A.   I don't recall.**

12:26PM 20   Q.   Let's take a look back at City

21   Exhibit 14. I'm sorry, that's a mistake. Excuse

22   me. City Exhibit 12. So we looked at this memo

23   before. There was from you to Chief White,

24   correct?

1   **A.   Yes.**

2   Q.   It's dated October 18th, 2018?

3   **A.   Yes.**

4   Q.   You had been asked to submit your

5   availability going forward?

6   **A.   Yes.**

7   Q.   And your response was that you were

8   available Monday through Thursday from 7:45 to

9   16:00 hours. The military guys will correct me,

12:27PM 10   but I believe that to be 4:00 p.m.

11   **A.   Yes.**

12   Q.   So from 7:45 to 4:00 p.m.?

13   **A.   Yes.**

14   Q.   And that's what you submitted to Chief

15   White, correct, your availability those dates?

16   **A.   Yes.**

17   Q.   And we talked about before that you

18   weren't available to work Friday, Saturday and

19   Sunday because of at least child care obligations,

12:27PM 20   correct?

21   **A.   Correct.**

22   Q.   Looking at that, do you recall how your

23   schedule the days changed back in October of 2018,

24   and your hours were reduced?

1    I guess I could ask this, you would
2 defer to whatever the documentation or schedule is
3 that the police department might have, you would
4 defer to those, those are the dates that you were
5 assigned to work?
6    A.    Yes.
7    Q.    You mentioned seeing some schedules that
8 were put out?
9    A.    Yes.
12:26PM 10    Q.    So if you had those schedules in front
11 of you, that might refresh your memory?
12    A.    Yes.
13    Q.    Part of your claim again is that, we
14 touched on this, but you were working 32 hours
15 plus, correct, prior to the reduction?
16    A.    Yes.
17    Q.    Do you know how long you were working
18 32 hours plus as a part-time officer?
19    A.    I don't recall.
12:26PM 20    Q.    You were taken down to say 24 hours,
21 correct?
22    A.    Correct.
23    Q.    Did anyone ever discuss with you the
24 state law limit and the city ordinance limit on

1 part-timers working over 30 hours?  Did that ever
2 come up?
3    A.    Prior to October 18th or before?
4    Q.    Well, at the time of the change.  You
5 know, close to that time, either before or after
6 October 18, 2018, did anyone inform you or did you
7 have a conversation with anyone about 30 hours
8 being the maximum or upper limit legally for
9 part-time officers?
12:29PM 10    A.    No.
11    Q.    What was your wage at that time?
12    A.    $16 an hour.
13    Q.    Have you ever calculated the amount
14 of -- for the hours lost when your time was changed
15 from 32 hours plus to 16 hours or to 24 hours,
16 excuse me?
17    A.    I don't recall.
18    Q.    So you've never done the calculation of
19 the difference at $16 an hour, you've never tried
12:30PM 20 to make that calculation for damages purposes?
21    A.    No.
22    Q.    I think we had established this, but the
23 change would have been October 18, 2018 and up to
24 the time you left or separated from employment with

1 Markham on July 3rd, 2019, correct?
2    A.    Correct.
3    Q.    You've never calculated the time or
4 money you lost based on the time you alleged was
5 changed?
6    A.    No.
7    Q.    Pursuant to the general orders of the
8 police department, including the one we looked at
9 earlier, do you believe that your chief owed you an
12:31PM 10 explanation prior to altering or changing your
11 hours as a part-time officer?
12    A.    Can you repeat that question?
13    Q.    Based on any understanding that you have
14 about the general orders of the police department,
15 do you believe that Chief White owed you an
16 explanation or advance notice of changing your work
17 schedule or reducing hours?
18    A.    No.
19    Q.    Let's refer back then and switch gears a
12:31PM 20 little bit to City Exhibit No. 1 which is the
21 amended complaint, and we're going to keep kind of
22 doing this where we -- because as we jump to a new
23 topic, we'll reference kind of the complaint which
24 is City Exhibit 1.  It's on Page 3 of that exhibit

1 but Paragraph 12(d).  Do you have that in front of
2 you?
3    A.    Yes.
4    Q.    So in this you're alleging that it was
5 discrimination or harassment based on your sex to
6 promote -- for the chief of the city to promote
7 male officers above you, correct?
8    A.    Yes.
9    Q.    What male officers were promoted above
12:32PM 10 you?
11    A.    Jerald Jackson.
12    Q.    Are there any other part-time male
13 officers that were promoted ahead of you that is
14 part of your claim I should say?
15    A.    That's a part of my claim.
16    Q.    Correct.  As part of this lawsuit, you
17 have an allegation that a male was or male officers
18 were promoted above you because you're a female.
19 You have mentioned Jerald Jackson.  Is there any
12:33PM 20 other part-time officers promoted when you should
21 have been?
22    A.    Not that I know of.
23    Q.    Jerald Jackson, we had a conversation a
24 few minutes ago that he told you he was made

1 full-time, correct?

2     A.    Yes.

3     Q.    This was near again that same date,

4 October 18, 2018?

5     A.    Yes.

6     Q.    For reference, is that the promotion you

7 are complaining about in your lawsuit?

8     A.    Yes.

9     Q.    We're talking promotions, but that's the

12:34PM 10 transition from part-time to full-time that you're

11 complaining of, right?

12     A.    Yes.

13     Q.    That he as a male officer received that

14 transition when you had not?

15     A.    Yes.

16     Q.    Prior to Jackson telling you he became

17 full-time, have you been aware of any opening for

18 full-time officers or had any notice gone out that

19 there would be seeking interest in the full-time

12:34PM 20 position at the Markham Police Department?

21     A.    Not that I recall.

22     Q.    Had you ever -- Prior to learning that

23 Jerald Jackson, as he said, became a full-time

24 officer in or around October 18, 2018, had you ever

1 applied for or discussed with anyone a transition

2 to full-time officer?

3     A.    Not that I recall.

4     Q.    You never submitted some type of written

5 documentation that you have a copy of to the

6 administration say I'm interested in a full-time

7 transition?

8     A.    Not that I recall.

9     Q.    Other than Jerald Jackson telling you

12:35PM 10 based on your recollection that he had become a

11 full-time officer, did you have a discussion about

12 that transition or Jerald Jackson's transition over

13 you with anyone in the administration?

14     A.    No.

15     Q.    In other words, did you complain to

16 anyone in administration about that it was unfair

17 or that it should have been you?

18     A.    No.

19     Q.    What was your understanding in October

12:35PM 20 of 2018 of what it would take for a part-time

21 officer to be transitioned to a full-time officer

22 in the Markham Police Department?

23     A.    Nothing.

24     Q.    Nothing was necessary in terms of

1 application or certification, training of any

2 kind?

3     A.    **Not to my knowledge, no.**

4     Q.    You are not aware of what it would

5 have -- what the requirement would have been for a

6 part-time officer to, in fact, transition and

7 become certified as a full-time officer?

8     A.    **No.**

9     Q.    Can you list for me all the reasons --

12:36PM 10 Obviously you are alleging that you were more

11 qualified for a full-time position than Jerald

12 Jackson in October of 2018. List to me all the

13 reasons why you were more qualified for a full-time

14 spot versus him.

15     A.    **I got hired before he did.  More**

16 **qualified.  I was able to take the refresher course**

17 **instead of going to a full-time regular academy,**

18 **never failed the full-time exam.**

19     Q.    You mean you never failed the full-time

12:37PM 20 exam?

21     A.    No.

22     Q.    Have you ever -- while you were with the

23 Markham Police Department, did you ever take the

24 full-time exam?

1     A.    **No.**

2     Q.    Is it your understanding that Jerald

3 Jackson failed the full-time exam?

4     A.    **Yes.**

5     Q.    What is that based on?

6     A.    **To my knowledge out of his mouth and**

7 **this documentation.**

8     Q.    So Jerald Jackson told you that he

9 failed the full-time examination?

12:37PM 10     A.    **Yes.**

11     Q.    When did he tell you that?

12     A.    **I don't recall.**

13     Q.    Was it after he told you he had been

14 transitioned to full-time in or around October 18th

15 of 2018?

16     A.    No.

17     Q.    It was not after that date?

18     A.    No.

19     Q.    It was before that date?

12:38PM 20     A.    **Yes.**

21     Q.    Okay.  Do you recall how long before?

22 Was it years before?

23     A.    **Years.**

24     Q.    So Jerald Jackson at some point had a

1    conversation with you where he said he failed the
2    full-time examination, some years prior to 2018?
3    **A.    Right.**
4    Q.    The refresher course, you're referencing
5    the same type of course you took when you were
6    hired at Harvey, correct?
7    **A.    Yes.**
8    Q.    And that was a two-week refresher
9    course?
12:38PM 10    **A.    Yes.**
11    Q.    And it's your understanding that a
12    part-timer could take just the refresher course and
13    become a full-time certified police officer?
14    **A.    The department has to send you.**
15    Q.    I'm sorry?
16    **A.    Your department has to send you.**
17    Q.    Your department would have to send you
18    and then you obtain your full-time certification
19    through the refresher course?
12:38PM 20    **A.    Yes.**
21    Q.    And do you know the difference of why
22    someone might be -- a part-time officer might be
23    sent to the refresher course versus the regular
24    academy as you referred to it?  Is there different

1    tracks for different part-time officers?
2    **A.    No.**
3    Q.    So any part-time officer once you're
4    certified part-time should be able to transition to
5    full-time based on this two-week refresher course?
6    **A.    If your department allows.**
7    Q.    If your department sends you to it?
8    **A.    Yes.**
9    Q.    And when you say regular academy then,
12:39PM 10    what were you referring to?
11    **A.    Part-time academy.**
12    Q.    Well, you said that you were more
13    qualified than Jerald Jackson because you would
14    only need the refresher course to transition versus
15    the regular academy?
16    **A.    Yes.**
17    Q.    So what is the regular academy?
18    **A.    It's longer.  If a civilian was hired as**
19    **a police officer, that's the academy you would have**
12:39PM 20    **to go to.**
21    Q.    So someone, I don't mean this to be
22    belittling, someone hired off the street who's not
23    already certified as a part-timer to become a
24    full-time police officer would have to go to the

1    regular academy?
2    **A.    Yes, the police academy.**
3    Q.    And that's a much longer course or
4    training?
5    **A.    Yes.**
6    Q.    Okay.  So your understanding is you
7    wouldn't need to -- while you were with Markham,
8    you would only need the refresher course to become
9    full-time, correct?
12:40PM 10    **A.    Yes.**
11    Q.    That's your understanding?
12    **A.    Yes.**
13    Q.    But do you believe though that Jerald
14    Jackson he also would have only needed to have
15    participated in the refresher course if sent by the
16    department to become full-time?
17    **A.    No.**
18    Q.    Do you think he needed to do something
19    different?
12:40PM 20    **A.    From his mouth, yes.**
21    Q.    From his mouth.  So he was telling you
22    that he needed to do something more than the
23    refresher course?
24    **A.    Yes.**

1    Q.    And that he would need to go to the full
2    on academy to become full-time?
3    **A.    Yes.**
4    Q.    So that's the basis of you're saying
5    well, they could have promoted me because I only
6    needed a two-week course versus someone taking a
7    longer course?
8    **A.    Yes.**
9    Q.    You mentioned you are more qualified
12:41PM 10    than Jerald Jackson for a full-time opening.  Why
11    is that?  What's the basis of saying that?
12    Qualified for what?
13    **A.    Just pertaining to going to the academy.**
14    **I've worked for Markham longer than he has.**
15    Q.    I'm sorry, I missed that.  Can you say
16    that again?
17    **A.    I worked for Markham --**
18    Q.    You mentioned seniority first?
19    **A.    Yes.**
12:41PM 20    Q.    You believe seniority is a part of it?
21    **A.    Yes.**
22    Q.    Other than seniority and the difference
23    in -- the potential difference in how long it would
24    take to certify you to full-time, anything else

1    that justifies your allegation that you were more
2    qualified than Jerald Jackson for that full-time
3    spot?
4         A.    Different certification.
5         Q.    Again that's the difference between the
6    refresher course and the full-time academy?
7         A.    What you mean?
8         Q.    Well, you said different certifications,
9    right?  What are you referring to when you say you
10   are more qualified than him based on different
11   certifications?  What does that mean?
12        A.    I received certifications.  I have
13   different certifications.
14        Q.    In terms of in-house training over the
15   years and that type of thing?
16        A.    Yes.
17        Q.    Okay.  Is there a specific training that
18   you think you had more of or that he didn't have?
19        A.    I don't recall.
20        Q.    Okay.  When you say more certifications,
21   what are you talking about specifically?
22        A.    I have certifications.
23        Q.    What are those certifications?
24        A.    I am Taser certified.

1         Q.    Let me stop you.  Does that mean Jerald
2    Jackson was not Taser certified?
3         A.    I don't recall.
4         Q.    What other certifications?
5         A.    I don't recall all of them at this
6    time.
7         Q.    Anything else that you can recall that
8    justified your being more qualified for a full-time
9    police officer position at Markham in or around
10   October of 2018 as opposed to Jerald Jackson?
11        A.    I don't recall.
12        Q.    Why do you believe that was sex
13   discrimination for him to get the position instead
14   of you?
15        A.    Because of things that had been said by
16   Chief White.
17        Q.    Okay.  And what things are those?
18        A.    Women shouldn't be police officers.
19        Q.    So that's a comment you heard him make?
20        A.    Yes.
21        Q.    So anything else that you can recall
22   that lead you to believe that it was sex
23   discrimination for Jerald Jackson to receive this
24   full-time position versus you?

1         A.    I don't recall anything else.
2         Q.    Then we'll talk a little more about that
3    comment you referenced in a little bit.
4              If you look at Exhibit 1, the
5    amended complaint, Paragraph 12(c).  Do you have
6    that in front of you, Exhibit 1?
7         A.    Yes.
8         Q.    12(c), removing her from assignments and
9    involuntary changing her schedule and thus
10   subjecting you to ridicule, embarrassment and
11   placing you in a less desirable work environment.
12             Do you see that that's one of your
13   claims in this case?
14        A.    Yes.
15        Q.    From what assignment are you referring
16   to that's removed that's the basis of that claim or
17   assignments?
18        A.    Senior building.
19        Q.    Senior building?
20        A.    Yes.  Markham Roller Rink and city hall.
21        Q.    Okay.  What was the city hall detail or
22   assignment?
23        A.    Opening up and closing city hall,
24   sitting there in the building.

1         Q.    So you were assigned -- stationed in the
2    building?
3         A.    Yes.
4         Q.    Was this a part-time assignment or would
5    full-time officers get this assignment as well?
6         A.    I don't recall any full-time officers.
7         Q.    Okay.  During your -- Do you recall when
8    you did start on the city hall assignment?
9         A.    I don't recall the exact date.
10        Q.    And do you recall when, as you allege,
11   you were removed involuntarily from this city hall
12   assignment?
13        A.    I don't recall the exact date.
14        Q.    Would it have been 2018, 2017, 2016?  Do
15   you recall any year?
16        A.    I know it was 2019.
17        Q.    Who removed you?
18        A.    Chief White.
19        Q.    Did he have a conversation with you
20   about it?
21        A.    No.
22        Q.    How did you learn this assignment was
23   being changed and you were being shifted to a new
24   assignment?

```
 1      A.      I came in for my schedule and I was told
 2   then.
 3      Q.      Did part-time officers get permanent
 4   assignments?  In other words, you are given
 5   assignment until further notice that you did every
 6   time you are on duty?
 7      A.      Yes.
 8      Q.      That's how the city hall assignment
 9   worked?
12:48PM 10      A.      Yes.
11      Q.      Where you would report every day you
12   were on duty to city hall?
13      A.      Yes.
14      Q.      You don't recall when that assignment
15   started?
16      A.      No.
17      Q.      And are you saying -- Part of your claim
18   is that sometime in 2019 Chief White changed the
19   assignment and you learned about that from the
12:48PM 20   schedule?
21      A.      Yes.
22      Q.      Do you know who received the city hall
23   assignment then or started on the city hall
24   assignment after you were removed?
```

```
 1      A.      To my knowledge no one.
 2      Q.      I'm sorry?
 3      A.      To my knowledge no one except for court.
 4      Q.      So no other part-time officer received
 5   the city hall assignment after you were removed
 6   from it?
 7      A.      Correct.
 8      Q.      In other words, the police department
 9   didn't have someone on a city hall assignment?
12:48PM 10      A.      Not to my knowledge.
11      Q.      And the city hall assignment, is that
12   during a particular shift if you are opening and
13   closing city hall and sitting there during the day
14   I take it it's during business hours?
15      A.      Correct.
16      Q.      So someone on an overnight shift or
17   weekend wouldn't get that assignment?
18      A.      No.
19      Q.      And it was a Monday through Friday
12:49PM 20   assignment if you were on duty?
21      A.      Correct, if I was on duty.
22      Q.      And when you weren't on duty, who would
23   get the city hall assignment?
24      A.      I don't recall.  I don't know.
```

```
 1      Q.      But do you know whether or not there was
 2   someone assigned on city hall on days, weekdays for
 3   example, that you weren't on duty?
 4      A.      No.
 5      Q.      You don't know one way or the other?
 6      A.      No.
 7      Q.      So as you sit here, you're not aware of
 8   any other part-time officers having gotten the city
 9   hall assignment?
12:49PM 10      A.      No one did.
11      Q.      No one did, all right.
12              You mentioned except for the courts.
13   That's an assignment too?
14      A.      Municipality court.
15      Q.      And where is that at?
16      A.      City hall.
17      Q.      But that's more a limited number of
18   hours, correct, or a different assignment from the
19   one you just talked about?
12:50PM 20      A.      Yes.
21      Q.      So describe for me the Markham courts
22   assignment, the hours.
23      A.      Court started at 9.  It was one day a
24   month for municipal court.  It depends on how many
```

```
 1   tickets or people there that it will last and that
 2   was it.
 3      Q.      It didn't end at a specific time, just
 4   until everyone's tickets and violations were dealt
 5   with?
 6      A.      Yes.
 7      Q.      It always began at 9:00 a.m.?
 8      A.      Yes.
 9      Q.      So this was again a business hours
12:51PM 10   assignment, correct?
11      A.      Yes.
12      Q.      Was it always on the same day of the
13   week when they had it scheduled once a month?
14      A.      I don't recall.
15      Q.      And is the city courts assignment a part
16   of your claim, that was removed from your
17   assignment?
18      A.      Yes.
19      Q.      Would you get that -- would you be on
12:51PM 20   the city courts assignment on the same days that
21   you had the city hall assignment?
22      A.      Yes.
23      Q.      Did you ever do city courts when you
24   weren't assigned to the city hall assignment?
```

1    A.    No.
2    Q.    So those two assignments are almost part
3  of the same assignment?
4    A.    Yes.
5    Q.    Whoever was assigned to city hall
6  handled the city courts as well?
7    A.    Yes.
8    Q.    Do you know whether any part-time
9  officers handled the city courts assignment on
12:52PM 10  days that you weren't on duty when court was in
11  session?
12    A.    I don't recall.
13    Q.    Since we sit here, you don't recall male
14  or female or any other part-time officers?
15    A.    I'm the only female officer.
16    Q.    That would have been the same female
17  part-time officer, correct?
18    A.    Right.
19    Q.    Is that correct?
12:52PM 20    A.    Right.
21    Q.    Okay. Whether full-time or part-time,
22  male or female, are you aware of any other officer
23  getting the city hall, city courts assignment in
24  place of you?

1    A.    Jerald Jackson.
2    Q.    When did he start handling the city hall
3  and city courts assignment in place of you?
4    A.    After Terry White became the chief.
5    Q.    So sometime around October of 2018?
6    A.    Yes.
7    Q.    You said you were removed from the city
8  hall assignments in 2019?
9    A.    Yes.
12:53PM 10    Q.    A some point while you were still
11  handling the city hall assignment, did Jerald
12  Jackson start doing the city courts assignment?
13    A.    Yes.
14    Q.    That would have happened around October
15  of 2018?
16    A.    Yes.
17    Q.    You would still both be at city hall at
18  the same time under those circumstances?
19    A.    Yes.
12:53PM 20    Q.    Okay. But that was once a month?
21    A.    Yes.
22    Q.    Okay. And how did that -- did that
23  change anything in terms of how you handled the
24  city hall assignment if it was going on at the same

1  time or how much you were paid? How did that
2  affect you?
3    A.    Sometimes he wouldn't be scheduled for
4  that day and he would get called in to do court and
5  that's overtime.
6    Q.    Was there a usual time that city courts
7  would wrap up? I know it's a different time every
8  session depending on how many tickets or ordinances
9  there are, but was it usually around noon, around
12:54PM 10  11, 1 o'clock?
11    A.    Time is different.
12    Q.    Is there a range that was somewhat
13  typical based on your experience handling the city
14  courts?
15    A.    Not to my knowledge.
16    Q.    So the basis of your discrimination
17  claim with reference to city courts is that Jerald
18  Jackson was allowed to work overtime and handle the
19  city courts on occasions when he wasn't on duty
12:55PM 20  otherwise?
21    A.    Yes.
22    Q.    And you observed him on those occasions
23  while you were on the city hall assignment?
24    A.    Yes.

1    Q.    Did you ever have a conversation with
2  anyone at the Markham Police Department or
3  administration about why at some point they brought
4  in another officer, part-time officer to handle the
5  city courts while you were still there handling the
6  city hall assignment?
7    A.    No.
8    Q.    Did you ever ask about that?
9    A.    No.
12:55PM 10    Q.    I'm sorry?
11    A.    No.
12    Q.    So you didn't ask for an explanation why
13  Officer Jackson started coming to city courts?
14    A.    No.
15    Q.    Do you recall when you started handling
16  city courts?
17    A.    I do not recall.
18    Q.    Would it have been about the same time
19  you started the city hall assignment?
12:56PM 20    A.    I don't recall.
21    Q.    What about the senior -- Let me go back
22  before I move on.
23          The city hall assignment when your
24  schedule was changed, what assignment were you

```
 1   given instead of the city hall assignment?
 2        A.    I was put back on the street.
 3        Q.    That would be on patrol?
 4        A.    Yes.
 5        Q.    Describe for me what would be a typical
 6   day for you as a part-time officer on patrol.
 7        A.    Riding around, making sure, you know,
 8   making sure no offenses or city ordinance were --
 9   no criminal damage, let me think, back up for
10   full-time officers, take calls, any type of
11   criminal calls or anything like that.
12        Q.    And other part-time officers were
13   assigned to patrol; is that correct?
14        A.    Yes.
15        Q.    Including male part-time officers?
16        A.    Yes.
17        Q.    And so that was part of a potential
18   part-time officer's job description, correct,
19   patrol?
20        A.    Yes.
21        Q.    And how about the senior living center,
22   describe for me what was that assignment.
23        A.    To sit there and make sure no
24   infractions.  Do red light cameras, I would sit
```

```
 1   there.
 2        Q.    I'm sorry, red light --
 3        A.    Red light cameras.
 4        Q.    What would you do regarding red light
 5   cameras while you were at the senior living center?
 6        A.    Just review the red light cameras.
 7        Q.    So a citation for a red light camera
 8   that's given to a driver, the police department
 9   reviews those, correct, at some point or another,
10   reviews the videos of those red light violations?
11        A.    Markham did.  I don't know about other
12   departments.
13        Q.    Well, that's a good clarification.  In
14   terms of Markham, your experience with the red
15   light cameras is an officer would review the videos
16   of those citations?
17        A.    Yes.
18        Q.    Okay.  So that was one of the things you
19   do while sitting assigned to the senior living
20   center?
21        A.    Yes.
22        Q.    If you weren't doing it, do you know who
23   else would be doing it, whether full-time or
24   part-time?
```

```
 1        A.    Part-time, whoever is sitting there.
 2        Q.    Was a part-time officer always assigned
 3   to the senior living center?
 4        A.    I don't recall.
 5        Q.    But it wasn't -- a full-time officer
 6   wouldn't be assigned there?
 7        A.    Some full-time officers was assigned
 8   there.
 9        Q.    Would it always be one officer, whether
10   it was part-time or full-time, or would there be
11   multiple officers there?
12        A.    At one time?
13        Q.    Correct.
14        A.    No, just one.
15        Q.    Whether it was part-time or full-time?
16        A.    Mostly part-time there.
17        Q.    And when did you start at the senior
18   living center?
19        A.    I don't recall.
20        Q.    Was it years ago?
21        A.    Yes.
22        Q.    And when was the senior living center
23   assignment changed?
24        A.    I don't recall.
```

```
 1        Q.    Was it in or around October of 2018?
 2        A.    I don't recall.
 3        Q.    And did someone communicate to you that
 4   you would no longer be working the senior living
 5   center?
 6        A.    Yes.
 7        Q.    Who was that?
 8        A.    I don't recall exactly who, just
 9   somebody from administration.
10        Q.    Okay.  But you don't recall whether it
11   was Deputy Chief Genius, Chief White, a prior
12   police chief?
13        A.    No.
14        Q.    A lieutenant?
15        A.    No.
16        Q.    Anything that would refresh your memory
17   about when did you handle the senior living center
18   assignment?
19        A.    No.
20        Q.    And why do you think that your removal
21   from the senior living center assignment was sexual
22   harassment or discrimination?
23        A.    Why?
24        Q.    Correct.
```

1      A.      Because I was the only female sitting
2  over there.  The residents -- I got along good with
3  the residents.
4      Q.      You said someone from the administration
5  told you you would no longer handle the senior
6  living center assignment.  Do you know what
7  assignment they put you into, the administration,
8  that is, after the removal from the senior living
9  center?
01:01PM 10      A.      I don't recall.
11      Q.      And do you know who the officer was,
12  part-time or full-time, that started going to the
13  senior living center after you were removed?
14      A.      I don't recall.
15      Q.      Whether it's a man or woman, you don't
16  recall?
17      A.      No.
18      Q.      Let me ask you this:  The senior living
19  center assignment, did they have certain hours or
01:02PM 20  days of the week?
21      A.      24 hours.
22      Q.      Seven days a week?
23      A.      To my recollection, yes.
24      Q.      So do you know who would be assigned --

1  I assume your assignment to this senior living
2  center would only cover one shift, correct?
3      A.      The shift I worked.
4      Q.      The shift that you worked?
5      A.      Yes.
6      Q.      So for two other shifts during the 24
7  hours, some other officer was assigned to the
8  senior living center, correct?
9      A.      Fernando I know for sure because he
01:02PM 10  would relieve me sometimes.
11      Q.      He was the other part-time officer?
12      A.      Yes.
13      Q.      Do you know of any other officers who
14  worked that assignment at the same time you did?
15      A.      I do not recall.
16      Q.      And you don't recall who replaced you?
17      A.      No.
18      Q.      The roller rink assignment, can you
19  describe for me what that assignment was?
01:03PM 20      A.      It was on a Saturday, and they have like
21  a lot of juveniles there dancing and skating, and
22  that was only I think for four hours, if I recall
23  right.
24      Q.      So that opened later in the day on

1  Saturday?
2      A.      Yes.
3      Q.      Do you know what time it opened and what
4  time it closed?
5      A.      I don't recall the time that it opened.
6      Q.      Was it after -- certainly afternoon?  By
7  that I mean after 12 p.m.
8      A.      Yes.
9      Q.      Was it after court?
01:03PM 10      A.      Yes.
11      Q.      After 5 p.m.?
12      A.      Yes.
13      Q.      We're talking about opening, right?
14      A.      Yes.
15      Q.      Did it open after 6:00 p.m.?
16      A.      I don't recall.
17      Q.      This was a late afternoon into the night
18  assignment, Saturday only assignment, correct?
19      A.      Yes.
01:04PM 20      Q.      Okay.  How many times did you work the
21  roller rink assignment?
22      A.      I don't recall the exact number.
23      Q.      Were you the assigned part-time officer
24  to handle that assignment at some point, do you

1  remember?
2      A.      Yes.
3      Q.      Do you know when that was?
4      A.      I don't recall.
5      Q.      Do you recall the beginning of that
6  assignment, the first night you received it?
7      A.      I don't recall.
8      Q.      The roller rink is a city-owned
9  building, correct, or business?
01:04PM 10      A.      Yes.
11      Q.      Do you know one way or the other?
12      A.      I don't know.
13      Q.      But Saturday nights, would it always be
14  a part-time officer assigned to that?
15      A.      Yes.
16      Q.      Is there anything that would refresh
17  your recollection about the times that you were
18  assigned to the roller rink?
19      A.      No.
01:05PM 20      Q.      At some point though you believe or
21  perceived that you were removed from that
22  assignment?
23      A.      Yes.
24      Q.      When was that?

```
1    A.    I don't recall the exact date.
2    Q.    Was it a year ago, two years ago?
3    A.    I want to make sure --
4    Q.    Let's talk a year preceding your last
5  day which is early July of 2019.
6    A.    I don't recall.
7    Q.    So you don't recall whether it was a
8  year -- within a year before that?
9    A.    No.
01:06PM 10  Q.    Do you recall if it was within two years
11  before that?
12   A.    No.
13   Q.    Do you recall whether it was within
14  three years before that?
15   A.    I do not recall.
16   Q.    Who was it that communicated to you that
17  you were no longer on that assignment?
18   A.    No one.
19   Q.    No one told you that?
01:06PM 20  A.    No.
21   Q.    So it was just a schedule change?
22   A.    Yes.
23   Q.    But you don't recall when?
24   A.    No.
```

```
1    Q.    And no one had a discussion with you
2  then?
3    A.    No.
4    Q.    Then why is it that you think it was sex
5  discrimination or harassment to remove you from
6  that assignment or not scheduled?
7    A.    To my recollection they put Jerald
8  Jackson in that position due to his dealings with
9  Chief White and the mayor of Markham.
01:07PM 10  Q.    There was a word in there that I missed.
11  Can you repeat?  So it was Jerald Jackson received
12  the assignment.  Can you repeat what your answer
13  was?  I missed part of it.
14              (Record read as requested.)
15       That was the word I missed, due to
16  his dealings.  What do you mean by dealings?
17   A.    Dealing with the mayor's campaign when
18  he first got elected, walk around with T-shirts of
19  the mayor's campaign, friends with Chief White.
01:08PM 20  Q.    So you believe Jerald Jackson was
21  somehow involved or supported Mayor Agpawa's
22  campaign?  Is that the mayor you're referring to?
23   A.    Agpawa, yes.
24   Q.    And how do you know that he was involved
```

```
1  with his campaign?  You mentioned wearing a
2  T-shirt.
3    A.    Yes, wearing T-shirts on his campaign.
4  He openly acknowledged that he supports them.
5    Q.    That he supported the mayor's run for
6  mayor?
7    A.    Yes.
8    Q.    When you say T-shirt, that was a
9  campaign T-shirt with the mayor's name on it?
01:08PM 10  A.    Yes.  Yes.
11   Q.    Or party?
12   A.    Yes.
13   Q.    Where did you see him wearing that?
14   A.    Around the station.
15   Q.    And you heard him say specifically that
16  he supported the mayor?
17   A.    Yes.
18   Q.    And that you believe him to be friends
19  with Chief White?
01:08PM 20  A.    Correct.
21   Q.    And is there any other basis for you to
22  believe that Jerald Jackson received the roller
23  rink assignment due to his dealings with the mayor
24  and Chief White?
```

```
1    A.    Yes, just in communication with Jerald
2  Jackson.
3    Q.    What else specifically did he say that
4  leads you to believe that that was the reason he
5  got the roller rink assignment?
6    A.    That he was friends with them, that they
7  owe him.
8    Q.    That they owe him?
9    A.    Yes.
01:09PM 10  Q.    This is specific from Jerald Jackson?
11   A.    Yes.
12   Q.    Where and when was that conversation?
13   A.    I don't know directly the exact date.
14  We have multiple conversations.
15   Q.    Do you remember the locations and dates
16  of any of them?
17   A.    Some at the station, most of it at the
18  station.
19   Q.    And do you recall, even if not the exact
01:09PM 20  date but the timeframe of these conversations, were
21  they near the mayor's first campaign for mayor?
22   A.    Yes, when he first got elected.
23   Q.    So he's been elected -- he was
24  re-elected this year, correct?
```

1    A.    **I don't know. I haven't followed it.**

2    Q.    But even prior to -- you had been at the

3    Markham Police Department while Mayor Agpawa was

4    the mayor, he had been the mayor for at least three

5    years I believe before you left, correct?

6    A.    **Yes.**

7    Q.    So you're referring to your

8    conversations with Jerald Jackson were near that

9    original campaign when Mayor Agpawa first became

01:10PM 10    mayor?

11    A.    **Yes.**

12    Q.    And beforehand?

13    A.    **Yes.**

14    Q.    Did he use any other specifics of why

15    the mayor or chief like owed him?

16    A.    **He was just excited about the new**

17    **changes to the administration, that he was promised**

18    **full-time.**

19    Q.    When you say "he," this is Jerald

01:11PM 20    Jackson?

21    A.    **Jerald Jackson.**

22    Q.    At that time were you friendly with

23    Jerald Jackson on a social basis?

24    A.    **Cordial.**

1    Q.    You were certainly work colleagues?

2    A.    **We were sometimes partner.**

3    Q.    Were you friendly outside of work?

4    A.    **No.**

5    Q.    So your conversations with him would

6    typically have been at or near work?

7    A.    **Yes.**

8    Q.    Any other specifics that you can recall

9    that Jerald Jackson told you?

01:11PM 10    A.    **That he couldn't wait until the new**

11    **administration comes in, he'll be full-time.**

12    Q.    Have you ever heard Chief White say I

13    owe Jerald Jackson and that's why I'm giving him

14    the roller rink assignment?

15    A.    **No.**

16    Q.    Have you ever heard Mayor Agpawa say

17    something like that?

18    A.    **No.**

19    Q.    Have you ever heard Mayor Agpawa say I'm

01:12PM 20    going to make Jerald Jackson a full-time police

21    officer?

22    A.    **No.**

23    Q.    Have you heard directly from Chief White

24    that he was going to make Jerald Jackson a

1    full-time officer?

2    A.    **Not that I recall.**

3    Q.    The roller rink assignment, did you get

4    any additional money from that assignment or

5    benefits of any kind?

6    A.    **I banked those hours as comp time.**

7    Q.    You would receive comp time for the

8    roller rink assignment?

9    A.    **Yes.**

01:12PM 10    Q.    And comp time allows you to take

11    essentially paid time off?

12    A.    **Yes.**

13    Q.    Depending on how much comp time you had

14    banked or available, correct?

15    A.    **Correct.**

16    Q.    Was there any limits on comp time for

17    part-time officers depending on how long you could

18    carry it so then you have to use it?

19    A.    **Not that I recall.**

01:13PM 20    Q.    Was it a one-to-one ratio for every hour

21    of comp time, you could take an hour of paid leave

22    if it was okay with the administration?

23    A.    **Correct.**

24    Q.    And so that was the benefit of the

1    roller rink assignment that you would receive comp

2    time for that?

3    A.    **Correct.**

4    Q.    That was Saturday only, correct?

5    A.    **Correct, unless you worked a**

6    **juke-a-thon.**

7    Q.    How often did those occur?

8    A.    **Not often.**

9    Q.    And as of October 18th, 2018, you had

01:13PM 10    advised the administration you weren't available

11    Saturdays; is that correct?

12    A.    **Correct.**

13    Q.    We talked about your relationship

14    with -- Let me ask this before I get into that.

15    Were there any other assignments that were the

16    basis of your claim for sex discrimination?

17    A.    **Not to my knowledge.**

18    Q.    We have talked about everything that

19    would be underlying that claim?

01:14PM 20    A.    **To my knowledge.**

21    Q.    We talked earlier about Raquel Dawson,

22    full-time officer Raquel Dawson, correct?

23    A.    **Okay.**

24    Q.    And your relationship with her, you

1    mentioned that you sometimes interacted with her as
2    a friend socially outside of the department?
3        A.    Yes.
4        Q.    Okay.  And do you recall ever having a
5    personal dispute with Officer Dawson at work?
6        A.    I don't recall.
7        Q.    Were you and Officer Dawson at any time
8    during your career at Markham assigned to the city
9    hall assignment at the same time?  In other words,
01:15PM 10   the same day same shift.
11        A.    I don't recall that.
12        Q.    Let's turn to City Exhibit 11.  The
13   plaintiff's Bates stamps on these are 842, 847 and
14   846.  It's a three-page exhibit.  Take your time to
15   look through that and I'll ask you some followup
16   questions.
17              Did you get a chance to look at the
18   three pages?
19        A.    Yes.
01:17PM 20       Q.    Page 1 of City 11 is listed as a
21   counseling from the police department addressed to
22   you from Deputy Chief Jack Genius dated October 18,
23   2016 regarding harassment memo from Officer Dawson.
24   For the record, you have that page in front of

1    you?
2        A.    Yes.
3        Q.    Have you ever seen this counseling
4    before?
5        A.    Yes.
6        Q.    Yes, you have?
7        A.    Yes.
8        Q.    Do you recall now a dispute with Officer
9    Dawson?
01:18PM 10       A.    Yes.
11        Q.    This is Deputy Genius addressing you
12   about what he's doing about that complaint, right?
13   Officer Dawson according to the memo accused you of
14   harassing her?
15        A.    Correct.
16        Q.    Do you recall what that was about?
17              MS. SAMUELS:  Objection.  You can answer.
18              THE WITNESS:  What did you say?
19              MS. SAMUELS:  I said you can answer.
01:18PM 20   BY THE WITNESS:
21        A.    Yes.
22   BY MR. HAYES:
23        Q.    What was the nature of the dispute?  Why
24   did she think you were -- You received this memo.

1    What originated or started this dispute between you
2    and Officer Jackson?
3              MS. SAMUELS:  Just so I don't have to
4    keep objecting to every question, I have an
5    objection to that line of questioning.
6              MR. HAYES:  No problem.
7    BY THE WITNESS:
8        A.    It was something that happened outside
9    of work that had nothing to do with the City of
01:18PM 10   Markham.
11   BY MR. HAYES:
12        Q.    This dates back to October 2016, right?
13        A.    Yes.
14        Q.    Do you know what -- Do you recall what
15   your assignment was in October of 2016?
16        A.    I do not recall.
17        Q.    Did you and Officer Dawson share an
18   assignment or cross paths on a regular basis at
19   work at that time?
01:19PM 20       A.    Yes.
21        Q.    How was it that the two of you
22   interacted at work at that time?
23        A.    I recall we was on the same shift.
24        Q.    You were on the same shift, okay.  Was

1    it the city hall?  Do you recall where you were
2    working on your shift?
3        A.    I don't recall.
4        Q.    Okay.  According to -- Deputy Chief Jack
5    Genius, he and Sergeant Wilkins investigated this
6    dispute, right?
7        A.    Yes.
8        Q.    Okay.  Do you recall them talking to you
9    about it?
01:19PM 10       A.    Yes.
11        Q.    Do you recall what you told them about
12   the dispute and what was happening?
13        A.    I don't recall.
14        Q.    You recall talking to them about Officer
15   Dawson --
16        A.    Yes.
17        Q.    -- but you don't recall the specifics?
18        A.    Exactly.
19        Q.    Okay.  His conclusion in the memo was
01:20PM 20   that whatever happened between you two did not
21   occur due to work related circumstances as I'm
22   quoting from the middle paragraph of the memo.  Do
23   you recall him communicating that to you?
24        A.    Yes.

1    Q.    And do you recall did the department --
2  Let me strike that.
3        Let me ask you this.  In the next
4  paragraph he orders you to stay away from Officer
5  Dawson as much as possible.  Do you recall
6  receiving that order?
7    A.    Yes.
8    Q.    Is that something that you did then?
9    A.    Yes, to my best ability.
01:20PM 10    Q.    And it mentions that there are
11  circumstances that arise where there is further
12  conflict between you, you should contact him or
13  Lieutenant White or Deputy Chief Walker, correct?
14    A.    Yes.
15    Q.    That's at least what he instructed of
16  you, correct?
17    A.    Yes.
18    Q.    And Lieutenant White, this is
19  October 2016, and that is Terry White, correct?
01:21PM 20    A.    Yes.
21    Q.    Who become Chief White.
22        If you look at the next page, City
23  Exhibit 11, Page 2, for the record it says City of
24  Markham Police Department memorandum to you again

1  from Deputy Chief Jack Genius regarding conflict
2  resolution dated December 7, 2016, so almost two
3  months later.  Here this is addressing the same
4  dispute between you and Officer Dawson, correct?
5    A.    Correct.
6    Q.    Based on the information he has, they've
7  ordered you to attend a licensed conflict
8  resolution professional?
9    A.    Both of us, yes.
01:22PM 10    Q.    I'm sorry?
11    A.    Both of us.
12    Q.    Both you and Officer Dawson received the
13  same instruction, correct?
14    A.    Yes.
15    Q.    Did you, in fact, followup or visit with
16  a conflict resolution professional?
17    A.    Yes.
18    Q.    Do you recall when that was?
19    A.    I do not recall the exact date.
01:22PM 20    Q.    Do you recall how many sessions were
21  involved?
22    A.    I do not recall.
23    Q.    Do you recall who the -- Do you recall
24  where it was, who and where it was?

1    A.    I do not recall.
2    Q.    Does this refresh your memory at all
3  about the details of what the dispute between you
4  and Officer Dawson at that time?
5    A.    Yes.
6    Q.    Okay.  What was the dispute?  I'm not
7  sure if I heard you answer or not.
8    A.    It wasn't pertaining to work.  It was
9  personal.
01:23PM 10    Q.    I understand, but what was the dispute?
11    A.    I didn't tell her I was coming to an
12  event.
13    Q.    And what event?
14    A.    It was an out-of-town event.
15    Q.    An out-of-town event?
16    A.    Yes.
17    Q.    What was the event?
18    A.    I don't recall the exact event.
19    Q.    Where was the event?
01:23PM 20    A.    Vegas.
21    Q.    In Las Vegas.  When was the event?
22    A.    I don't recall the exact date.
23    Q.    What was the event for, do you remember
24  that?  Why did you go to it?

1    A.    I don't recall.
2    Q.    But it was something that you arranged,
3  correct, you did attend it?
4    A.    I did.
5    Q.    And Officer Dawson attended it?
6    A.    She did.
7    Q.    And you saw each other there?
8    A.    Physically we didn't see each other.
9  Somebody else saw me there.
01:24PM 10    Q.    Who would that be?
11    A.    Her mother.
12    Q.    And was there anyone else from the
13  Markham Police Department at this event to your
14  knowledge?
15    A.    No.
16    Q.    Okay.  But what happened that caused --
17  To your knowledge, what happened that caused the
18  problem for Officer Dawson that you were in Las
19  Vegas at this event?
01:24PM 20    A.    Nothing.
21    Q.    Did you have an interaction with Officer
22  Dawson's mother?
23    A.    I said hello.
24    Q.    Anything else?

```
 1      A.    No.
 2      Q.    Officer Dawson had complained to Deputy
 3   Chief Jack Genius that you were harassing her.  Do
 4   you have any basis to understand why she would be
 5   making that allegation --
 6      A.    No.
 7      Q.    -- based on your attending that event?
 8      A.    No.
 9      Q.    That's what Deputy Chief Genius and
01:25PM 10   Officer Wilkins investigated and talked to you
11   about?
12      A.    Not pertaining to the event, no.
13      Q.    Was there something that they asked you
14   about?
15      A.    I don't recall but they didn't bring up
16   Vegas.
17            MR. SULLIVAN:  I'm sorry, could you
18   repeat that?
19            THE WITNESS:  They didn't bring up Vegas.
01:25PM 20            MR. SULLIVAN:  Thank you.
21   BY MR. HAYES:
22      Q.    That wasn't something they asked you
23   about?
24      A.    No.
```

```
 1      Q.    So do you know whether Officer Dawson
 2   brought up Las Vegas and this event if and when she
 3   talked to Jack Genius and Nicole Wilkins?
 4      A.    I don't recall.
 5      Q.    Okay.  What did they ask -- You said you
 6   don't recall what you discussed with them though,
 7   correct?
 8      A.    Correct.
 9      Q.    But you know it wasn't this Vegas event?
01:26PM 10      A.    Correct.
11      Q.    As you sit here today, you don't
12   understand why your attending this Las Vegas event
13   caused the problem with Officer Dawson, but you
14   believe that's the basis of it?
15      A.    Can you restate that question?
16      Q.    As you sit here today, you don't know
17   why Officer Dawson had a problem with you being in
18   Las Vegas at this event where you saw her mother?
19      A.    Because I didn't tell her I was coming.
01:26PM 20      Q.    Why would that be a problem for her?
21      A.    Because she wanted to know if I was
22   coming.  At the time she asked me, I did not know.
23      Q.    I see.  This was something -- Were you
24   invited?
```

```
 1      A.    No.
 2      Q.    How did you know about the event?
 3      A.    I was there with my friend that doesn't
 4   work at the City of Markham.
 5      Q.    Is any of this refreshing your memory
 6   about what the event was?
 7      A.    It was just vacation.  It wasn't no --
 8   it was just vacation.
 9      Q.    It wasn't a conference, it wasn't
01:27PM 10   anything like that?
11      A.    Not to my recollection, no.
12      Q.    Okay.  You and Officer Dawson and her
13   mother all happened to be in Las Vegas at the same
14   time?
15      A.    Yes.
16      Q.    But you don't recall any other details
17   or understand why that would be a problem for
18   Officer Dawson?
19      A.    Because I didn't tell her I was coming.
01:27PM 20   That was her problem.  She couldn't control the
21   fact if I was coming or not.
22      Q.    Okay.  Did she -- Was her understanding
23   you might go to Las Vegas?
24      A.    Yes.
```

```
 1      Q.    But you didn't tell her you were?
 2      A.    Exactly.
 3      Q.    In any event, you never met up with
 4   Officer Dawson in Las Vegas?
 5      A.    No.
 6      Q.    Other than that event, is there any
 7   other basis for the dispute between you two dating
 8   back to at least December of 2016?
 9      A.    Not to my knowledge.
01:28PM 10      Q.    If you take a look at the last page of
11   City 11.  It's another Markham Police Department
12   memo.  This one is to Deputy Chief Genius from you,
13   subject discrimination, date December 12, 2016.  Do
14   you see that on the same page?
15      A.    Yes.
16      Q.    Okay.  Now, in this memo, I won't read
17   it word for word, but you are complaining to Deputy
18   Chief Genius that you are being discriminated
19   against by Officer Dawson because of prior issues
01:29PM 20   which I think maybe we were just talking about.
21   You weren't invited to a holiday grab bag exchange
22   like you typically are.  That was the subject of
23   this complaint?
24      A.    Yes.
```

1    Q.    And did Deputy Chief Genius talk to you

2  about it?

3    A.    **I don't recall.**

4    Q.    Was there any followup either from you

5  or from the city administration regarding this

6  discrimination complaint?

7    A.    **I don't recall.**

8    Q.    The message here is you would have liked

9  to have been part of the gift exchange, correct?

01:29PM 10    A.    **Right.**

11    Q.    That was the basis of the discrimination

12  allegation against Officer Dawson?

13    A.    **Yes.**

14    Q.    You don't recall any followup or any

15  resolution to this?

16    A.    **Correct.**

17    Q.    We talked again earlier about your

18  relationship with Officer Dawson and how you

19  interacted with her socially outside of work and

01:30PM 20  were friendly with her?

21    A.    **I was.**

22    Q.    At some point did you patch things up?

23    A.    **With the conflict resolution, yes.**

24    Q.    You both attended that separately I take

1  it, correct?

2    A.    **Yes, and one session together.**

3    Q.    And that resolved whatever the disputes

4  were between you at that time and you've been

5  friendly since then?

6    A.    **Cordial, yes.**

7    Q.    And do you know whether this dispute and

8  these allegations of harassment and discrimination

9  between you and Officer Dawson had anything to do

01:30PM 10  with your getting removed from the city hall

11  assignment?

12    A.    **Not to my knowledge.**

13    Q.    No one ever explained that to you, that

14  as a result of the department ordering you to stay

15  away from each other, you were being taken off a

16  particular assignment?

17    A.    **Not to my knowledge.**

18    Q.    Would anything refresh your recollection

19  about that, whether there was a connection between

01:31PM 20  this assignment removal and this dispute?

21    A.    **I doubt it. I don't know.**

22    Q.    Have we kind of gone through all the

23  assignments that -- assignment changes that are the

24  basis of your discrimination complaint of the

1  amended complaint?

2    A.    **Yes, that I recall.**

3    Q.    We talked a little bit about your

4  Walmart secondary employment earlier. I believe

5  you said you don't recall when that ended,

6  correct?

7    A.    **Correct.**

8    Q.    Have you worked at all while you have

9  been a full-time officer with the Harvey Police

01:32PM 10  Department?

11    A.    **No.**

12    Q.    So it ended sometime prior to your

13  starting there?

14    A.    **Yes.**

15    Q.    Your start date was July 4th, 2018?

16    A.    **2019.**

17    Q.    And was there a particular reason you

18  ended your Walmart employment regardless of when it

19  was?

01:32PM 20    A.    **Due to knowledge of me being terminated**

21  **from Markham.**

22    Q.    Why would your separation or termination

23  from Markham Police Department affect your working

24  at Walmart as security?

1    A.    **Because you have to be an officer or**

2  **retired police officer to work that security job.**

3    Q.    So at the end of your employment with

4  Markham disqualified you from being a Walmart

5  security officer?

6    A.    **Yes. I didn't know if I was going to**

7  **get hired at another police department or not.**

8    Q.    Okay. Your last day at Markham was

9  July 3rd, 2019?

01:33PM 10    A.    **I don't recall.**

11    Q.    In any event, your first day was

12  July 4th 2019 at the Harvey Police Department?

13    A.    **Yes.**

14    Q.    What about your rodeo security, when did

15  you work for them?

16    A.    **The rodeo?**

17    Q.    Rodeo, okay.

18    A.    **What was the question?**

19    Q.    What years did you work -- did you work

01:33PM 20  for rodeo?

21    A.    **Yes.**

22    Q.    Was that a security job?

23    A.    **Off duty, yes.**

24    Q.    I'm sorry?

1    A.    **Off duty.**

2    Q.    It was a secondary employment job?

3    A.    **Yes.**

4    Q.    As security?

5    A.    **Yes.**

6    Q.    What years did you work that secondary

7  employment?

8    A.    **I do not recall specifically.**

9    Q.    Did you end that employment prior to

01:34PM 10  working at Walmart as a security officer?

11    A.    **No, before.**

12    Q.    Your work at rodeo was before working at

13  Walmart?

14    A.    **Yes.**

15    Q.    You didn't work at the same time?

16    A.    **I did.**

17    Q.    You worked both rodeo and Walmart as a

18  security officer during the same period of time?

19    A.    **Yes.**

01:34PM 20    Q.    Do you recall when your last day was --

21  Let me ask you:  Have you stopped working at rodeo?

22    A.    **Yes.**

23    Q.    When was your last day at rodeo?

24    A.    **I don't recall.**

1    Q.    Do you recall when your first day was?

2    A.    **I don't recall.**

3    Q.    Have you worked at rodeo any time you've

4  been a full-time officer at the Harvey Police

5  Department?

6    A.    **No.**

7    Q.    Your working for rodeo and your working

8  for Walmart overlapped at least to some extent

9  timewise?

01:35PM 10    A.    **Yes.**

11    Q.    Did you work specific days or times at

12  rodeo?

13    A.    **When they would have a rodeo.**

14    Q.    Maybe I misunderstand.  Rodeo is not

15  just a company, it's an actual --

16    A.    **It's a horse rodeo.**

17    Q.    -- rodeo as security?

18    A.    **Yes.**

19    Q.    I didn't take that from the answer in

01:35PM 20  the interrogatories.

21         MR. SULLIVAN:  Cowboys.

22  BY MR. HAYES:

23    Q.    Were would those rodeos be?

24    A.    **In the City of Markham.**

1    A.    I wasn't aware of that.  That's why we

2  do these deps because you do learn stuff.

3         How often would those be?

4    A.    **I don't recall.**

5    Q.    More than once a year?

6    A.    **Yes.**

7    Q.    It would be more than once?

8    A.    **Yes.**

9    Q.    And I saw in some of your answers 2015

01:36PM 10  to 2017, does that sound approximately correct?

11    A.    **Yes.**

12    Q.    How much were you paid to work at a

13  rodeo?

14    A.    **I don't recall.**

15    Q.    Did you have a supervisor there?

16    A.    **Yes.**

17    Q.    Who was that?

18    A.    **James Walker.**

19    Q.    James Walker?

01:36PM 20    A.    **Yes.**

21    Q.    James Walker was a former full-time

22  officer for the Markham Police Department?

23    A.    **He was former deputy chief.**

24    Q.    Is there a particular reason why you

1  stopped working security at the rodeo?

2    A.    **From my recollection, my services were**

3  **no longer needed.**

4    Q.    When you say your services, the Markham

5  Police Department or any security?

6    A.    **The group of officers that was working**

7  **there.**

8    Q.    Was this a detail through the city

9  police department or was this separate outside

01:37PM 10  employment?

11    A.    **Outside employment.**

12    Q.    Correct me if I'm wrong, it sounds like

13  at some point they stopped using off duty Markham

14  police officers as security.  Is that why you

15  stopped being security at the rodeo?

16    A.    **I know they stopped using our group of**

17  **officers that was working there.**

18    Q.    Who was the group of officers other than

19  former deputy chief James Walker?

01:37PM 20    A.    **Some officers from county, other**

21  **surrounding departments.**

22    Q.    How did you become aware of the

23  opportunity to work security at the rodeo?

24    A.    **Word of mouth.**

1    Q.    Your understanding though is whole group
2  was discontinued as security at one time?
3    A.    Yes.
4    Q.    You weren't fired for any reason?
5    A.    No.
6    Q.    Other than the rodeo, Walmart, any other
7  secondary employment that you worked while a
8  Markham police officer?
9    A.    No.
01:38PM 10   Q.    Have you ever been disciplined as a
11  Markham police officer?
12   A.    Yes.
13   Q.    Had you ever been suspended?
14   A.    Not to my knowledge.
15   Q.    So whatever discipline you had was
16  something less than suspension?
17   A.    To my knowledge.
18   Q.    Take a look at City 13, six pages.  Take
19  whatever time you need to page through those.  I'm
01:39PM 20  not going to dwell on these.
21        MR. SULLIVAN:  Do you want to take a
22  five-minute break while you read that and go back
23  on the record?
24        THE WITNESS:  I'm good.

1
2  BY MR. HAYES:
3    Q.    Are you just about through?  We're not
4  going to dwell on it too much.  You've seen all
5  these before?
6    A.    Yes.
7    Q.    The first four pages are more recent
8  ones.  These are just verbal warnings that you
9  received for various disciplinary matters, correct?
01:42PM 10   A.    Yes.
11   Q.    Are any of these the basis -- a basis of
12  your claim for sexual discrimination or harassment
13  by the City of Markham?
14   A.    No.
15   Q.    None of these we have in Exhibit 13 are
16  something that are addressed in your complaint?
17   A.    No.
18   Q.    Jumping to a new topic, Exhibit 1,
19  Paragraph 12(b), there you have an allegation that
01:43PM 20  you've been denied paid time off.  Do you see that?
21   A.    Yes.
22   Q.    Is that in reference to the compensatory
23  time we talked about a little earlier?
24   A.    Yes.

1    Q.    Did you ever personally track how much
2  compensatory time that you had earned or banked?
3    A.    Personally once.
4    Q.    Once you tracked how much time you had?
5    A.    Yes.
6    Q.    Do you recall when that was?
7    A.    I don't recall.
8    Q.    Was it more than a year before you left
9  Markham or that your employment was terminated?
01:44PM 10   A.    Yes.
11   Q.    It was dated further back.  Was it two
12  years, more than two years before?
13   A.    Yes.
14   Q.    What about more than three years before?
15   A.    I don't recall.
16   Q.    Then turn to -- this will help focus us.
17  City Exhibit No. 2 which is the interrogatories
18  answers and Questions 12, you were asked about this
19  allegation.
01:46PM 20        MS. SAMUELS:  Question 12?
21  BY MR. HAYES:
22   Q.    Question 12.  I will have to redirect
23  you.  What was it -- 14, I'm sorry.  Question 14 on
24  City Exhibit 2.

1        The question, for the record, you
2  were asked to identify all instances where you were
3  denied paid time off as alleged in the complaint,
4  Paragraph 12(b) stating the dates and additional
5  details.
6        In your answer to Interrogatory 14,
7  you listed three dates basically, March 17, 2018,
8  which I believe would be your birthday, correct?
9    A.    Yes.
01:45PM 10   Q.    Christmas of 2018 and June of 2019.  Are
11  those three instances where you requested to use
12  compensatory time?
13   A.    Did I request?  Yes.
14   Q.    So are there any other instances that
15  are a basis of your claim?
16   A.    December of 2018.
17   Q.    We listed that, Christmas, you mentioned
18  that in the answer?
19   A.    Yes.
01:46PM 20   Q.    So aside from these three references,
21  were there any other dates?
22   A.    Not to my knowledge.
23   Q.    When you requested compensatory time on
24  these occasions, you use it to take paid time off

1 essentially, correct?

2     A.    **Correct.**

3     Q.    Who did you make the request to?

4     A.    **Okay. Administration.**

5     Q.    How did you do that, by written

6 documentation, conversation?

7     A.    **Written documentation.**

8     Q.    So you submitted a memo to take -- to

9 use compensatory time?

01:46PM 10     A.    **A request time form.**

11     Q.    So there's a specific form that you can

12 submit?

13     A.    **Yes.**

14     Q.    Who do you submit that to or to whom do

15 you submit that?

16     A.    **Chain of command.**

17     Q.    Is there someone specific in the chain

18 of command that you submit it to or just anybody?

19     A.    **It goes to my sergeant and then from the**

01:47PM 20 **sergeant up to administration.**

21     Q.    And March of 2018, do you recall who

22 your sergeant was?

23     A.    **I do not recall.**

24     Q.    Is there any reason to believe that you

1 submitted to someone else on that particular

2 occasion on March 17th of 2018?

3     A.    **Administration.**

4     Q.    Your request was denied on that

5 occasion; is that correct?

6     A.    **Correct.**

7     Q.    Since it's part of your complaint. How

8 do you know it was denied or how was that

9 communicated to you?

01:47PM 10     A.    **The sheet was given back to me that I**

11 **filled out.**

12     Q.    Okay. Did it indicate -- Does it say

13 denied? How do you know it's been denied or

14 granted as the case may be?

15     A.    **It had check box denied or approved. I**

16 **don't recall if that specific date was approved or**

17 **not.**

18     Q.    So March 17, 2018 you don't recall if

19 you were given that date or allowed to use comp

01:48PM 20 time or not allowed?

21     A.    **Correct.**

22     Q.    I suppose you would defer to the record

23 of that, whichever way it went?

24     A.    **Yes.**

1     Q.    What about Christmas in 2018, do you

2 recall submitting a request to use comp time or

3 paid time off for that date?

4     A.    **Yes.**

5     Q.    Do you recall what the response was?

6     A.    **I don't recall.**

7     Q.    What about June of 2019?

8     A.    **I don't recall.**

9     Q.    You don't recall if it was denied or

01:49PM 10 not?

11     A.    **I don't recall whether it was denied or**

12 **not.**

13     Q.    Do you know why did you put these three

14 dates in your answer to interrogatories if you

15 don't recall whether it was granted or denied?

16     A.    **I don't recall today.**

17     Q.    Why did you list these dates if you

18 can't recall whether you got those dates off or

19 not?

01:49PM 20     A.    **I don't recall.**

21     Q.    Do you recall whether you had any comp

22 time banked at the time of these requests?

23     A.    **Yes.**

24     Q.    You do recall that you believe you had

1 comp time available to use?

2     A.    **I believe that I had comp time**

3 **available.**

4     Q.    On all of these instances?

5     A.    **Yes.**

6     Q.    Did anyone from administration tell you

7 you didn't have any comp time available to use on

8 any of these three occasions that you recall?

9     A.    **Yes.**

01:50PM 10     Q.    Who told you that?

11     A.    **I don't recall.**

12     Q.    You don't recall having that discussion

13 with anyone from administration that you don't have

14 comp time?

15     A.    **I had that discussion, but I don't**

16 **exactly know -- recall who the person was.**

17     Q.    You don't recall which of these three

18 instances that was?

19     A.    **Around Christmas of 2019. 2018, excuse**

01:50PM 20 **me.**

21     Q.    Okay. That conversation regarding comp

22 time available was specific to that one Christmas

23 2018?

24     A.    **Yes.**

1    Q.    Why do you think that -- Why do you
2    think it was based on your sex then, whatever
3    happened with these requests, why include that your
4    interrogatory answers in support of the allegation
5    of Paragraph 12 in your complaint?
6    A.    **Due to other officers being able to have**
7    **comp time and use comp time, and from my**
8    **recollection I thought I had comp time and was told**
9    **I did not.**
01:51PM 10    Q.    You were told you did not; is that
11    correct?
12    A.    **That's correct.**
13    Q.    But you don't recall who told you that?
14    A.    **Correct.**
15    Q.    Are you aware of any other male officer
16    that you know whether or not they were allowed to
17    use comp time in a particular situation?
18    A.    **No, I do not.**
19    Q.    You had to request these paid time off
01:52PM 20    or comp time approved by the administration?
21    A.    **Have I had it approved before?**
22    Q.    Yes.
23    A.    **Yes.**
24    Q.    Do you know how many times you've been

1    approved to use comp time?
2    A.    **I don't recall.**
3    Q.    Anything that would refresh your memory?
4    A.    **I don't recall.**
5    Q.    Let's take a look at Exhibit 1,
6    Paragraph 12(h). That's the complaint. There's no
7    ambiguity about this, this is the termination. You
8    claim to be terminated based on your retaliation
9    for your sex, right? That's a part of your claim?
01:53PM 10    A.    **Correct.**
11    Q.    And then let's take a look at Exhibit 2
12    then, Question 21. It's the interrogatory answers
13    when you were asked about this complaint. I think
14    I got it right this time.
15             21 where he asked about how you
16    learned about potential termination and so forth,
17    and part of your response was word of mouth,
18    correct?
19    A.    **Correct.**
01:54PM 20    Q.    Okay. Do you recall who you heard from
21    word of mouth that termination or terminations were
22    coming?
23    A.    **The whole police department.**
24    Q.    Everyone was talking about?

1    A.    **They was talking about the changes that**
2    **was coming, yep.**
3    Q.    There was specific talk or concern about
4    terminations?
5    A.    **Correct.**
6    Q.    Of police officers?
7    A.    **Correct.**
8    Q.    And do you know why there was concern?
9    What was the basis of the concern from those
01:55PM 10    discussions or rumors?
11    A.    **At that time, no.**
12    Q.    Let's turn to City 16. Do you have that
13    in front of you, and have you had a chance to take
14    a look at it?
15    A.    **Yes.**
16    Q.    And this is, for the record, a letter
17    dated -- City of Markham Police Department to you
18    dated July 3rd, 2019 from Chief of Police Terry
19    White, correct?
01:56PM 20    A.    **Correct.**
21    Q.    And is this the first formal notice you
22    received that your employment would be ended with
23    Markham?
24    A.    **Yes.**

1    Q.    Prior to that, everything else was just
2    word of mouth around the department, correct?
3    A.    **Correct.**
4    Q.    And did you have a conversation with
5    Chief White or anyone else in administration about
6    this formal notice?
7    A.    **To my recollection, Officer Blohm.**
8    Q.    You had a conversation with him about
9    it?
01:56PM 10    A.    **Yes.**
11    Q.    Do you recall when that was?
12    A.    **I don't recall.**
13    Q.    That was after receiving this notice or
14    before?
15    A.    **I don't recall.**
16    Q.    What was your conversation about? What
17    did you say to him and what did he say to you?
18    A.    **Just about I didn't receive a schedule**
19    **for the following week and that was it.**
01:57PM 20    Q.    So you were inquiring why you didn't
21    have a -- weren't on the schedule?
22    A.    **Exactly.**
23    Q.    What was his response to you?
24    A.    **I don't recall his exact response.**

1     Q.    Was this an in-person conversation?

2     A.    **I don't recall.**

3     Q.    What was his response to you?

4     A.    **I don't recall.**

5     Q.    Okay. The date on the notice, July 3rd,

6   2019, was that your last day of employment with the

7   Markham Police Department?

8     A.    **Yes.**

9     Q.    And the notice that you received, this

01:58PM 10   letter from Chief White, represents budget cuts,

11   correct?

12     A.    **Yes.**

13     Q.    And that your position has been

14   eliminated?

15     A.    **Yes.**

16     Q.    Did you ever have a conversation with

17   Chief White about that or any further detail about

18   that?

19     A.    **No.**

01:59PM 20     Q.    Did you have a conversation with anyone

21   in the city administration or HR about that?

22     A.    **Budget cuts?**

23     Q.    About budget cuts or the reason for the

24   position elimination.

1     A.    **Not that I recall.**

2     Q.    And did you know whether the other

3   part-time officers -- Let me ask you first: How

4   many part-time officers were there at the beginning

5   of July 2019?

6     A.    **Three.**

7     Q.    Three part-time officers?

8     A.    **To my knowledge, yes.**

9     Q.    You, Jerald Jackson and who else?

01:59PM 10     A.    **Valenzuela.**

11     Q.    Okay. Did you have a conversation with

12   any of them about this notice of position

13   eliminations?

14     A.    **Not that I recall.**

15     Q.    Do you know whether their positions were

16   eliminated at the same time?

17     A.    **Not that I recall.**

18     Q.    Do you know one way or the other -- do

19   you have any evidence whatsoever of whether they

02:00PM 20   were -- they continued working or their part-time

21   positions were eliminated too?

22     A.    **The only person I think continued**

23   **working was Jerald Jackson.**

24     Q.    How do you know that or why do you think

1   that?

2     A.    **Out of his mouth.**

3     Q.    So did you have a conversation with him?

4     A.    **Yes.**

5     Q.    Okay. When was that conversation?

6     A.    **Around June of 20 -- of that year.**

7     Q.    June of 2019?

8     A.    **Yes.**

9     Q.    So before you received the formal

02:00PM 10   notice?

11     A.    **Yes.**

12     Q.    Okay. And what did he tell you?

13     A.    **He's a full-time officer, he's staying**

14   **on full-time.**

15     Q.    Okay. And do you know whether, in fact,

16   he did stay on after July 3rd, 2019?

17     A.    **I heard from him he was.**

18     Q.    Okay. You heard from him in June that

19   he was staying on full-time, correct?

02:01PM 20     A.    **A little after July I spoke with him.**

21     Q.    Okay. Where did you speak to him?

22     A.    **I saw him at a Walmart.**

23     Q.    In Walmart?

24     A.    **Yes.**

1     Q.    Okay. As a customer or as a security

2   guard?

3     A.    **Security.**

4     Q.    Were you working security or him?

5     A.    **Him.**

6     Q.    You had stopped working there at that

7   point?

8     A.    **Yes.**

9     Q.    And you had another conversation about

02:01PM 10   the lay-offs?

11     A.    **Yes.**

12     Q.    And he told you he was staying on at

13   Markham?

14     A.    **Yes.**

15     Q.    And beyond that date, have you had any

16   communication with him of what his status is at the

17   Markham Police Department?

18     A.    **No.**

19     Q.    Do you know how long after July 3rd,

02:02PM 20   2019 that conversation took place in Walmart?

21     A.    **How long?**

22     Q.    Correct.

23     A.    **How long was the conversation?**

24     Q.    How long after July 3rd the conversation

1   took place.
2       A.      I don't recall.
3       Q.      Why do you believe that the elimination
4   or termination of your employment with Markham was
5   based on sex discrimination or retaliation?
6       A.      Because it happened after I filed with
7   the Department of Human Rights and they asked -- to
8   my recollection Markham had just received the
9   information from the Department of Human Rights
02:02PM 10   about the case, and then that's when all the
11   chatter was talking about they letting go of all
12   the part-timers and the fact that Jerald was still
13   going as a full-time, a full-time officer with no
14   full-time credentials.
15      Q.      Okay.  So then we talked about all the
16   basis for why you believe -- you were more
17   qualified than him to be a full-time officer --
18      A.      Yes.
19      Q.      -- for Markham?
02:03PM 20      A.      And it wasn't offered to -- at the time
21   of elimination to say they bring us on as full-time
22   officers.
23      Q.      Your understanding from talking to him
24   was that he was allowed to stay on and transition

1   to full-time and he's a male and you were not, you
2   were let go?
3       A.      Yes.
4       Q.      Fernando, the other part-timer is a
5   male, correct?
6       A.      Yes.
7       Q.      And he was -- Do you know whether he was
8   laid off or not?
9       A.      Later on I found out after talking to
02:04PM 10   him.
11      Q.      You found out he was laid off at the
12   same time?
13      A.      Yes.
14      Q.      Was that an in-person conversation?
15      A.      Yes.
16      Q.      Where did you see him?
17      A.      The City of Harvey.
18      Q.      Does he work there too?
19      A.      To my knowledge, yes.
02:04PM 20      Q.      Okay.  As of when you went off on injury
21   leave, he was an employee of the police department
22   in Harvey?
23      A.      Yes.
24      Q.      Okay.  So did he start about the same

1   time you did?
2       A.      He started after I did.
3       Q.      But you had a conversation at Harvey
4   about the lay-offs and learned he was laid off also
5   on July 3rd?
6       A.      Yes.
7       Q.      Any other basis for believing it was sex
8   discrimination or retaliation?
9       A.      Not to my recollection.
02:04PM 10      Q.      Okay.  You said to your knowledge you
11   found out that the city received news of your
12   filing of the original discrimination charge, some
13   period before the position elimination.  Who did
14   you hear that from?
15      A.      Just people talking.
16      Q.      What people?  Which people?
17      A.      In the city, in city hall and the police
18   department.
19      Q.      Can you identify any of the people you
02:05PM 20   heard talking about the city receiving your charge
21   of discrimination?
22      A.      I don't remember their names.
23      Q.      So none of the people we discussed so
24   far or brought up today?

1       A.      From city hall?
2       Q.      Was it someone at city hall or the
3   police department?
4       A.      I don't recall.
5       Q.      You heard from somebody at some time
6   that the city had received notice of your filing
7   your charge of discrimination?
8       A.      Yes.
9       Q.      And this position elimination occurred
02:05PM 10   after that?
11      A.      Yes.
12      Q.      So that's one of the bases of your claim
13   for retaliation?
14      A.      Yes.
15      Q.      Any other bases we haven't talked about?
16      A.      Not to my knowledge.
17      Q.      I'll move to it for reference, but City
18   Exhibit 1, Paragraph 12(e) you make a claim for
19   being denied training opportunities.
02:06PM 20      A.      Yes.
21      Q.      That's part of your claim.  And if you
22   look at City Exhibit 2, which is the interrogatory
23   answers, Question 18, you were asked to identify
24   all training opportunities that you were denied.

1    A.    Yes.
2    Q.    And the only one you identified
3    specifically in your answer was an active shooting
4    drill?
5    A.    Yes.
6    Q.    Okay.  Is that the training that you
7    applied to do or were planning to do?
8    A.    Planning to do.
9    Q.    What is an active shooting drill?
02:07PM 10    A.    We use one of the schools that's in the
11    community, and the school is also in session, and
12    it was training for the school too to simulate if
13    an active shooter was to come into the school what
14    the teachers had to do and simulate from our end
15    how to go in and out of the classroom and whether
16    or not the classrooms was clear or not.
17    Q.    So the training, do you recall the date
18    that that training was conducted or going to be
19    conducted?
02:08PM 20    A.    I don't recall the specific date.
21    Q.    Okay.  The interrogatory answer
22    references the beginning of 2019.  Does that
23    refresh your memory at all?
24    A.    Yes.  I don't recall the specific date.

1    Q.    Okay.  Do you believe it was prior to
2    2019?
3    A.    At the beginning.
4    Q.    And you mentioned that it was given to a
5    white officer instead of you.  Did you submit
6    something in writing or otherwise to indicate you
7    wanted to participate in the shooting drill?
8    A.    To my knowledge you don't have to.
9    Q.    Okay.  It was something the whole
02:08PM 10    department was going to be involved in?
11    A.    Certain officers.
12    Q.    I'm sorry?
13    A.    Certain officers.
14    Q.    Forgive me, but I'm not following you.
15    A.    Certain officers.
16    Q.    Certain officers?
17    A.    Yes.
18    Q.    Had this drill training ever been done
19    in the past while you were at Markham?
02:09PM 20    A.    Yes.
21    Q.    When was it done on a prior occasion?
22    A.    I don't recall the exact date.
23    Q.    Had you participated in it before?
24    A.    Yes.

1    Q.    How many times had you participated in
2    it?
3    A.    I don't recall the number.
4    Q.    Do you recall how long before this time
5    in 2019 that the last one was held?
6    A.    I do not recall.
7    Q.    Do you know how officers are picked to
8    participate in the active shooting drill whenever
9    it's up?
02:09PM 10    A.    I don't recall.
11    Q.    With respect to the one being held as
12    you recall in the beginning of 2019, do you know
13    how officers were going to be picked or selected
14    for that to train?
15    A.    Just by word of mouth.  It was more of
16    the Caucasian officers that were cool with Chief
17    Terry White.
18    Q.    You reference white officers in your
19    answer, correct?
02:10PM 20    A.    Yes.
21    Q.    Do you have any claim for race
22    discrimination in the amended complaint?
23    A.    Not to my knowledge.
24    Q.    Okay.  Did you raise race discrimination

1    in your charges of discrimination, your original
2    charge?
3    A.    Not to my knowledge.
4    Q.    Well, do you know who the white officers
5    are you're talking about in your answer to
6    Interrogatory 18?
7    A.    There's multiple.
8    Q.    Who?
9    A.    It's multiple.
02:10PM 10    Q.    Who are the white officers that you are
11    complaining of that got to do this instead of you?
12    A.    Officer Carey, Officer, I don't know his
13    first name, Johnston.  I don't recall the other
14    officers.
15    Q.    Officers Johnston and Officer Carey, are
16    they full-time officers?
17    A.    I don't know about now.  Then yes.
18    Q.    Are you aware of any part-time officers
19    that were participating in this active shooting
02:11PM 20    drill training in the beginning of 2019?
21    A.    Jackson.
22    Q.    Officer Jackson was involved?
23    A.    Yes.
24    Q.    And at some point had you been picked to

1 participate in the training and were removed?
2     A.   **No.**
3     Q.   It was just something you wanted to do?
4     A.   **Yes.**
5     Q.   And you were notified that you were one
6 of the selected officers?
7     A.   **But it was being given.**
8     Q.   So you didn't even know it was coming?
9     A.   **Correct.**
02:12PM 10     Q.   But you had participated in that
11 training before?
12     A.   **Yes.**
13     Q.   And you don't recall how many times
14 before though?
15     A.   **No.**
16     Q.   Was it more than one?
17     A.   **Yes.**
18     Q.   More than two?
19     A.   **I don't recall.**
02:12PM 20     Q.   So it was more than one but you don't
21 know if it was more than two?
22     A.   **Correct.**
23     Q.   Okay. And Officers Carey, Johnston and
24 Officer Jackson, do you know if they ever

1 participated in the active -- an active shooting
2 drill training before?
3     A.   **I don't recall.**
4     Q.   Was there any basis or what is the basis
5 of your belief that you weren't notified of this
6 training based on you being a female for
7 retaliation?
8     A.   **No female officer was picked for that at**
9 **all, given the opportunity.**
02:13PM 10     Q.   Because the officers were all male on
11 this particular occasion, that has become a part of
12 your claim?
13     A.   **Yes.**
14     Q.   Anything other than that?
15     A.   **Just for this occasion.**
16     Q.   Well, I mean, you were asked to identify
17 all instances, all training in the complaint and
18 this is the only one you've raised.
19     A.   **Oh, yes. Just for this, yes.**
02:13PM 20     Q.   Is there any other training that's a
21 part of your claim?
22     A.   **No, not that I recall.**
23     Q.   How do you know for certain that there
24 were no female officers involved in the active

1 shooting drill training in early 2019?
2     A.   **Because I was told there wasn't.**
3     Q.   Who told you that?
4     A.   **By the other female officers.**
5     Q.   So a discussion among the female
6 officers?
7     A.   **That was there at that time, yes.**
8     Q.   That was there at that time?
9     A.   **Yes.**
02:14PM 10     Q.   Where is there?
11     A.   **At the City of Markham.**
12     Q.   Okay. So they were employed at the
13 police department at the time in early 2019, there
14 was a consensus of no female officers were
15 involved?
16     A.   **Correct.**
17     Q.   Who specifically was that discussion
18 with?
19     A.   **I don't recall exactly.**
02:14PM 20     Q.   Do you recall how many female officers
21 were in the department at that time?
22     A.   **Around five or six.**
23     Q.   Of those five or six women, can you
24 think of anyone of them that was involved in this

1 conversation with you that confirmed there were no
2 female officers involved in the training?
3     A.   **Monique Wood.**
4     Q.   Any others?
5     A.   **Not to my knowledge.**
6     Q.   Among you -- between you and Monique
7 Woods, you're not aware of any female officers
8 invited to that training?
9     A.   **Correct.**
02:15PM 10     Q.   For reference quickly here, City Exhibit
11 No. 1 which is the amended complaint,
12 Paragraph 12(a), 12(f), and Paragraph 20,
13 Subparagraph 12(a) is subjecting her to harassment
14 and belittlement. 12(f) is using belittling and
15 condescending language to and about her in front of
16 her counterparts, and then Paragraph 20 references
17 defendant took adverse employment actions against
18 plaintiff including her -- including subjecting her
19 to unwelcome harassment that unreasonably
02:16PM 20 interfered with her work performance and created an
21 environment that was intimidating, hostile and
22 offensive on the basis of her sex. Those are all
23 part of your claim, correct?
24     A.   **Correct.**

1   Q.   You were asked about those allegations
2   in City Exhibit 2, Questions 13, 19 and 22. For
3   purpose of my questions, I'd like you to take a
4   look at -- before I ask another question, 13 --
5   answers to 13, 19 and 22.
6        MS. SAMUELS:  Can we take a break?
7        MR. HAYES:  Sure.
8             (Whereupon, a short break in
9             the proceedings was taken.)
02:26PM 10       We are back on the record.
11   BY MR. HAYES:
12   Q.   I know you've taken a look at those
13   answers I've directed you to, but I'm going to back
14   up for one second for something I forgot to ask you
15   about.
16        Would you take a look at Exhibit
17   City 17?  It should be the last.  17 and 18.  If
18   you can put those in front of you.  17 for the
19   record is titled agreement and general release
02:27PM 20   between you and the City of Markham.  It's a
21   four-page exhibit.  City 17, do you see that in
22   front of you?
23   A.   Yes.
24   Q.   I'm not going to get into the details of

1   it, but have you seen that document before?
2   A.   Yes.
3   Q.   Okay.  When did you see it or who did
4   you receive it from?
5   A.   HR.
6   Q.   Okay.  So you received it from HR for
7   the City of Markham?
8   A.   Yes.
9   Q.   Was there a specific person from HR that
02:27PM 10   sent this to you or gave it to you?
11   A.   I don't recall.
12   Q.   Okay.  How did you receive it?  Was it
13   emailed?  Was it given to you in person?
14   A.   Personally.
15   Q.   Where was it, at city hall or at the
16   police department?
17   A.   I don't recall.
18   Q.   Someone handed you this document in
19   person; is that correct?
02:28PM 20   A.   I was physically given a copy.
21   Q.   Physically by someone in HR?
22   A.   Correct.
23   Q.   Did you have any conversation about this
24   document or what it is?

1   A.   Not to my knowledge.
2   Q.   Do you remember any details if you had
3   any conversation with the person that handed it to
4   you?
5   A.   After receiving it.
6   Q.   You had a conversation with someone?
7   A.   Yes.
8   Q.   Who did you have a conversation with?
9   A.   Ashley.  I don't know her last name.
02:28PM 10   Q.   From HR?
11   A.   Yes.
12   Q.   What did you two talk about?
13   A.   When the deadline was for this, to
14   receive this and why was I given it so late.
15   Q.   Do you remember the date that you
16   received it or that you talked about?
17   A.   Not to my recollection.
18   A.   It was after July 3rd, 2019?
19   A.   Yes.
02:29PM 20   Q.   Did Ashley or anyone else from the city
21   explain what this is or talk to you about the
22   details?
23   A.   No.
24   Q.   Do you have an understanding of what

1   City Exhibit 17 is?
2   A.   At that time, no, I did not.
3   Q.   Did you ever sign or agree to City 17?
4   A.   No.
5   Q.   So did you have a followup communication
6   about your position on whether you were signing
7   this or not?
8   A.   No.
9   Q.   Did you communicate to the city that you
02:29PM 10   either were or weren't signing it or have more
11   questions?  How did you leave it with the city?
12   A.   Her just asking me when will she get
13   this back, and at that time I was on vacation so I
14   told her I'm on vacation, I don't have this
15   paperwork with me.
16   Q.   Did you receive this Exhibit 17 or a
17   copy of it after it was given to you?
18   A.   At that time, yes.
19   Q.   But you never signed it?
02:30PM 20   A.   I never signed it.
21   Q.   Did you ever tell the city you weren't
22   going to sign it?
23   A.   No.
24   Q.   You didn't have any followup with them

1  at all regarding this document?

2      A.    No.

3      Q.    Did anyone from the city ever followup

4  with you about where is it at, do you have any

5  questions, any followup whatsoever?

6      A.    Not that I recall.

7      Q.    Pull up City Exhibit 18.  With

8  reference to Plaintiff's production number on this

9  is Palmer 37, PF Palmer 37.  This was produced to

02:31PM 10  us in discovery.  Do you know what this picture is?

11      A.    Jerald Jackson.

12      Q.    This is Jerald Jackson.  Where is this

13  taken?

14      A.    Walmart.

15      Q.    It's not the greatest quality picture.

16  Is this something taken from your phone?  Did you

17  take the picture?

18      A.    I don't recall if I took this picture

19  but this is him.

02:31PM 20      Q.    It's hard to tell from the picture.  If

21  you didn't take this picture, who did?

22      A.    I don't recall where I got it from.

23      Q.    And why was it produced in this case?

24  What is this supposed to show in support of your

1  claim?

2      A.    That he still is working as a police

3  officer under the City of Markham.

4      Q.    Do you know what date this was taken?

5      A.    I do not recall.

6      Q.    You don't know if you took it?

7      A.    I do not recall.

8      Q.    Do you know whether this was taken

9  before -- before or after July 3rd, 2019?

02:32PM 10      A.    After July 3rd.

11      Q.    How do you know that?

12      A.    I was no longer working at Walmart then.

13      Q.    But you don't know who took this picture

14  or when it was taken?

15      A.    I don't recall who took this picture.

16      Q.    You don't recall who gave it to you?

17      A.    I don't recall.

18      Q.    Do you think that's Jerald Jackson in

19  the picture?

02:32PM 20      A.    It's Jerald Jackson.

21      Q.    Do you know where this is?  Is this

22  Walmart?

23      A.    This is Walmart.

24      Q.    When you worked for security for

1  Walmart, did you wear your Markham police uniform?

2      A.    No.

3      Q.    How would this picture then prove that

4  Jerald Jackson was still working at Markham?

5      A.    I physically seen him working at

6  Markham -- I mean working at Walmart with a Markham

7  badge and had a conversation with him while he was

8  working at Walmart.

9      Q.    When was that?

02:33PM 10      A.    After July 3rd.

11      Q.    Is that the conversation you talked

12  about earlier where he said he was staying on

13  full-time?

14      A.    Yes.

15      Q.    Is this a picture from that day or that

16  conversation?

17      A.    I don't recall.

18      Q.    You can't tell what uniform he's wearing

19  in this picture, can you, or if he's wearing a

02:33PM 20  uniform?

21      A.    Not from this picture.

22      Q.    Okay.  Back to City Exhibit 2.  I had

23  asked you to take a look at question and answers

24  for 13, 19 and 22.  These are interrogatory

1  answers.  And the three answers are basically the

2  same, aren't they?

3      A.    Yes.

4      Q.    To all of them, interrogatories that

5  were asked of the three different portions of the

6  complaint that we went through.

7      In these answers you reference some

8  phrases we'll talk about.  I guess maybe we'll just

9  go through them is the best way to do it.

02:34PM 10      From the phrases that you've

11  specifically identified, the first one was "am I

12  supposed to be the police".  I think you attribute

13  that to Chief White; is that correct?

14      A.    Yes.

15      Q.    Do you know when he said that?

16      A.    I don't recall the date.

17      Q.    What about a timeframe or a location?

18      A.    It was in the City of Markham.

19      Q.    And the police department?

02:35PM 20      A.    Yes.

21      Q.    What was the occasion?  Were you

22  speaking directly to you?

23      A.    Yes.

24      Q.    This is a direct quote from him, "am I

1  supposed to be the police?"
2      A.    Yes.
3      Q.    What were you talking about at the
4  time?
5      A.    I don't recall the conversation.
6      Q.    Do you know what -- Did you ask Chief
7  White what he meant by that?
8      A.    I don't recall.
9      Q.    Other than this phrase, "am I supposed
02:35PM 10  to be the police," on the occasion that Chief White
11  said this to you in the police department, do you
12  recall any other details of the conversation or
13  further interaction between you two?
14      A.    One on one or in a group?
15      Q.    On this occasion.  Did you hear him say
16  "am I supposed to be a police" on more than one
17  occasion?
18      A.    I don't recall.
19      Q.    Well, on the one occasion that you
02:36PM 20  recall in the police department where he said this,
21  do you recall any other specifics about further
22  discussion or conversation or interaction between
23  the two?
24      A.    For that day, No.  I don't recall.

1      Q.    I'm sorry, you said you didn't recall
2  when this was, right?
3      A.    I don't.
4      Q.    Was anyone else around?
5      A.    I don't recall.
6      Q.    I'm quoting these from your answer
7  "women who are females are not supposed to be the
8  police."  Are you attributing Chief White saying
9  that?
02:36PM 10      A.    Yes.
11      Q.    And did he say that directly to you?
12      A.    Yes.
13      Q.    Was anyone else present?
14      A.    I don't recall.
15      Q.    Where was that at?
16      A.    In the City of Markham.
17      Q.    In the police department?
18      A.    Yes.
19      Q.    Do you recall the date?
02:37PM 20      A.    I do not recall the date.
21      Q.    I don't need the exact date but even a
22  timeframe.
23      A.    I don't recall.
24      Q.    Do you recall the circumstances of the

1  occasion that Chief White was addressing when he
2  said this?
3      A.    I don't recall.
4      Q.    Do you recall whether you followed up
5  with Chief White and said what do you mean by that
6  or if he further explained it?
7      A.    He did not.
8      Q.    Do you recall any other specifics about
9  what you two were talking about on the particular
02:37PM 10  occasion you recall Chief White saying this to
11  you?
12      A.    I don't recall.
13      Q.    How about "ignorant", you used that
14  word, quoted it.  At some point did you hear Chief
15  White call you ignorant?
16      A.    Chief White didn't say that.
17      Q.    Who said that?
18      A.    Officer Carey.
19      Q.    Do you recall when Officer Carey said
02:38PM 20  that?
21      A.    I don't know the exact date and time.
22      Q.    Do you know the timeframe?
23      A.    Before July 3rd.
24      Q.    While you worked at Markham?

1      A.    Yes.
2      Q.    Before July 3rd, 2019?
3      A.    Yes.
4      Q.    Was anyone else present when Officer
5  Carey called you ignorant?
6      A.    Yes.
7      Q.    Who else was present?
8      A.    Officer Muldrow and Officer Short.
9      Q.    And was this on one occasion?
02:39PM 10      A.    Yes.
11      Q.    What were the circumstances?  What were
12  you talking about when he used the word ignorant?
13      A.    Officer Short and I was having a
14  conversation, and Officer Carey butted in and made
15  that derogatory statement towards me in front of
16  Officer Muldrow and Officer Short, which are both
17  male, very loud, and I was asked to write a to/from
18  a memo.
19      Q.    Let's look at Exhibit 14.  For the
02:40PM 20  record, it's City of Markham Police Department memo
21  to Lieutenant Blohm from the plaintiff, subject
22  inappropriate behavior dated April 10th, 2019, it
23  seems to detail the incident with Officer Carey,
24  correct?

1    A.    Yes.

2    Q.    It's the same incident you were just

3 talking about?

4    A.    Yes.

5    Q.    When he called you ignorant, do you

6 recall him using any other language or any other

7 terms or language you would consider to be

8 belittling or intimidating or it was just the term

9 ignorant?

02:40PM 10    **A.    The whole conversation.**

11    Q.    The whole conversation?

12    **A.    Yes.**

13    Q.    What was the rest of the conversation?

14    **A.    It was just fun banter between Officer**

15 **Short and I, which on our shift we have that, and**

16 **at that present moment when Carey was saying all**

17 **those derogatory things to me, he was standing over**

18 **me. I was sitting down. He was towering over me,**

19 **and him being a man, that was unacceptable to me.**

02:41PM 20    **He wouldn't stop and -- I was like**

21 **this conversation was between me and Short, you're**

22 **not even on our shift. This was between my shift,**

23 **you are not even on our shift. He worked a shift**

24 **prior to us coming on.**

1    Q.    So Officer Carey was not supervising you

2 or supervising your shift that particular night?

3    **A.    Not to my recollection, no.**

4    Q.    He wasn't the officer in charge or the

5 sergeant on that occasion?

6    **A.    No.**

7    Q.    And Officer Short and you, according to

8 your memo, had a dialogue over a chair,

9 conversation was fun that you had in the past.

02:42PM 10 What was the conversation?

11    **A.    Because his last name is Short, it was**

12 **just joking manner --**

13    Q.    Give me the specifics. What was the

14 conversation?

15    **A.    I don't remember word from word, but we**

16 **was always just joking and nobody took offense and**

17 **nobody -- it was literally about a chair, and then**

18 **he came in and the whole dynamic changed.**

19    Q.    So the subject of the conversation

02:42PM 20 was -- there was some conversation about Officer

21 Short, his name and his height?

22    **A.    And the chair where he sit. It was fun**

23 **banter between our shift.**

24    Q.    Okay. Was there any name calling

1 involved between you and Officer Short, even if it

2 was in fun?

3    **A.    No.**

4    Q.    And Officer Carey came in in the midst

5 of that?

6    **A.    Correct.**

7    Q.    Okay. In what context did he call you

8 ignorant?

9    **A.    Very derogatory to the point where I**

02:43PM 10 **felt small. Like I am very educated and I**

11 **mentioned, I said I'm educated, I'm not ignorant,**

12 **and he just kept saying it, and I was like this**

13 **conversation had nothing to do with you, you're not**

14 **even on our shift so what are you doing in here.**

15    Q.    Okay. Why would he call you ignorant?

16 Did he ask you for an explanation of what was

17 happening?

18    **A.    No, he just butted himself into the**

19 **conversation.**

02:44PM 20    Q.    And he used the word ignorant to refer

21 to you?

22    **A.    Yes.**

23    Q.    Anything else about that incident that

24 you can recall, anymore specifics about what he

1 said?

2    **A.    He called me an ignorant black woman,**

3 **yeah.**

4    Q.    This was on one occasion, correct?

5    **A.    Yes.**

6    Q.    Okay. Officer Carey was not your

7 supervisor at that moment?

8    **A.    No.**

9    Q.    And how did it come to pass that you

02:44PM 10 were required to do a to/from memo about this

11 incident? Who required you to do that?

12    **A.    I don't recall who required me to, but I**

13 **did one.**

14    Q.    Okay. Did you do it to complain to the

15 administration about the language used by Officer

16 Carey or were you asked to do one?

17    **A.    I don't recall if I was asked to do**

18 **one.**

19    Q.    You don't recall?

02:45PM 20    **A.    No.**

21    Q.    Was there any followup related to this

22 by Lieutenant Blohm or anyone else in

23 administration?

24    **A.    I had a conversation with Lieutenant**

1  Blohm.  I followed up.  I asked him -- I told him I
2  haven't heard anything about the situation between
3  me and Officer Carey, and I asked him what would be
4  done, would we have a sit down, if it will go
5  further than just my to/from, and he stated to --
6  he looked me in my face and said, what more do you
7  want?"  And I told him for this not to be okay.
8  This is unacceptable.
9      Q.    In terms of Officer Carey's behavior?
10     A.    Exactly.
11     Q.    Or language?
12     A.    Yes.
13     Q.    Any further reaction from Lieutenant
14  Blohm after that?
15     A.    I told him I know you and Carey are
16  friends, and he laughed and walked away.
17     Q.    Do you know if Officer Carey submitted a
18  to/from memo?
19     A.    I don't recall.
20     Q.    It's not anything you've ever seen
21  whether he had, if he did?
22     A.    I don't recall anything from him.
23     Q.    Anything related to that incident after
24  that, either between you and Officer Carey or

1  someone in your administration?
2      A.    Just myself and Lieutenant Blohm.
3      Q.    Beyond that, we've discussed everything
4  related to that incident?
5      A.    To my knowledge, yes.
6      Q.    And the other comment that you
7  referenced is the term used is "nightmare"?
8      A.    Yes.
9      Q.    You attribute that to Chief White around
10  the time he was appointed?
11     A.    Yes.
12     Q.    So what were the circumstances that
13  Chief White used the term nightmare?
14     A.    He came to roll call right after he got
15  sworn in and stated that for some of you this will
16  be a nightmare and for others this will be great.
17  He used other terminology but --
18     Q.    But in your complaint you used the word
19  nightmare?
20     A.    Yes, he said this will be a nightmare
21  for some of you.
22     Q.    Who was present for that?  You said it
23  was at roll call?
24     A.    Yes.  Monique Woods.  I don't recall

1  anybody else.
2      Q.    Was it a particular shift that he was
3  addressing at roll call for the shift?
4      A.    Yes.
5      Q.    So whoever was on that shift was present
6  for it?
7      A.    Correct.
8      Q.    Chief White to your knowledge, was he
9  addressing the term nightmare to you directly?
10     A.    It felt that way, yes.
11     Q.    You felt that way, but when he used the
12  term, he was talking to the whole shift?
13     A.    Correct.
14     Q.    Did you have any followup conversation
15  about what he meant by that?
16     A.    With who?
17     Q.    What Chief White meant by the word
18  nightmare.
19     A.    With him directly, no.
20     Q.    You never had any further conversation
21  with him about the use of that term and what he
22  meant?
23     A.    No.
24     Q.    Anything else from that conversation,

1  his addressing the roll call?  That was one
2  occasion?
3      A.    To my knowledge, yes.
4      Q.    Why does that support your claim for sex
5  discrimination or harassment?
6      A.    Because he has been known to say that he
7  does not like females that are police officers.  He
8  mentioned women being police officers.  And due to
9  his prior dealings with the police department, at
10  that time I was not a police officer there, but
11  legal issues with the city and he came back with
12  vengeance against whatever happened in his legal
13  case or legal battles, he came back with vengeance
14  for the people that testified in his legal case or
15  anybody that was affiliated or he might have
16  thought that was cordial or cool with them, he
17  would come after them.
18     Q.    And that referenced an era where you
19  weren't there, correct?
20     A.    His legal issues I wasn't there.
21     Q.    You didn't have that conversation
22  directly with Chief White, correct?
23     A.    No.
24     Q.    You said it's been known that he doesn't

1   like female officers, he doesn't think females
2   should be officers. Did Chief White ever tell that
3   to you?
4       A.   Directly, no.
5       Q.   Have you ever heard him say that to
6   anyone?
7       A.   In conversation, yes.
8       Q.   You overheard Chief White telling that
9   to someone?
02:50PM 10       A.   Yes.
11      Q.   Who did you hear Chief White telling
12  that to?
13      A.   I don't recall.
14      Q.   What time period or what date was it
15  that you overheard him saying females shouldn't be
16  police officers?
17      A.   I don't recall the exact date and time.
18      Q.   Do you know who he was talking to in
19  this conversation that you overheard?
02:50PM 20      A.   I don't recall.
21      Q.   Do you know where the location was of
22  that conversation you overheard?
23      A.   The police department.
24      Q.   Is that the same conversation we talked

1   about earlier with women and females are not
2   supposed to be police?
3       A.   Yes.
4       Q.   So this is one of the occasion that you
5   overheard that?
6       A.   When he said the same thing he said,
7   yes.
8       Q.   So that's the phrases he used in your
9   three different interrogatory answers. Have we
02:51PM 10  exhausted the terms that support your claim for sex
11  discrimination or harassment?
12      A.   Yes.
13      Q.   We talked a lot about this at the
14  beginning of the dep. You have listed a number of
15  witnesses in your interrogatory answers in City
16  Exhibit 2, Questions 2 and 3, so I'm going to go
17  through.
18           Some of them you say you have
19  personal knowledge, some are just people that you
02:51PM 20  think had secondhand knowledge apparently. Let me
21  just go through them.
22           Sergeant Walker, what does he have
23  personal knowledge of related to your claims for
24  sex discrimination?

1       A.   Which Sergeant Walker? There's two
2   Walkers.
3       Q.   I think you just put Sergeant Walker so
4   you just tell me.
5       A.   Both of them -- there's multiple
6   Sergeant Walkers.
7       Q.   These are your answers. What do they
8   know? What do they have firsthand knowledge of?
9       A.   Of the things we talked about throughout
02:52PM 10  this deposition, scheduling.
11      Q.   This is for both Sergeant Walkers?
12      A.   Yes.
13      Q.   Let me ask you this: Have either of the
14  Sergeant Walkers ever told you, you know, Chief
15  White changed your hours or scheduling because you
16  are a female?
17      A.   No.
18      Q.   Or because of retaliation?
19      A.   No.
02:52PM 20      Q.   How about Kenneth Muldrow, why did you
21  list him? What does he have firsthand knowledge
22  of?
23      A.   He witnessed the incident between Carey
24  and myself.

1       Q.   Beyond that, does he have firsthand
2   knowledge of anything?
3       A.   Not that I know of.
4       Q.   Did he ever tell you that Chief White
5   changed your schedule or hours or assignments
6   because of discrimination because you are a woman?
7       A.   No.
8       Q.   Joseph Johnston, what does he have
9   firsthand knowledge of?
02:53PM 10      A.   The training.
11      Q.   Let me followup with a question on that.
12  That training, is that open to everyone in the
13  police department or do you have to be on a task
14  force to participate in that training? Training or
15  it might not be training, but exercise, I might be
16  using the improper term for it. This is the active
17  shooting drill.
18      A.   No.
19      Q.   You don't have -- It's open to anyone in
02:54PM 20  the police department?
21      A.   No, you have to be on the task force.
22      Q.   You don't have to be on the SWAT team or
23  anything like that?
24      A.   No.

1    Q.    How do you know that?

2    A.    **At that time we only had one person on**

3 **the SWAT team to my knowledge.**

4    Q.    Who was that?

5    A.    **Anderl. I don't know his first name.**

6    Q.    He is one of the people you didn't list

7 him earlier that was participating in that 2019

8 training, correct?

9    A.    **I don't recall.**

02:54PM 10    Q.    Joseph Johnston was involved in the

11 training so he has personal knowledge of who was

12 present for that?

13    A.    **Yes.**

14    Q.    Anything else beyond that?

15    A.    **Not to my knowledge.**

16    Q.    How about Tiffany Burt?

17    A.    **She was over comp time, how many hours**

18 **you got banked.**

19    Q.    So in terms of documentation of comp

02:55PM 20 time or time off and benefits, she has some

21 knowledge of the department's records?

22    A.    **Yes.**

23    Q.    Did you ever have a conversation with

24 her about whether or not you had comp time or not

1 in a particular occasion?

2    A.    **Yes.**

3    Q.    Okay. When did you have that

4 conversation?

5    A.    **In 2018.**

6    Q.    What did you ask her? What did you talk

7 about?

8    A.    **How much comp time I had and could I get**

9 **it in writing.**

02:55PM 10    Q.    Could you get what?

11    A.    **Can I get it in writing.**

12    Q.    Okay. Did she give it to you?

13    A.    **No. She ended up being terminated.**

14    Q.    Was she a sworn member of the police

15 department?

16    A.    **No, she was not a police officer.**

17    Q.    Okay. She was in administration?

18    A.    **Yes.**

19    Q.    In the police department though?

02:56PM 20    A.    **Yes.**

21    Q.    And so do you recall whether in 2018 you

22 asked her for documentation of how much comp time

23 you had?

24    A.    **I don't recall the specific date.**

1    Q.    Okay. Then she was let go for some

2 reason and she never gave you a response?

3    A.    **Correct.**

4    Q.    Okay. Other than that, have you ever

5 had any other conversation with her about time off

6 or how much time comp time you have?

7    A.    **Since then?**

8    Q.    Correct.

9    A.    **No.**

02:56PM 10    Q.    Domenica Tolbert we talked about. You

11 mentioned her own charge of discrimination to you

12 socially, correct?

13    A.    **Correct.**

14    Q.    Does she have -- Did she have personal

15 knowledge of anything else in terms of what's

16 raised in your complaint or in your charge?

17    A.    **Not that I know of.**

18    Q.    Monique Woods, you mentioned her a

19 couple times. Beyond what we've already talked

02:57PM 20 about, does she have personal knowledge of anything

21 else in terms of what is raised in your complaint?

22    A.    **Not to my knowledge.**

23    Q.    You talked quite a bit about a Raquel

24 Dawson. Anything we haven't covered in terms of

1 what she knew, has personal knowledge of witnessing

2 in terms of allegations of the complaint?

3    A.    **Not to my knowledge.**

4    Q.    Eddie Winters, I think that's Chief

5 Winters?

6    A.    **Yes.**

7    Q.    So he would have -- According to your

8 testimony today, he would have some knowledge of

9 communicating with Chief White about you after you

02:57PM 10 were hired at Harvey?

11    A.    **Yes.**

12    Q.    Anything beyond that we haven't talked

13 about?

14    A.    **No.**

15    Q.    Then you listed in the next

16 interrogatory Ray Tolbert, Dashun Walker and Shelly

17 Crawford --

18    A.    **Yes.**

19    Q.    -- as having been secondhand knowledge

02:58PM 20 of certain things.

21        What would Roy Tolbert know about

22 your complaint that we didn't talk about already?

23    A.    **All the discrimination.**

24    Q.    I'm sorry?

```
1    A.    Discrimination, sex.
2    Q.    Based on his conversations with you?
3    A.    Yes.
4    Q.    So you've talked to him about your
5  allegations?
6    A.    Oh, no.
7    Q.    About your charge?
8    A.    Not in depth, no.
9    Q.    I'm sorry?
10   A.    Not in depth, no.
11   Q.    What would he know or what would he have
12  personal knowledge of related to the allegations in
13  your complaint?
14   A.    Scheduling changing.
15   Q.    Why would he know about that, because it
16  affected you or does he know about scheduling
17  changes in general?
18   A.    Generally.
19   Q.    Nothing specific to you or what the
20  reasons are, just about the process?
21   A.    Not to my knowledge.
22   Q.    Anything else?
23   A.    No.
24   Q.    Dashun Walker, is he another one of the
```

```
1  Sergeant Walkers that we talked about?
2    A.    Yes.
3    Q.    And Sheldon Crawford?
4    A.    He's an officer.
5    Q.    Have you had any conversation with
6  Sheldon Crawford about your complaint or your
7  allegations?
8    A.    Yes.
9    Q.    What conversation did you have with
10  Sheldon Crawford?
11   A.    Just asked me how was it going, how was
12  I doing mentally.
13   Q.    When was that?
14   A.    Last year sometime.
15   Q.    Was it after then you had left
16  employment with Markham?
17   A.    After I got terminated, yes.
18   Q.    It was last year, it was while you were
19  working for Harvey?
20   A.    Yes.
21   Q.    Did you see him socially somewhere?
22   A.    Not that I recall.
23   Q.    Where did you see him that you had a
24  conversation when he asked how was it going in
```

```
1  reference to your lawsuit?
2    A.    Over the phone.
3    Q.    Do you talk to him as a friend, socially
4  often?
5    A.    Not often.
6    Q.    Other than the one occasion that he
7  asked you how is it going, was there anything else
8  that you talked about in terms of the lawsuit or
9  the discrimination charge?
10   A.    No.
11   Q.    What did you tell him?
12   A.    That I was stressed out, that I was
13  still hurt by what happened, especially about what
14  was done after I was terminated from Markham.  That
15  was it.
16   Q.    Okay.  And you didn't list any other
17  people in your Interrogatory answers so we have
18  covered everyone?
19   A.    Yes, to my knowledge.
20   Q.    Okay.  Again I don't want to dwell on
21  this.  This will be quick I think.
22         Take a look at Exhibit City 5.  We
23  haven't talked about it yet.  These are produced by
24  the plaintiff, and the Bates numbers are PF Palmer
```

```
1  967 to 974.  For the record, it says web timesheet
2  up at the top.  I don't think I'm going to get into
3  any real specifics on this.  Have you seen those
4  records before?
5    A.    Not like this, no.
6    Q.    Do you know who obtained these records,
7  web timesheet and above that it says employee self
8  service web timesheets?
9    A.    Paycom.
10   Q.    Paycom?
11   A.    That's the service that they used at the
12  time I was there.
13   Q.    And they is the Markham Police
14  Department or the City of Markham?
15   A.    Yes.
16   Q.    The pay for payroll purposes, okay.
17         It's got some selected pay periods,
18  but they all kind of center around September of
19  2018 and October of 2018, and it looks like into at
20  least February of 2019.  Do you know what these
21  were produced for or what they are supposed to
22  show?
23   A.    I don't know.  They show my pay and my
24  hours.
```

1    Q.    It shows your hours during that select

2  time period; is that correct?

3    A.    **Correct.**

4    Q.    Your pay and the hours you worked. Were

5  these submitted to the Department of Human Rights?

6  Do you know one way or the other?

7    A.    **I don't recall.**

8    Q.    I believe that they were and I think

9  that's why they were printed up, but beyond that,

03:04PM 10  you don't have any specific knowledge of these

11  records or what they show?

12    A.    **They show me --**

13    Q.    I'm not holding you to that.

14    A.    **They show my time.**

15    Q.    Your time and your pay during this time

16  period?

17    A.    **Yes.**

18    Q.    Okay. In response to an interrogatory

19  in Exhibit 2, Question 6, you mentioned you

03:04PM 20  suffered emotional distress as a result of the

21  actions attributed to the City of Markham. There's

22  no description of that. You've denied any physical

23  injuries, but you've suffered emotional distress;

24  is that correct?

1    A.    **Yes.**

2    Q.    Can you describe the emotional distress

3  that you have suffered as a result of the actions

4  we have talked about?

5    A.    **Stress, headaches, not sleeping.**

6    Q.    When did headaches start?

7    A.    **Prior to July 3rd.**

8    Q.    So while you were still employed by

9  Markham?

03:05PM 10    A.    **Yes.**

11    Q.    Was there a particular event that you

12  can recall where it started with headaches and the

13  stress?

14    A.    **No.**

15    Q.    Do you do anything for the headaches?

16  How often do you have them?

17    A.    **I don't know right now how often I have**

18  **them.**

19    Q.    Is it once a week? Twice? Every night

03:05PM 20  where you can quantify it?

21    A.    **When it pertains to Markham.**

22    Q.    Right. If you could attribute it to

23  Markham, how often are your -- start with how often

24  you are having headaches.

1    A.    **When anything about Markham comes up.**

2    Q.    How often is that? I understand you

3  pursued a lawsuit, so it comes up related to that,

4  but aside from the lawsuit you filed, how often

5  does Markham come up?

6    A.    **Not often.**

7    Q.    The headaches started even before

8  July 3rd, 2019?

9    A.    **Yes.**

03:06PM 10    Q.    Did they start prior to your filing your

11  charge of discrimination, the original charge?

12    A.    **I don't recall.**

13    Q.    You don't recall a particular date they

14  started between the termination and the filing of

15  the charge?

16    A.    **I don't recall.**

17    Q.    Do you take anything for the headaches,

18  any medication?

19    A.    **Not for headaches, no.**

03:06PM 20    Q.    You mentioned stress. You suffer

21  headaches. I think you said maybe loss of sleep?

22    A.    **Yes.**

23    Q.    How often do you experience loss of

24  sleep?

1    A.    **Whenever anything pertaining to Markham**

2  **comes up.**

3    Q.    This is kind of the same frequency as

4  the headaches?

5    A.    **Yes.**

6    Q.    Do you take anything to alleviate the

7  inability to sleep or loss of sleep?

8    A.    **ZzzQuil.**

9    Q.    Just over-the-counter sleep medication?

03:07PM 10    A.    **Yes.**

11    Q.    Okay. Other than when Markham comes up,

12  can you give us any frequency in terms of when you

13  experience headaches, some sleep loss?

14    A.    **No.**

15    Q.    Do you still suffer these things through

16  today?

17    A.    **Yes.**

18    Q.    And do you have a history of headaches

19  or lack of sleep issues?

03:07PM 20    A.    **No.**

21    Q.    Even predating the incident raised in

22  the complaint?

23    A.    **No.**

24    Q.    I guess in relation to those claims I

1   got to ask you your injury with Harvey. What was
2   the nature of your injury?
3       A.   **What do you mean?**
4       Q.   You were hurt apparently on the job in
5   Harvey. You were experiencing loss of sleep and
6   headaches. I need to explore if these are
7   attributable to Markham and not to the injury that
8   you suffered and have been off for close to a year.
9       A.   **I got hit by a car and left for dead.**
03:08PM 10  Q.   Was this on duty?
11      A.   **Yes.**
12      Q.   I'm sorry, you may have mentioned the
13  date that you were injured.
14      A.   **September 13th.**
15      Q.   September 15th?
16      A.   **13th.**
17      Q.   Of 2020?
18      A.   **Yes.**
19      Q.   What injuries did you suffer?
03:08PM 20  A.   **I don't know the medical term for it. I**
21  **had a cartilage replacement in my knee.**
22      Q.   Which one?
23      A.   **My right.**
24      Q.   Any other physical injuries, broken

1   bones?
2       A.   **No.**
3       Q.   Anything like that?
4       A.   **No.**
5       Q.   Were you hospitalized?
6       A.   **Yes.**
7       Q.   For how long and where?
8       A.   **Christ. I don't know exact dates, how**
9   **many days. Two or three.**
03:09PM 10  Q.   You've been off work completely since
11  this incident, correct?
12      A.   **Yes.**
13      Q.   So is it related to the knee or is there
14  other parts of your body that were injured?
15      A.   **To my knee.**
16      Q.   Is that the only part of your body being
17  treated since or as a result of that accident? I
18  won't call it an accident but the car hit you.
19      A.   **Physically, yes.**
03:10PM 20  Q.   Do you have like -- Are there emotional
21  injuries that you have suffered attributable to
22  being hit by that car?
23      A.   **Yes.**
24      Q.   Okay. What are those?

1       A.   **PTSD.**
2       Q.   I know that to be a post traumatic --
3           MR. SULLIVAN: Stress disorder.
4   BY MR. HAYES:
5       Q.   -- stress disorder. Thank you.
6           So what are your symptoms? How does
7   that manifest itself?
8       A.   **It doesn't. I go to a therapist.**
9       Q.   Have you been diagnosed with PTSD?
03:10PM 10  A.   **I don't -- I can't recall the medical**
11  **terminology that he used, but it was a medical**
12  **terminology that he described at that time of my**
13  **diagnosis.**
14      Q.   So I want to make sure I don't skip, but
15  in terms of the physical injuries from the car
16  accident, for the car hitting you, it was injury to
17  your right knee?
18      A.   **Yes.**
19      Q.   And you got cartilage replacement. In
03:11PM 20  terms of physical, that's everything, correct?
21      A.   **Yes.**
22      Q.   No broken bones or anything like that?
23      A.   **No.**
24      Q.   But you suffered emotional injuries or

1   damages as a result of the same occurrence, and you
2   have post traumatic stress disorder, correct?
3       A.   **At that time, yes.**
4       Q.   Okay. You saw a therapist. Was it
5   Dr. Haywood?
6       A.   **No.**
7       Q.   Who were you seeing for the PTSD?
8       A.   **Dr. Brown.**
9       Q.   Dr. Brown. Do you have a first name for
03:11PM 10  Dr. Brown?
11      A.   **Peter.**
12      Q.   Is Dr. Brown associated with a
13  particular practice and facility?
14      A.   **Not that I'm aware of.**
15      Q.   Do you know what is Dr. Brown's
16  specialty or degree in?
17      A.   **Clinical -- he's a clinical therapist**
18  **who does -- he did more on-the-job injuries, people**
19  **dealing with PTSD from on-the-job injuries.**
03:12PM 20  Q.   Where do you see him?
21      A.   **At his office.**
22      Q.   Where is that?
23      A.   **In Orland.**
24      Q.   Orland you think?

```
                                    233                                              235
 1    A.    Yes.                                       1    Q.    You tell me.  Has he recommended you do
 2    Q.    Do you know the street that he's on?       2  anything to try and treat or get over the PTSD
 3    A.    No, I do not.                              3  related to the car accident?
 4    Q.    Just Dr. Peter Brown in Orland?            4    A.    Different exercises but no other
 5    A.    Yes.                                       5  therapy.
 6    Q.    Clinical therapist?                        6    Q.    Physical exercises or mental?
 7    A.    Yes.                                       7    A.    Mental.
 8    Q.    When did you start seeing him?             8    Q.    Okay.  What are those mental exercises?
 9    A.    I don't recall the exact date.            9    A.    Breathing, getting back to driving,
03:12PM 10   Q.    Okay.  It was after the car accident? 03:15PM 10  driving at night because my accident happened at
11    A.    It was after my car accident.            11  night.
12    Q.    Do you currently see him?                12         You don't currently drive or drive at
13    A.    Yes.                                     13  night?
14    Q.    How often do you see him?                14    A.    I do now.  After my accident I didn't.
15    A.    Once every couple of weeks.              15    Q.    For a period of time, okay.
16    Q.    Is it a therapy session that you see him  16    A.    Yes.
17  for?                                             17    Q.    In your answers to interrogatories you
18    A.    Yes.                                     18  mentioned Dr. Haywood, Mindful Wellness, and you
19    Q.    Okay.  How long does a session last?     19  saw him or her for counseling --
03:13PM 20   A.    An hour, hour ten minutes.        03:15PM 20   A.    Her.
21    Q.    Okay.  Are you seeing him or talking to  21    Q.    -- related to the allegations of this
22  Dr. Peter Brown about anything related to the City 22  case?
23  of Markham or your lawsuit?                      23    A.    Yes.
24    A.    No.                                      24    Q.    Okay.  And how often -- Do you still see

                                    234                                              236
 1    Q.    You haven't talked about that in          1  Dr. Haywood?
 2  counseling at all with him?                       2    A.    Yes.
 3    A.    I didn't ever tell him about it.          3    Q.    How often do you see her?
 4    Q.    Has he prescribed you any medication for  4    A.    Once a week.
 5  the PTSD?                                          5    Q.    Even more often than Dr. Brown?
 6    A.    No.                                        6    A.    Yes.
 7    Q.    So other than the therapy once every      7    Q.    And when did you start seeing
 8  couple weeks, that's the extent of your --        8  Dr. Haywood?
 9    A.    We've had video sessions.                 9    A.    I don't recall.
03:14PM 10   Q.    Okay.  So whether it's in person or  03:15PM 10   Q.    Was it prior to or after your separation
11  video, you check with him for a session once every 11  from work?
12  couple of weeks?                                  12    A.    After my separation from Markham.
13    A.    When it's needed.                        13    Q.    And do you know -- How did you find
14    Q.    As needed?                               14  Dr. Haywood?  Did someone recommend her?
15    A.    Yes.                                     15    A.    Yes.
16    Q.    Is he the only counselor or therapist    16    Q.    Who was that?
17  you're seeing related to the car accident?       17    A.    I don't recall.
18    A.    Yes.                                     18    Q.    And do you see Dr. Haywood specifically
19    Q.    But he's not prescribed you any          19  for the emotional distress that we talked about?
03:14PM 20  medication or anything like that?        03:16PM 20   A.    Emotional distress, yes.
21    A.    No.                                      21    Q.    Do you ever talk to Dr. Haywood about
22    Q.    Any other therapies or anything else     22  your car incident?
23  that he's prescribed or recommended?             23    A.    Yes.
24    A.    What do you mean?                        24    Q.    She treats you or talks to you about
```

1 that occurrence as well?
2    A.   She doesn't treat it, no, but I do talk
3 to her about it.
4    Q.   You've listed Mindful Wellness
5 Counseling.  What kind of treater is she?
6    A.   She's a therapist clinical.
7    Q.   She's also a clinical therapist?
8    A.   Yes.
9    Q.   Where does she work out of?
03:17PM 10    A.   That's the group she works out.
11    Q.   The same one as Dr. Peter Brown?
12    A.   No, the Mindful --
13    Q.   Mindfull Wellness?
14    A.   Yeah, that's the name on the building.
15    Q.   Where is that located?
16    A.   In Homewood.
17    Q.   Had you ever treated with Dr. Haywood
18 prior to being let go by Markham?
19    A.   No.
03:17PM 20    Q.   You have no history with her?
21    A.   No.
22    Q.   And has she recommended any type of
23 therapy or exercises of any kind related to the
24 emotional distress allegations or incidents with

1 Markham?
2    A.   No.
3    Q.   But you see her once a week.  How long
4 does this session?
5    A.   An hour.
6    Q.   She's not prescribed any type of
7 therapies of any kind or medication?
8    A.   No.
9    Q.   Are you planning to continue to see
03:18PM 10 Dr. Haywood?
11    A.   Yes.
12    Q.   On an ongoing basis?
13    A.   Yes.
14    Q.   You talked about stress headaches, loss
15 of sleep.  Any other symptoms or manifestations of
16 the emotional distress that you listed in your
17 answers to interrogatories?
18    A.   No.
19    Q.   Nothing else?
03:18PM 20    A.   Not that I recall.
21    Q.   Have you advised the Harvey Police
22 Department that you are treating with Dr. Haywood?
23    A.   No.
24    Q.   Did you start seeing Dr. Haywood after

1 you started with the Harvey Police Department?
2    A.   Yes.
3    Q.   You haven't informed them that you're
4 treating with her for counseling for emotional
5 distress?
6    A.   No.
7    Q.   I assume the police department knows
8 about Dr. Peter Brown?
9    A.   They should.
03:18PM 10    Q.   Those bills are being paid by Harvey I'm
11 assuming?
12    A.   Yes.
13    Q.   Okay.  What does Dr. Haywood charge for
14 a counseling session?
15    A.   I do not know.
16    Q.   Are you paying those bills?
17    A.   Yes.
18    Q.   Do you have invoices or bills from
19 Dr. Haywood for the treatments you've participated
03:19PM 20 in?
21    A.   I don't.  I only pay my --
22    Q.   Co-pay?
23    A.   Yes.
24    Q.   How much do you pay?

1    A.   $20.
2    Q.   Otherwise it's covered by insurance, the
3 counseling?
4    A.   Yes.
5    Q.   Do you have any -- Do you know or have
6 you calculated how much you paid out of pocket so
7 far to see or continue to see Dr. Haywood?
8    A.   No.
9    Q.   Have you done any type of calculations
03:19PM 10 in terms of out-of-pocket damages as a result of
11 being let go by Markham?
12    A.   No.
13    MR. HAYES:  That's all I have.
14    MR. SULLIVAN:  Let's take five minutes
15 and then I've got some questions.
16        (Whereupon, a short break in
17        the proceedings was taken.)
18        DIRECT EXAMINATION
19 BY MR. SULLIVAN:
03:31PM 20    Q.   Ms. Palmer, I'm Sean Sullivan and I
21 represent Chief Terry White in this matter.  I just
22 have some brief followups.  I'm going to kind of go
23 through my notes.
24        First of all, I wanted to ask you,

## 241

1    you mentioned -- and I'm going to jump around

2    because I'm trying to make this quick because we've

3    been here for a while.

4           You mentioned earlier in your

5    testimony in response to Mr. Hayes' questions that

6    you had a conversation with Chief Winters at the

7    Harvey Police Department in approximately October

8    of 2019 when he told you that he received a call

9    from my client; is that correct?

03:32PM 10    A.    Correct.

11    Q.    All right.  When Chief Winters spoke to

12    you, did he tell you how many phone calls he

13    received from Chief White?

14    A.    No.

15    Q.    So did he tell you when he received the

16    phone call from Chief White?

17    A.    No.

18    Q.    You've already testified as to what your

19    recollection was of the conversation, so what I

03:32PM 20    want to ask you about is when that -- after Chief

21    White had concluded this conversation with you, did

22    you write -- make any statements that you forwarded

23    to the chief of police of Harvey about this alleged

24    conversation you had?

## 242

1           In other words, did you do any

2    to/from memos to Chief Winters in which you

3    documented the fact that Chief Winters had just

4    told you about a conversation he purportedly had

5    with Chief White?

6    A.    I'm confused.  He talked to Chief White.

7    Q.    What I'm trying to find out is Chief

8    Winters supposedly tells you about a conversation

9    in October of 2019, correct, that he had with Terry

03:33PM 10    White?

11    A.    Correct.

12    Q.    Where were you when he told you this?

13    A.    In his office.

14    Q.    Was there anybody else present?

15    A.    Yes.

16    Q.    Who else was present?

17    A.    Dr. Anderson.

18    Q.    Okay.  Besides those two, anybody else?

19    A.    Not that I recall.

03:33PM 20    Q.    Did Chief Winters ever followup and send

21    you an email confirming that he had received a

22    phone call from Terry white?

23    A.    Not that I recall.

24    Q.    Did he ever give you a statement -- Has

## 243

1    Chief Winters ever provided a written statement to

2    you in any format confirming what he told you in

3    October of 2019?

4    A.    No.

5    Q.    How about Dr. Anderson, have they

6    provided you any statement to your knowledge?  Is

7    it a she?

8    A.    She.

9    Q.    Has she given you any written statements

03:33PM 10    confirming that she was present when Chief Winters

11    told you about this alleged phone conversation he

12    had with Terry White?

13    A.    No.

14    Q.    All right.  Now I want to ask about you,

15    whether you documented -- you know, whether you

16    wrote down anything after you had this conversation

17    in Chief Winters' office in October of 2019.  Do

18    you understand my question?

19    A.    Did I write anything to Chief Winters?

03:34PM 20    Q.    No.  What I'm asking you is after Chief

21    Winters supposedly told you in his office in

22    October of 2019 about a phone call from Terry

23    White, right, everything you testified to, after he

24    told you this, did you go out and did you write

## 244

1    anything down to document what Chief Winters just

2    told you?

3    A.    Not that I recall.

4    Q.    Did you do a to/from memo to Chief

5    Winters thanking him for telling you about the

6    phone call?

7    A.    No.

8    Q.    Did you send him an email?

9    A.    No.

03:34PM 10    Q.    Did you send anybody an email saying you

11    won't believe what Chief Winters just told me about

12    a phone call he had with Terry White?

13    A.    Not that I recall.

14    Q.    How about text, did you text anyone in

15    October of 2019 after Chief Winters purportedly

16    told you about the phone call with Terry White?

17    A.    Not that I recall.

18    Q.    This isn't hide the ball.  I just want

19    you to know, the reason why I'm asking this is I

03:35PM 20    just want to know is there an email out there at

21    some point in October of 2019 that you might have

22    sent to anyone saying you won't believe what Chief

23    Winters just told me about a phone call he had with

24    my former boss, Chief Terry White.  So no emails to

1    your knowledge, correct?

2        A.    Not to my knowledge, no.

3        Q.    No text messages to your knowledge that

4    you texted anybody after this conversation,

5    correct?

6        A.    Not to my knowledge.

7        Q.    You didn't even text Chief Winters?  You

8    didn't text him saying, Chief, I just want to thank

9    you for sharing that information with me?

03:35PM 10    A.    No.

11        Q.    How many times did Chief Winters ever

12    tell you that he received a phone call from Terry

13    White in which they discussed you?

14        A.    That one.

15        Q.    What exactly did Chief Winters tell you

16    that my client purportedly said to him?

17        A.    He stated he wasn't going to go into

18    the details of what was being said.  He said he

19    doesn't believe in listening to what other people

03:36PM 20    say.  My job performance would show that I'm a

21    good officer.  He believed what my job performance

22    is.

23        Q.    If I understand you correctly then did

24    he say anything else?

1        A.    That I knew what it was about, the

2    conversation was about.

3        Q.    Okay.  But he didn't tell you then.  So

4    if I under correctly Chief Winters didn't tell you

5    specifically what my client purportedly said in

6    this phone call?

7        A.    Correct.

8        Q.    So Chief Winters didn't quote Terry

9    White.  He's not telling you, Officer Palmer, I

03:36PM 10    want you to know exactly what Officer White told

11    you?

12        A.    No.

13        Q.    He just told you I received a phone

14    call, correct, from Terry White?

15        A.    Correct.

16        Q.    I'm not going to go into any specific

17    detail about it, correct?  Am I right?

18        A.    Correct.

19        Q.    And then he said all I want you to know

03:37PM 20    is that I'm going to judge you on your own

21    performance here today as a Harvey police officer.

22    You just keep doing the job well, you'll have no

23    problems, words like that; is that right?

24        A.    Correct.

1        Q.    How about Dr. Anderson, did Dr. Anderson

2    indicate to you that she had received any phone

3    calls from Chief White?

4        A.    No.

5        Q.    Okay.  Did Dr. Anderson indicate to you

6    that she had any knowledge as to what Chief White

7    purportedly said to Chief Winters?

8        A.    Not to my knowledge.

9        Q.    Do you recall why you were called in

03:37PM 10    Chief Winters' office that day in October of 2019?

11        A.    I do not recall.

12        Q.    You have no idea why you were called

13    in?

14        A.    I do not recall.

15        Q.    Okay.  Thank you, Officer Palmer.

16            Now I got a couple of question and

17    I'm going to go through the list of names we've

18    been hearing.  Again same question.  I want to know

19    whether you provided any written statements to

03:37PM 20    these people or whether you've talked to their

21    lawyers.

22            You have heard the name Raquel

23    Dawson multiple times, correct?

24        A.    Correct.

1        Q.    Have you provided any written statements

2    to Raquel Dawson in which you provide any

3    information about your time as a Markham police

4    officer?

5        A.    Not to my knowledge.  I don't recall.

6        Q.    I mean, is there -- are you telling me

7    there's a chance you may have provided written

8    statements to Raquel Dawson?

9        A.    About what?

03:38PM 10        Q.    That's what I'm asking.  You know Raquel

11    Dawson has also filed a discrimination claim

12    against the City of Markham, correct?

13        A.    Yes.

14        Q.    Do you know she also has a lawyer?

15        A.    Yes.

16        Q.    Have you provided her lawyer, meaning

17    Raquel Dawson's lawyer, with any statements?

18        A.    No.

19        Q.    Have you provided Raquel Dawson with any

03:38PM 20    statements?

21        A.    No.

22        Q.    And you know that for sure now?  I only

23    ask that because you said you didn't recall.  Do

24    you know for sure -- so I'm trying to find out all

1  the written statements you may have created and
2  drafted and provided to anyone about your time as a
3  Markham officer, so that's the purpose of my
4  question.
5           I know Raquel Dawson is also -- you
6  know, we talked about the barbecues and people
7  talked about their claims. So that's why I'm
8  asking about this. So as you sit here today, you
9  know for a fact that you haven't provided Raquel
03:39PM 10  Dawson or her attorney with any written statements;
11  is that correct?
12      A.    Correct.
13      Q.    Have you provided any witness interviews
14  to her attorney, in other words, have you talked to
15  her attorney about your observations of the Markham
16  Police Department when you were a police officer?
17      A.    No.
18      Q.    The Tolberts, there were two Tolberts
19  mentioned, correct?
03:39PM 20      A.    Correct.
21      Q.    What are their names again?
22      A.    Domenica and Roy.
23      Q.    Have you provided them with any written
24  statements reflecting any of your knowledge or

1  observations of the Markham Police Department while
2  you were there?
3      A.    No.
4      Q.    Okay. How about their lawyers, have you
5  provided the Tolberts' lawyers with any written
6  documentation or statements?
7      A.    No.
8      Q.    All right. So I don't have to keep
9  going through this. Monique Woods, have you
03:40PM 10  provided her with my written statements?
11      A.    Not to my knowledge, no.
12      Q.    Okay. You seem like you were thinking
13  there for a reason, so that's why I'm asking. I'm
14  asking you to exhaust your memory because we have a
15  right to ask you about any written statements, you
16  know, you may have created with regard to your
17  memories of events at the Markham Police
18  Department. That's the purpose of my question.
19  I'm just trying to go through this checklist to
03:40PM 20  make sure I'm not missing anything.
21      A.    I don't recall.
22      Q.    Is there a possibility that you might
23  have provided some written documentation to
24  Ms. Woods?

1      A.    No.
2      Q.    What about her lawyers?
3      A.    No.
4           MS. SAMUELS: I think that's sort of a
5  trick question because I represent Ms. Woods.
6           MR. SULLIVAN: I didn't know that.
7           THE WITNESS: I'm like no, pertaining to
8  her case, no.
9  BY MR. SULLIVAN:
03:40PM 10      Q.    There you go. That's why I needed to
11  know then. So then as we sit here today, I've
12  asked you about the Tolberts, I've asked about you
13  the Woods, I've asked about the Dawsons or Officer
14  Dawson, I've asked you as you sit here today, have
15  you met with any of the lawyers, besides your own
16  lawyer, have you met with any of the lawyers in
17  which you discussed your observations of the
18  Markham Police Department and/or any conduct by
19  Chief Terry White besides your own lawyer, I don't
03:41PM 20  want to know about your own lawyer, whether you've
21  discussed it with her.
22           I'm talking about other than your
23  own lawyer, any other lawyers that you've talked to
24  about what you may have seen or heard or observed

1  while you were a Markham police officer?
2      A.    Or affiliated with her that works under
3  her?
4           MS. SAMUELS: Correct.
5  BY MR. HAYES:
6      Q.    That's part of your lawsuit. What I'm
7  talking about is other lawyers that may represent
8  other Markham police officers that have filed
9  various claims. That's what I'm just trying to get
03:41PM 10  to.
11      A.    No.
12      Q.    All right. Now, this may be my own
13  confusion, but you were talking about the use of
14  the term nightmare purportedly being used by my
15  client at roll call, right?
16           Off the record when we first
17  introduced each other, I think I mentioned to your
18  counsel that I spent 30 years in the Marine Corps,
19  okay? Roll call is a formation for police officers
03:42PM 20  before they hit the streets, right? Isn't that
21  what roll call is?
22      A.    Yes.
23      Q.    It's like what we call in Marine Corps
24  unit formation, right?

1     A.     I was never in the Marines, so I
2  wouldn't know.
3     Q.     But what I'm talking about is roll call
4  is the meeting or the get together of all the
5  police officers that are on duty at that particular
6  date and time, correct?
7     A.     Yes.
8     Q.     All right.  So when you're talking about
9  the use of the term nightmare at roll call, you
03:42PM 10  were not just alone in a room when you heard this
11  term, correct?
12     A.     Correct.
13     Q.     How many people were at the roll call?
14  How many officers, I should say the correct term,
15  how many police officers are we talking about that
16  are at roll call?
17     A.     I don't recall.
18     Q.     How many are we talking about on your
19  average roll call day?  You were there from 2010 to
03:43PM 20  2019.  Give me an estimate.  More than two?
21     A.     Yes, more than two.
22     Q.     More than four?
23     A.     Yes.
24     Q.     Maybe ten?

1     A.     In roll call or a shift, no.
2     Q.     Eight?
3     A.     On a shift, no.
4     Q.     Six?
5     A.     I don't recall if there was six.
6     Q.     You don't recall the date of this roll
7  call that you're talking about when you allegedly
8  used the term nightmare?  Do you know when this
9  happened?
03:43PM 10     A.     In October of 2018.
11     Q.     Okay.  What shift was it?
12     A.     Day shift.
13     Q.     So how many people were on a day shift
14  in the roll call?
15     A.     There was four or five that day plus the
16  sergeants.
17     Q.     Okay.  So now possibly five or six then,
18  right?
19     A.     Correct.
03:44PM 20     Q.     And do I understand you correctly in
21  your memory the chief comes out and addresses
22  everybody who's present, right?
23     A.     Correct.
24     Q.     In formation, are you standing at

1  attention or parade dress or are just sitting
2  around a table?
3     A.     We sit at tables.
4     Q.     Okay.  So the chief is addressing
5  everybody in the room, is that your understanding?
6     A.     Correct.
7     Q.     He certainly didn't single you out by
8  name or anything like that, correct?
9     A.     Not by name.
03:44PM 10     Q.     Okay.  After you purportedly heard this
11  term, can I ask you did you complain to anybody
12  about it?
13     A.     No.
14     Q.     Okay.  So no to/from memo saying I can't
15  believe the new chief used the term nightmare?
16     A.     No.
17     Q.     No documentation I'm missing in which
18  you memorialized your lack of enthusiasm for the
19  term nightmare?
03:45PM 20     A.     No.
21     Q.     Okay.  And I'll move on quickly but just
22  if I'm getting this right, you know, it wasn't you
23  singled out for this term, it was -- it was used in
24  the presence of everybody indirectly to the team as

1  a unit or roll call personnel as a unit; is that
2  fair to say?
3     A.     He said some of you it will be a
4  nightmare.
5     Q.     Yeah.  What he was talking about is --
6  Did you realize the chief of police was a former
7  Marine?  Was that known?
8     A.     He went to boot camp, yes.
9     Q.     Okay.  Well, did you know that when the
03:45PM 10  term nightmare was -- you're saying he allegedly
11  used this, at that point did you realize -- did you
12  had knowledge that the police chief spent time in
13  the United States Marine Corps?
14     A.     Yes.
15     Q.     Okay.  And did people talk amongst your
16  unit about the chief being a former Marine might be
17  somewhat strict or whatever you want to call it,
18  aggressively professional, you know, whatever -- I
19  don't want to put words.
03:46PM 20            Was that known?  Was that talked
21  about that we've got a chief of police now that
22  used to be in the Marines?
23     A.     No.
24     Q.     Never talked about?

```
 1      A.      Not in that order that you said.
 2      Q.      Okay.  We'll move on from the roll call.
 3              You never sent a to/from memo or any
 4  sort of report or any sort of written complaint to
 5  anybody?
 6      A.      No.
 7      Q.      All right.  I'm trying to followup now
 8  on the Harvey accident that you've talked about.
 9  That phone call in October of 2019, you still
10  stayed on as a Harvey police officer, right?
11      A.      Yes.
12      Q.      Had no impact whatsoever on your
13  employment with the Harvey PD, correct?
14      A.      Correct.
15      Q.      Have you filed for any sort of
16  disability pension with the fire and police
17  commission for the City of Harvey?
18      A.      I'm injured on duty now.
19      Q.      Okay.  But you haven't filed any formal
20  application for some sort of disability pension or
21  anything like that?
22      A.      No.
23      Q.      Okay.  What is your -- What's the status
24  then of your injury?  You been off duty, if I
```

```
 1  understood correctly, September of 2020; is that
 2  right?
 3      A.      Correct.
 4      Q.      So we're talking ten months now.  When
 5  are you going to go back on duty?
 6      A.      When my doctor releases me.
 7      Q.      Do you have any idea when that may be?
 8      A.      When I go to my next doctor's
 9  appointment.
10      Q.      Are you getting close to being back to
11  full duty?
12      A.      Yes.
13      Q.      Okay.  And that's your intention to go
14  back to full duty and work at Harvey PD?
15      A.      Yes.
16      Q.      Okay.  Now, earlier in your testimony
17  you talked about some of these -- you know, the
18  positions that you or for lack of a better term
19  duty stations that you've previously been assigned
20  to, like the roller rink, I think you mentioned the
21  City of Markham in the traffic courtroom, citation
22  room; is that correct?
23      A.      Yes.
24      Q.      When you were answering Mr. Hayes'
```

```
 1  questions, you were talking about those are certain
 2  assignments that you had that you felt that you
 3  were removed from, do you remember that?
 4      A.      Yes.
 5      Q.      Okay.  And when you testified in
 6  response to those questions, you testified that you
 7  were assigned to patrol duty, correct?
 8      A.      What do you mean?
 9      Q.      When Mr. Hayes was asking you about your
10  assignment at this Markham city hall and that line
11  of questions, you mentioned that you no longer were
12  being assigned to those -- that specific duty
13  assignment because your assignment had changed and
14  you were assigned to patrol duty, if I understand
15  correctly.  Maybe I'm wrong.  Isn't that what you
16  said?
17      A.      Yes, I was back on patrol.
18      Q.      Now, as a part-time officer for the City
19  of Markham, let me ask you:  Was it your
20  understanding that being a patrol officer was a
21  legitimate assignment for a part-time officer?
22      A.      Yes.
23      Q.      Okay.  And you were paid for your time
24  working part-time as a patrol officer for the City
```

```
 1  of Markham; is that right?
 2      A.      Yes.
 3      Q.      Okay.  And, you know, I know you weren't
 4  in the Marine Corps, but you've been a police
 5  officer now since 2010, do I understand that
 6  correctly?
 7      A.      Yes.
 8      Q.      I'm sorry?
 9      A.      Yes.
10      Q.      So, I mean, you're pretty well trained
11  on the fact that you got a chain of command in the
12  police department too, correct?
13      A.      Correct.
14      Q.      What is your understanding about the
15  chain of command and whether supervisors have the
16  ability to make personnel assignments to fill
17  requirements?
18              Is it lawful for a chief of police
19  or a deputy chief to assign a patrol officer to
20  different assignments depending on the needs of the
21  unit?  Is that a lawful action?
22      A.      Yes.
23      Q.      Are you claiming that your assignment to
24  patrol was unlawful in anyway?
```

1    A.    No.

2    Q.    I also want to followup on a

3    conversation you went through, I forget the

4    exhibits, but you mentioned Officer Carey and that

5    incident in which you were joking around with

6    Officer Short; is that correct?

7    A.    Correct.

8    Q.    Now, is Officer Short actually a short

9    person?

03:50PM 10   A.    No.

11   Q.    Okay.  Because that's what I didn't --

12   A.    No.

13   Q.    What I'm trying to figure out is what

14   the joking around was.  That's what I missed, and

15   that's what I'm trying to get to.  What were you

16   and Officer Short joking around about before

17   Officer Carey interjected?  Can you tell me about

18   that?

19   A.    I don't know specific details.  It was

03:51PM 20   about a chair.

21   Q.    Do you recall --

22   A.    I don't know verbatim, no.

23   Q.    Was this like before a roll call?  Like

24   where did this take place?

1    A.    In roll call before roll call started.

2    Q.    That's what I mean.  So we're at the

3    beginning of the shift where the officers are like

4    I think you used bantering?  Do you remember you

5    used that word in your answer?

6    A.    No.

7    Q.    So you and Short are bantering back and

8    forth something about the chair, correct?

9    A.    Correct.

03:51PM 10   Q.    And then Carey comes in and inserts

11   himself in the conversation?

12   A.    Correct.

13   Q.    Was Officer Carey the same rank as you?

14   A.    At that time, yes.

15   Q.    Okay.  And was he the same rank as

16   Officer short?

17   A.    At that time, yes.  He was full-time.  I

18   was part-time.

19   Q.    Who was?

03:51PM 20   A.    Carey.

21   Q.    So Officer Carey was full-time.  You

22   were part-time.  What about Officer Short?

23   A.    I don't recall.

24   Q.    But you were all patrol officers?

1    A.    Yes.

2    Q.    So nobody in this argument was a

3    striper, a sergeant, a lieutenant or deputy chief?

4    A.    No.

5    Q.    All right.  So you covered what Carey

6    said.  Do you have any knowledge as to whether

7    anybody in the chain of command spoke to Carey

8    about his conduct?

9    A.    I asked Lieutenant Blohm.

03:52PM 10   Q.    As I'm sitting here today, do you know

11   one way or the other whether anybody brought Carey

12   aside and said, hey, listen, you got to knock off

13   the baloney?

14   A.    As of today, no.

15   Q.    You don't know if that happened or not,

16   correct?

17   A.    Correct.

18   Q.    Okay.  Besides the documentation we saw,

19   did you file any other complaints about Officer

03:52PM 20   Carey that we haven't talked about today besides

21   what we have looked at?

22   A.    No.

23   Q.    Okay.  You know I got -- This is only

24   because I was confused.  I'm really confused about

1    this whole Las Vegas thing with Officer Dawson,

2    okay?  So I apologize.  I'm going to try and get

3    into this quickly, okay?

4         You talked at length about you saw

5    some documents about an altercation you had with --

6    an argument or whatever you want to call it

7    involving yourself and Officer Dawson, correct?

8    A.    Correct.

9    Q.    All right.  What I'm trying to get at is

03:53PM 10   I think you said you went to Las Vegas without

11   telling Officer Dawson, correct?

12   A.    Correct.

13   Q.    You went with somebody else to Vegas,

14   correct?

15   A.    Correct.

16   Q.    Who was the person you went with?

17   A.    My best friend and her family.

18   Q.    Okay.  And this is where I'm getting

19   confused, and correct me if I'm wrong, so while

03:53PM 20   you're in Vegas, you run into Raquel Dawson's

21   mother; is that right?

22   A.    Yes, at the same hotel.

23   Q.    Was Officer Dawson also in Vegas at the

24   same time?

1    A.    From my knowledge, yes.

2    Q.    Okay. That's where I was getting

3  confused. So I got to ask you, why is Officer

4  Dawson getting mad at you for being in Vegas? What

5  business is it of hers that you are going to Vegas?

6  Why is she even giving you --

7          MS. SAMUELS: Objection, calls for

8  speculation, asked and answered.

9  BY MR. SULLIVAN:

03:54PM 10   Q.    Go ahead. Your lawyer will also tell

11  you now you can answer for the record.

12          Explain to me why you believe

13  Dawson's mad. That's what I didn't get.

14    A.    Because I didn't tell her I was going.

15    Q.    But why would you have any -- I mean,

16  did have you some sort of -- if you want, we can

17  make this record confidential.

18          If this is a private matter, we can

19  just tell the court reporter make this confidential

03:54PM 20  so it's not public. Why don't we do that? Let's

21  make it confidential right now.

22          (Page 266, Line 1 to Page 269,

23          Line 2 were transcribed

24          separately due to confidentiality.)

1
2
3  BY MR. SULLIVAN:
4      Q.    All right.  There was some questions
5  about this active shooter event.  Do you have any
6  understanding as to whether that active shooter
7  event that Mr. Hayes talked to you about was
8  actually a state mandated event that required
9  participation from the Markham Police Department?
03:56PM 10    A.    I do not know.  I do not recall.
11      Q.    Do you know if the Markham Police
12  Department has a specific active shooter response
13  team?
14      A.    Does Markham?  Not that I recall.
15      Q.    My question is:  The Markham Police
16  Department, while you were there, do you have any
17  knowledge as to whether they had an active shooter
18  response team?
19      A.    No.
03:58PM 20    Q.    You have no knowledge?
21      A.    No.
22      Q.    Okay.  And you have no knowledge as to
23  whether the active shooter event at the school was
24  actually mandated by the State of Illinois?

1      A.    Correct.
2      Q.    Okay.  If I understood your testimony
3  earlier, you at least participated in that event on
4  two separate occasions as a part-time officer at
5  the City of Markham, correct?
6      A.    Correct.
7      Q.    Okay.  You also mentioned that on one
8  occasion you heard my client use words to the
9  effect of he doesn't believe women should be police
03:59PM 10  officers?  Do you remember that line of
11  questioning?
12      A.    Yes.
13      Q.    Okay.  Where did that conversation take
14  place?
15      A.    In the City of Markham.
16      Q.    Where in the City of Markham?
17      A.    Police department.
18      Q.    Okay.  Where in the police department?
19      A.    I don't recall.
03:59PM 20    Q.    Who was present?
21      A.    I don't recall.
22      Q.    You have no recollection whatsoever as
23  to anybody that was present other than yourself
24  obviously?

1      A.    Yes.
2      Q.    Nobody else?
3      A.    I do not recall.
4      Q.    You don't know the date that it took
5  place?
6      A.    I don't recall.
7      Q.    After you heard this, did you write down
8  what you heard in any sort of written format?
9      A.    No.
04:00PM 10    Q.    Did you send a to/from memo to anyone in
11  the police department that you heard Chief White
12  make this comment?
13      A.    No.
14      Q.    How about a text to anybody, did you
15  text anybody saying my chief of police just made
16  this comment?
17      A.    I don't recall.
18      Q.    How about an email to anybody at the
19  time at the time -- at or near the time that you
04:00PM 20  purportedly heard this comment?  Did you send an
21  email to anybody?
22      A.    No.
23      Q.    Have you ever talked to anyone that's
24  actually told you that they have already heard my

1  client say similar things?
2      A.    Not to my knowledge, no.
3      Q.    Okay.  So the list we went through
4  before, the two Tolberts, Raquel Dawson, Monique
5  Woods, have any of those women ever told you that
6  they also heard my client Chief White make
7  statements that he didn't think females or women
8  should be police officers?
9      A.    Not to my knowledge, no.
04:00PM 10    Q.    I mean, that's what I'm asking.  I mean,
11  you've done a good job here today.  You've told us
12  about barbecues you've been at.  I forget the other
13  multiple events that you had the opportunity to
14  communicate with these people.  That's what I'm
15  getting to.
16          During the entire time, has any of
17  them ever told you oh, I heard Chief White say he
18  doesn't think females should be police officers?
19      A.    I don't recall.
04:01PM 20    Q.    Okay.  And if I understood your
21  testimony, this is the one and only time you heard
22  him say that, correct?
23      A.    Yes.
24      Q.    And you didn't file any sort of

**273**

1  complaints about it to anyone within the City of
2  Markham Police Department?
3     A.    **No.**
4     Q.    Did you file a complaint with anybody at
5  the city's human resources department?
6     A.    **No.**
7     Q.    Did you ever file it with -- anybody at
8  the city at all, whether it's the police department
9  or, you know, to cut to this quick, I mean, did you
10  file a complaint with anybody at the city at or
11  near the time you allegedly heard this?
12     A.    **No.**
13     Q.    Okay. Let's get to your application for
14  the Harvey Police Department. I've done a lot of
15  police work in my time. When you filled out your
16  application for the Harvey Police Department, do
17  you recall approximately when you were actually
18  filling out the application for full-time position,
19  what year it was?
20     A.    **2019.**
21     Q.    I believe earlier you testified that you
22  actually started at Harvey on July 4th of 2019,
23  correct?
24     A.    **Correct.**

**274**

1     Q.    All right. So let's back. How many
2  months prior to actually starting did you actually
3  put in the application for the City of Harvey
4  Police Department?
5     MS. SAMUELS: Asked and answered.
6  BY MR. SULLIVAN:
7     Q.    To the best of your recollection. How
8  many months was it before July 4th, 2019?
9     A.    **June.**
10     Q.    So you did it in June of 2019?
11     A.    **Yes.**
12     Q.    All right. And did you do it -- was it
13  an online application? Did you have to go to a
14  portal and type in answers and all that?
15     A.    **I don't recall.**
16     Q.    All right. But do you recall that one
17  of the questions -- well, one of the questions that
18  you were asked was whether you are physically
19  capable of performing the duties as a police
20  officer, correct?
21     A.    **I don't recall.**
22     Q.    Do you recall any questions like that,
23  like whether you were physically capable of
24  performing the duties of a law enforcement officer?

**275**

1     A.    **No, I don't recall.**
2     Q.    Do you recall any questions about
3  whether you are emotionally capable of performing
4  the duties of a police officer?
5     In other words, do you recall any
6  questions about whether you had any mental health
7  disabilities or mental health issues or mental
8  health concerns that prohibit you from performing
9  the duties of a police officer? Do you recall any
10  of those questions?
11     A.    **No.**
12     Q.    Do you recall any of the questions for
13  your Harvey Police Department, do you recall any of
14  the questions at all on your application as you sit
15  here today?
16     A.    **My name.**
17     Q.    Is that the only thing you recall?
18     A.    **Regular application information.**
19     Q.    I believe you testified that you had an
20  in person interview in approximately June of 2019
21  about your application to be a full-time office
22  with the City of Harvey; is that correct?
23     A.    **Correct.**
24     Q.    Who interviewed you?

**276**

1     A.    **I don't recall.**
2     Q.    Was it a police officer?
3     A.    **It was the police, yes.**
4     Q.    That person, do you recall was it a
5  female or male?
6     A.    **I don't recall.**
7     Q.    Do you recall during the interview any
8  questions about whether you are physically and
9  mentally capable of performing as a police officer?
10  Did they talk to you?
11     A.    **I don't recall.**
12     Q.    You don't recall any questions about do
13  you think you can do this job, are you good to go?
14     A.    **Good to go?**
15     Q.    Meaning like you're capable, you're
16  physically and mentally capable to perform as a
17  Harvey police officer. No questions like that at
18  all?
19     A.    **Not that I recall.**
20     Q.    Okay. Let me ask you a different way.
21  When you interviewed with the City of Harvey for
22  that full-time position, did you tell anybody in
23  the City of Harvey Police Department that you had
24  any mental health issues that would prohibit you

1  from performing as full-time officer?

2      A.   **Can you repeat it?**

3      Q.   Yeah, a different way. When you were

4  being interviewed, did you disclose or did you tell

5  any of the people interviewing you for the

6  employment position at the City of Harvey that you

7  had any mental health issues that would affect your

8  ability to be a police officer?

9      A.   **No.**

04:05PM 10      Q.   And that's because at the time that was

11  true, right? I mean, you were ready to be a Harvey

12  police officer full-time; isn't that right?

13      A.   **Correct.**

14      Q.   Okay. Let me ask you: How do you think

15  you have performed as -- when you got hurt in

16  September of 2020. How do you think you performed

17  as a Harvey police officer from July 4th of 2019

18  through the accident in September of 2020? How do

19  you think you were performing your duties?

04:06PM 20      A.   **Great.**

21      Q.   Okay. I don't know if anybody has asked

22  this. Are you primarily a patrol officer for the

23  City of Harvey?

24      A.   **Yes.**

1      Q.   And before your injury, did you have a

2  particular shift? Were you working days? Were you

3  working nights, midnights or did it vary?

4      A.   **Nights.**

5      Q.   So you were working nights in Harvey?

6      A.   **Yes.**

7      Q.   As a patrol officer?

8      A.   **Yes.**

9      Q.   Right. And in your own evaluation, and

04:06PM 10  that's what I'm looking for, you were able to

11  perform all of those duties -- you said, what was

12  your term, excellent? What did you say?

13      A.   **Great.**

14      Q.   Great. Yeah. And you were able do that

15  from July 4, 2019 through the accident on

16  September 2020, correct?

17      A.   **Yes.**

18      Q.   All right. While you are at Harvey, do

19  they evaluate you? Do you know what a fitness

04:07PM 20  report is? Do they do any written evaluations of

21  your performance as an officer, as a full-time

22  officer, do you know?

23      A.   **Yes.**

24      Q.   Have you been evaluated? I know it was

1  July 4th of 2019, so the accident was about 14 to

2  15 months after you became full-time. Did you get

3  an evaluation for that first year that you worked

4  as a Harvey police officer?

5      A.   **Yes.**

6      Q.   Okay. Was that a written evaluation?

7      A.   **Yes.**

8      Q.   Okay. Do you have copies of that in

9  your records?

04:07PM 10      A.   **Not that I know of.**

11      Q.   Okay. They don't give you a copy when

12  they counsel you or sit down and talk to you about

13  how you're doing?

14      A.   **Yes.**

15      Q.   They did give you a copy?

16      A.   **Yes.**

17      MR. SULLIVAN: So we can ask for that.

18  I think I may be done. Can I take two seconds? I

19  just want to check with my client to make sure?

04:08PM 20         (Whereupon, a short break in

21         the proceedings was taken.)

22      Back on the record. Thank you. I

23  have no further questions. Thank you, Officer

24  Palmer.

1      MS. SAMUELS: Real quickly.

2

3

4

5           CROSS EXAMINATION

6  BY MS. SAMUELS:

7      Q.   Do you remember anything about -- did

8  Chief Winters describe what Officer White told him?

9      A.   **The details, no.**

04:08PM 10      Q.   What did he describe to you?

11      MR. HAYES: I'll object to asked and

12  answered.

13  BY MS. SAMUELS:

14      Q.   You can answer the question.

15      A.   **That he was contacted by Chief White and**

16  **that he doesn't believe what he said. He will let**

17  **my work show for itself and I've been a good**

18  **officer since he hired me and don't prove him**

19  **wrong.**

04:09PM 20      Q.   What did Winters describe about this

21  conversation with White?

22      A.   **That it was derogatory.**

23      Q.   Is that the word that he used?

24      A.   **No.**

1    Q.    Which words did he use?

2    A.    **That I knew what it was about.**

3    Q.    What else?

4    A.    **That's all I can recall right now.**

5    Q.    How would you describe your mental state

6    right now?

7    A.    **Stressed.**

8    Q.    Is that making it difficult to recall

9    some specific facts?

04:10PM 10    A.    **Yes.**

11    Q.    All right. When you have to deal or

12    think about the City of Markham and your time with

13    the Markham Police Department, does it make you

14    nervous?

15    A.    **Yes.**

16    Q.    Does it make you scared?

17    A.    **Yes.**

18    Q.    Does it make you worry?

19    A.    **Yes.**

04:10PM 20    Q.    Does it make -- Does it heighten your

21    stress?

22    A.    **Yes.**

23    Q.    Does it make you super emotional?

24    A.    **Yes.**

1    Q.    Have you cried since we've been here

2    today at this deposition?

3    A.    **Yes.**

4    Q.    You described the training that only

5    males were picked to attend. Do you remember that

6    line of questioning?

7    A.    **Yes.**

8    Q.    How would you describe the relationship

9    between Chief White and other male officers on the

04:10PM 10    force?

11        MR. HAYES: Objection, lack of

12    foundation, calls for speculation.

13        MR. SULLIVAN: Join.

14    BY MS. SAMUELS:

15    Q.    They just want your observations.

16    A.    **Good.**

17    Q.    Were they chummy? Do you know what

18    chummy means? Were they very friendly?

19    A.    **Yes.**

04:11PM 20    Q.    Do they joke around a lot?

21    A.    **Yes.**

22    Q.    Did they have sort of inside jokes that

23    you are not in on?

24    A.    **Yes.**

1    Q.    Would it be the proverbial old boys

2    club?

3    A.    **Yes.**

4    Q.    You described the officers that went to

5    the training as males. Officer Robert Anderl, he's

6    a white male, correct? You described him as white,

7    correct?

8    A.    **Yes.**

9    Q.    Robert Anderl is a white male?

04:11PM 10    A.    **Yes.**

11    Q.    Joseph Johnson a white male?

12    A.    **Yes.**

13    Q.    Matt Carey is a white male?

14    A.    **Yes.**

15    Q.    And Jerald Jackson, is he white or

16    black?

17    A.    **He's black.**

18    Q.    But he's a male?

19    A.    **Yes.**

04:11PM 20    Q.    Okay. Were you ever informed that there

21    was an opening for a full-time police officer

22    position?

23    A.    **No.**

24    Q.    Did you ever see any posting about it?

1    A.    **Not that I recall.**

2    Q.    Did you ever receive any emails about

3    it?

4    A.    **No.**

5    Q.    Had you known, would have you applied?

6    A.    **Yes.**

7        MR. SULLIVAN: Again that calls for

8    speculation. She's already testified she didn't

9    apply.

04:12PM 10        MS. SAMUELS: Right, but the question was

11    had she known would she have applied.

12    BY MS. SAMUELS:

13    Q.    You received in Exhibit 13 a number of

14    warnings that you received, do you recall that?

15    A.    **Yes.**

16    Q.    Prior to 2019, had you ever been late

17    for work?

18    A.    **Not that I recall, no.**

19    Q.    When you were late -- Prior to 2019, you

04:12PM 20    never showed up late for work?

21    A.    **Not that I recall.**

22    Q.    Are you saying you don't recall showing

23    up late or you don't recall being written up for

24    it?

1    A.    I don't recall showing up late.

2    Q.    Did you ever -- you talked about your

3  conversations with I believe Ms. Burt about comp

4  time.

5    A.    Yes.

6    Q.    Did she ever tell you how much

7  compensatory time you had?

8    A.    Yes.

9    Q.    What did she tell you?

04:13PM 10    A.    Over 80 hours.

11    Q.    And what time did you ask her about your

12  compensatory time?

13    A.    2018.

14    Q.    All right.  Was it right about the time

15  you were going to get a new chief?

16    A.    Yes.

17    Q.    Was that the reason why you asked?

18    A.    Yes.

19    Q.    All right.  And then you asked for

04:13PM 20  written documentation so you would have proof of

21  that; is that correct?

22    A.    Correct.

23    Q.    And before you could get proof of that,

24  Ms. Burt was released?

1    A.    Yes.

2    Q.    All right.  And then when you followed

3  up, were you told how much compensatory time you

4  had after Ms. Burt left?  Did anybody ever tell you

5  how much compensatory time you had?

6    A.    Yes.

7    Q.    What did they tell you?

8    A.    I didn't have any.

9    Q.    All right.  Do you know of any male

04:13PM 10  counterparts of yours who lost all of their

11  compensatory time?

12    A.    No.

13    Q.    Is that the reason -- Do you believe

14  that your loss of compensatory time was on the

15  basis of your sex because of that?

16    A.    Yes.

17    MS. SAMUELS:  No further questions.

18    MR. HAYES:  Two quick followup.

19    FURTHER DIRECT EXAMINATION

04:14PM 20  BY MR. HAYES:

21    Q.    Do you have any personal knowledge of

22  Jerald Jackson's employment history or experience

23  prior to his being hired at Markham?

24    A.    No.

1    Q.    Have you missed any work as a Harvey

2  police officer because of the emotional distress

3  that you've identified in your interrogatory

4  answers at this deposition?

5    A.    No.

6    MR. HAYES:  That's all I have.

7    MR. SULLIVAN:  I just have some very

8  brief.

9    FURTHER DIRECT EXAMINATION

04:14PM 10  BY MR. SULLIVAN:

11    Q.    My understanding from your testimony is

12  you've not had a lot of one-on-one conversations

13  with my client, Chief White; is that fair to say?

14    MS. SAMUELS:  Beyond the scope.  You can

15  answer.

16  BY THE WITNESS:

17    A.    Yes.

18  BY MR. SULLIVAN:

19    Q.    I'm being accurate, right?  Chief hasn't

04:15PM 20  spoken to you one on one hardly at all; isn't that

21  fair to say?

22    A.    No, he has.

23    Q.    Okay.  Let me ask you:  When he's spoken

24  to you, has he ever insulted you?

1    A.    I don't recall.

2    Q.    Okay.  It's always been as the chief of

3  police to Patrol Officer Palmer, correct?

4    A.    What do you mean?

5    Q.    You know like you don't socialize with

6  the chief, there hasn't been any socialization

7  going on where he's talking to you off duty,

8  correct?

9    A.    Just as the chief.

04:15PM 10    Q.    That's what I mean.  Your conversations

11  with Chief White have been professional in nature

12  on the job at the Markham Police Department during

13  the timeframes you've testified here today,

14  correct?

15    A.    Yes.

16    Q.    And because I know we have been asking

17  you to exhaust your memory, but what you recall

18  you've already testified to is the thing about

19  women, but you've never said in your complaint that

04:16PM 20  Chief White ever personally insulted you or

21  personally demeaned you.  That's what I'm getting

22  to.  There weren't a whole lot of conversations,

23  but the conversations were professional in nature

24  because he was the chief and you were the patrol

1 officer, right?

2    A.    Correct.

3    Q.    Yeah, I just want to make sure I'm not

4 missing anything, okay? This is my only time to

5 ask you.

6          Are there any -- Is there anything

7 else that you are claiming that chief of police

8 ever said to you that was demeaning or insulting or

9 belittling?

10    A.    Not that I can recall.

11          MR. SULLIVAN: I appreciate that, Officer

12 Palmer. Thank you. That's really all I have. I

13 don't think -- I don't know if you have followup or

14 you want to do the signature thing.

15          MS. SAMUELS: I do.

16          FURTHER CROSS EXAMINATION

17 BY MS. SAMUELS:

18    Q.    Can refer you to Exhibit 2, Question

19 No. 22? The last sentence of that says, "he would

20 ignore me when we were the only persons present

21 even if I addressed him." Do you see where you

22 answered that?

23    A.    In 23?

24    Q.    Yes. Look at the last sentence.

1    A.    Yes.

2    Q.    All right. And again that sentence is

3 White?

4    A.    Yes.

5    Q.    Okay. So were there times when you were

6 in his presence that he was demeaning?

7          MR. HAYES: Objection, asked and

8 answered.

9 BY MS. SAMUELS:

10    Q.    How about this, do you consider being

11 ignored demeaning?

12    A.    Yes.

13    Q.    All right. When you address someone,

14 when you addressed Officer White, were you always

15 respectful?

16          MR. SULLIVAN: Excuse me. It's not

17 Officer White, it's Chief White.

18 BY MS. SAMUELS:

19    Q.    When you addressed Officer White, were

20 you always respectful?

21    A.    Yes.

22    Q.    And there was no reason why he should

23 have ignored you when you were trying to address

24 him?

1    A.    Yes.

2          MS. SAMUELS: No further questions.

3          MR. SULLIVAN: I got a followup, all

4 right?

5          FURTHER DIRECT EXAMINATION

6 BY MR. SULLIVAN:

7    Q.    I asked this before. You were a patrol

8 officer, correct?

9    A.    Yes.

10    Q.    He was the chief of police, correct?

11    A.    Yes.

12    Q.    When he did engage with you, it was in a

13 professional manner, correct?

14    A.    Yes.

15    Q.    Your counsel just asked you about being

16 ignored.

17    A.    Yes.

18    Q.    As the chief of police, is it fair to

19 say did you know -- did you have knowledge of all

20 the duties and responsibilities that the chief of

21 police had on a daily basis that he had to take

22 care of?

23    A.    No.

24    Q.    Okay. So when your counsel asked you

1 about being ignored, have you ever been with

2 somebody that's focused on multiple matters and may

3 just not be in the mood to chitchat? Has that ever

4 happened to you in your professional career?

5    A.    Not that I recall.

6    Q.    Okay. And you were never in the

7 military; is that correct?

8    A.    No.

9    Q.    Okay. Have you any understanding about

10 a senior officer and how they're trained with

11 regard to their interactions with subordinate

12 personnel? Do you know what I'm talking about?

13          Have you ever received any training

14 about maybe a senior officer is not supposed to

15 chitchat and socialize and shoot the baloney with

16 subordinate personnel because they're trying to

17 maintain what's called a professional relationship

18 within the chain of command? Have you ever

19 received any training on that at all as a police

20 officer?

21    A.    Not that I recall, no.

22    Q.    My question though is your counsel asked

23 you about being ignored. My question is, and I'll

24 finish with this, but as you sit here today, can

1   you recall any times when Chief White ever
2   specifically spoke to you in either insulting or
3   demeaned you?
4       **A.**   **Specifically -- are you asking -- What**
5   **are you asking?**
6       **Q.**   Speaking words, did he ever say anything
7   insulting to you?
8       **A.**   **Directly?**
9       **Q.**   Yeah, that's what I'm asking.
04:20PM 10       MS. SAMUELS: Other than what she's
11   already testified to?
12   BY THE WITNESS:
13       **A.**   **Not that I recall.**
14       MR. SULLIVAN: Okay. That's all I have.
15       MS. SAMUELS: Nothing further. We'll
16   reserve signature.
17       THE COURT REPORTER: Do you want the
18   transcript?
19       MR. HAYES: Yes, please.
04:20PM 20       THE COURT REPORTER: Ms. Samuels, do you
21   want a copy?
22       MS. SAMUELS: Not at this time.
23       (Witness excused.)
24

1
2
3   UNITED STATES OF AMERICA    )
    NORTHERN DISTRICT OF ILLINOIS)
4   EASTERN DIVISION       )
    STATE OF ILLINOIS       )
5   COUNTY OF COOK       )

6       The within and foregoing deposition of
7   the witness, KYUNG PALMER, was taken before
8   MARI BETH KAWULIA, C.S.R., in the City of Chicago,
9   County of Cook and State of Illinois and there were
10   present at the taking of said deposition counsel as
11   previously set forth.
12       The said witness was first duly sworn
13   and was then examined upon oral interrogatories.
14   The questions and answers were taken down in
15   shorthand by the undersigned and transcribed under
16   my personal direction.
17       The within and foregoing is a true,
18   correct and complete record of all of the questions
19   asked of and answers made by the said witness at
20   the time and place hereinabove referred to.
21       The signature of the witness was not
22   waived. Pursuant to Rule 30(e) of the Rules of
23   Civil Procedure of the United States District
24   Courts, if the deponent does not appear to read and

1   sign the deposition within 28 days or make other
2   arrangements for reading and signing, the
3   deposition may be used fully as though signed, and
4   this certificate will then evidence such failure to
5   appear as the reason for signature being waived.
6       The undersigned is not interested in
7   the within case, nor of kin or counsel to any of
8   the parties.
9       Witness my official signature as a
10   certified shorthand reporter in and for Cook
11   County, Illinois, on this August 24, 2021.
12
13
14
15
16
17
18   *Mari Beth Kawulia*
    MARI BETH KAWULIA, C.S.R.
19   License No. 084-002873
20
21
22
23
24