**1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KYUNG PALMER,                      )
                                   )
        Plaintiff,                 )
                                   )
    vs.                            )No. 20 C 2603
                                   )Judge GOTTSCHALL
CITY OF MARKHAM and TERRY WHITE,   )
                                   )
        Defendants.                )

The Discovery Deposition via Zoom
Electronic Telephone/Video Conferencing of
TERRY WHITE,
taken before ADRIENNE M. LIGHTFOOT, Certified Shorthand

Reporter and Notary Public, taken pursuant to the
provisions of the Federal Rules of Civil Procedure and
the Rules of the Supreme Court thereof, pertaining to
.The taking of depositions for the purpose of discovery
held on the 29th day of December 2021, at the hour of
10:00 a.m. pursuant to notice.

Adrienne M. Lightfoot, CSR
Illinois License # 084-00427

**2**

A P P E A R A N C E S

REPRESENTING THE PLAINTIFF,
KYUNG PALMER:

    SAMUEL ASSOCIATES, LTD.
    Attorney At Law
    53 West Jackson Blvd.
    Suite 831
    Chicago, Illinois 60616
    (872)588-8726

    By: Jeanette Samuels, Esq.

REPRESENTING THE DEFENDANT,
CITY OF MARKHAM:

    ODELSON, STERK, MURPHEY, FRAZIER & McGRATH, LTD.
    Attorney At Law
    3318 West 95th Street
    Evergreen Park, Illinois 60805
    (708)424-5678

    By: Michael Hayes, Jr., Esq.

REPRESENTING THE DEFENDANT,
TERRY WHITE:

    DEL GALDO LAW GROUP, LLC
    Attorney At Law
    1441 South Harlem Avenue
    Berwyn, Illinois 60402
    (708)222-7000

    By: Sean Sullivan, Esq.

**3**

I N D E X

TERRY WHITE                        PAGE

    Examination by
    Ms. Samuels                       4

    Examination by
    Mr. Hayes                        81


E X H I B I T S
(No Exhibits Marked)

**4**

        (Witness Sworn)
        TERRY WHITE,
called as a witness herein, after having been first
duly sworn, was examined and testified as follows:
        EXAMINATION
BY MS. SAMUELS:
    Q   Can you please state and spell your name for
the record, sir?
    A   Terry White, T-e-r-r-y, W-h-i-t-e.
        MS. SAMUELS:   All right.  This is the
deposition of Terry White taken in the case of Palmer
versus Markham, et al.  Case No. 20 CV 2603.
        This deposition is taken pursuant to
notice in agreement of the parties and under all
applicable rules.
BY MS. SAMUELS:
    Q   Can you hear me okay?
    A   Yes.
    Q   Okay.  Have you ever given a deposition
before, sir?
    A   Yes.
    Q   All right.  About how many times?
    A   I have to say numerous times.  I don't have
an exact number.

DEFENDANT
EXHIBIT
**B**
tabbies

1  Q    All right. When was the last time you gave a
2  deposition?
3  A    I believe last year maybe.
4  Q    All right. Since it's been a while, I'll go
5  over the rules real briefly. Essentially, all of your
6  answers have to be verbal. They are equivalent of
7  testifying under oath.
8        If any of my questions are unclear, let
9  me know, and I'll rephrase them for you. Otherwise,
10 I'm going to assume your answer is responsive to the
11 questions that's being asked, okay?
12 A    Yes.
13 Q    And then of course if you need to take a
14 break at any time, just let me know, all right?
15 A    Yes.
16 Q    Did you prepare at all for your deposition
17 today?
18 A    I viewed some documents today.
19 Q    All right. What documents did you review?
20 A    The exhibits.
21 Q    The exhibits from the last deposition?
22 A    Right.
23 Q    Okay. Anything else?
24 A    That's about it.

1  Q    Did you graduate from high school?
2  A    Yes.
3  Q    All right. What year?
4  A    I believe 1982, maybe.
5  Q    What did you do after graduating from high
6  school?
7  A    I'm not really sure.
8  Q    Did you get a job? Did you go to college?
9  Did you just hang around?
10 A    Yeah, I just got a job and worked.
11 Q    What was your first place of employment after
12 high school?
13 A    I believe it was the school bus company. I'm
14 not sure though.
15 Q    And how long were you with the school bus
16 company?
17 A    It span several years, off and on.
18 Q    All right. And where was your next place of
19 employment?
20 A    I believe there was various mechanic shops.
21 Q    Are you a licensed mechanic?
22 A    Yes.
23 Q    All right. When did you receive your
24 license?

1  A    The actual ASC License came probably 2009,
2  maybe.
3  Q    All right. But had been working at various
4  mechanic shops back in the mid to late 80s?
5  A    Yes.
6  Q    All right. And at this time had you received
7  any additional schooling?
8  A    I attended the State Police Academy. I
9  believe that was 1989 if I'm not mistaking.
10 Q    All right. And what made you want to be a
11 Police Officer?
12 A    Well, the general idea was to kind of be of
13 service.
14 Q    After you attended the police academy in
15 1989, were you -- did you apply to various Departments?
16 A    The Harvey Police Department sent me to the
17 Police Academy.
18 Q    When did you begin working with the Harvey
19 Police Department?
20 A    In 1989.
21 Q    All right. Did you begin as a part-time or
22 full-time?
23 A    Full-time.
24 Q    All right. And then as part of your

1  employment, they sent you to the academy?
2  A    Yes.
3  Q    All right. And then after you were done with
4  the academy did you continue on as a full-time Police
5  Officer with the Harvey Police Department?
6  A    Yes.
7  Q    Who was the Chief at the time you were hired
8  by the Harvey Police Department?
9  A    Boy. I believe -- I'm not sure. It might
10 have been Nick Graves.
11 Q    And how long did you stay with the Harvey
12 Police Department?
13 A    Approximately two years.
14 Q    Why did you leave?
15 A    I left for employment with the Markham Police
16 Department.
17 Q    And the time you were with the Harvey Police
18 Department, were you ever subject to any discipline?
19 A    No.
20 Q    During the time you were with the Harvey
21 Police Department, were you ever promoted, or did your
22 job assignment change?
23 A    Yeah, it did.
24 Q    Okay. How did it change?

```
 1        A    I was first placed in a Tactical Unit.
 2   Subsequently, that led into becoming a member of the
 3   SWAT team.  And then I was offered the -- a role in
 4   Detective Division.
 5        Q    All right.  So when you say enrolled in
 6   Detective Division, do you mean Detective or something
 7   else?
 8        A    Detective.
 9        Q    And was that your final position with the
10   Harvey Police Department?
11        A    Yes.
12        Q    And what made you decide to leave the Harvey
13   Police Department?
14        A    The pay was higher at the Markham Police
15   Department.
16        Q    Did you know anybody at the Markham Police
17   Department at the time you were hired?
18        A    I knew a few of the guys over there.
19        Q    Who did you know?
20        A    I knew Fount Hinkle, Sergeant Henry Wilson.
21        THE COURT REPORTER:  I'm sorry.  The first
22   name, please?  I didn't get that.
23   BY MS. SAMUELS:
24        Q    I believe the next one you said was Sergeant
```

```
 1   Amy Wilson?
 2        A    Sergeant Henry Wilson.
 3        Q    Henry Wilson.  I apologize.
 4        A    Yeah.  Lieutenant Clayton, Officer Muldrow.
 5        Q    Anyone else you can think of?
 6        A    There's a few of the names that escape me
 7   now.
 8        Q    Okay.  Are any of the people you named still
 9   with the Har -- excuse me -- still with the Markham
10   Police Department?
11        A    One.
12        Q    Who?
13        A    Officer Muldrow.
14        Q    All right.  At the time that you are hired by
15   the Markham Police Department, what was your job title?
16        A    Patrolman.
17        Q    At the time that you were hired by the
18   Markham Police Department, did you have a regular
19   partner?
20        A    No.
21        Q    Do you recall who was the chief of the
22   Harvey -- excuse me -- of the Markham Police Department
23   at the time that you were hired?
24        A    I believe they were transitioning.  I think
```

```
 1   it originally was a guy by the name of Yager.  And then
 2   Pasquell Crawford.
 3        Q    And this would have been around 1991,
 4   correct?
 5        A    Yes, '91, '92, somewhere around there.
 6        Q    Okay.  After becoming a Patrolman with the
 7   Markham Police Department, what was your next job
 8   assignment within the Markham PD?
 9        A    Six months after being in Patrol, they placed
10   me in the Tactical Unit.  Six months after serving in
11   the Tactical Unit, they placed me into Investigations
12   as a Detective.
13        Q    Did you have to apply to be part of the Tact
14   Unit?
15        A    No.
16        Q    Did you have to apply to be a Detective?
17        A    No.
18        Q    After becoming a Detective, what was your
19   next job assignment within the Markham Police
20   Department?
21        A    Approximately five years after that, I was
22   promoted to Sergeant.
23        Q    So that would have been around '97?
24        A    I believe so.
```

```
 1        Q    Did you have to apply to become a Sergeant?
 2        A    No.  You have to take the Civil Service exam.
 3        Q    Okay.  All right.  While you were Patrol
 4   Officer with the Markham Police Department, were you
 5   ever subject to any discipline?
 6        A    There was one discipline while at the Markham
 7   Police Department.  That was the result of a traffic
 8   accident.
 9        Q    All right.  And when was this?
10        A    That was within my first year serving with
11   the Markham Police Department.
12        Q    All right.  And what was the discipline?
13        A    I believe it was a day or two off,
14   suspension.
15        Q    Was the traffic accident on-duty or off-duty?
16        A    It was on-duty in a brand new squad car.
17        Q    That will do it.
18        A    Yeah.
19        Q    All right.  After being a Sergeant for five
20   years -- no, excuse me.  You were a Detective for five
21   years, and then you were promoted to Sergeant, correct?
22        A    Yes.
23        Q    Okay.  And when you were a Sergeant, were you
24   a Sergeant for a particular shift?
```

1     A   I got promoted to Sergeant, and they moved me
2 to the midnight shift as a Sergeant. I probably stayed
3 in that capacity for a year, two years, and then they
4 put me back into Detectives as a Detective Sergeant in
5 charge of the Investigations committee.
6     Q   And when you were working as a Detective
7 Sergeant, are you still working — are you working
8 dayshift then?
9     A   Primarily, it was dayshift, but it often
10 wound up longer hours than that.
11     Q   So this would have been around '99, 2000?
12     A   Yes. I think that by 2000 I was promoted to
13 Lieutenant.
14     Q   Okay. And did you have to apply to become a
15 Lieutenant?
16     A   You had to take and pass the Civil Service
17 Exam.
18     Q   Who was the Chief at the time that you were
19 promoted to Lieutenant?
20     A   I believe it was Eric Limemoore(Phonetic).
21 I'm not sure.
22     Q   All right. And how long were you a
23 Lieutenant?
24     A   I served in that capacity for many years,

1 probably 15 years, maybe.
2     Q   So from approximately 2000 to 2015?
3     A   Yeah. There was a -- there was a time when
4 they created two positions of Deputy Chief. And they
5 appointed me as the first Black Deputy Chief of the
6 City of Markham.
7     Q   And when was that?
8     A   I'm not entirely sure. I believe it was
9 2004.
10     Q   So the Deputy Chief always a Lieutenant?
11     A   No. Originally it started out that they
12 would take the two Lieutenants and kind of eliminate
13 the position of Lieutenant and just appoint them as
14 Deputy Chiefs.
15     So there was actually two although the
16 second Lieutenant was not appointed Lieutenant. He was
17 not in Civil Service, but he still served as the second
18 Deputy Chief.
19     Q   All right. So from 2004 until when are you
20 Deputy Chief?
21     A   So that lasted about a year, somewhere around
22 2005. And then I was --
23     Q   I'm sorry. Go ahead.
24     A   That lasted until about 2005, if I remember

1 correctly and then I was reduced back to my Civil
2 Service rank of Lieutenant.
3     Q   Why did you go back to Lieutenant?
4     A   There was a disagreement about me shutting
5 down a nightclub.
6     Q   What do you mean shutting down a nightclub?
7     A   There was a strip club in town called
8 Cowboys, and I -- it was my case. And I had the court
9 shut down for ordinance violations.
10     Q   And who disagreed with that?
11     A   The then Mayor of the town.
12     Q   Who would that have been?
13     A   David Webb.
14     Q   Do you know why he disagreed with you?
15     A   I'm uncertain to this day.
16     Q   And so you go back to Lieutenant. And this
17 would have been in/or around 2005, correct?
18     A   That's correct.
19     Q   Okay. Then how long -- do you remain
20 Lieutenant for the remainder of that period, from 2005
21 to 2015?
22     A   Yes.
23     Q   All right. And then what's your next job
24 assignment after 2015?

1     A   In 2013, I'm assigned to Patrol Commander as
2 a Lieutenant.
3     Q   All right. And what's a Patrol Commander do?
4     A   You are in charge of the day-to-day
5 operations of the Patrol Division.
6     Q   Did that include setting schedules and things
7 like that?
8     A   That's correct.
9     Q   All right. How long were you Patrol
10 Commander?
11     A   It was off and on depending on the dynamics
12 of the Police Department and the Police Chief at the
13 time. So it was off and on right up until October 3,
14 2018.
15     Q   So from 2013 until when was it off, for the
16 first time?
17     A   I'm trying to understand your question.
18     Q   Sure. You said you were Patrol Commander off
19 and on depending on the dynamics of the Police
20 Department, correct?
21     A   Yes.
22     Q   All right. And so when is the first time it
23 went off that you were no longer Patrol Commander?
24     A   I don't have specific dates. They would just

```
1   say it's off, and then months later or the next year,
2   they'll send you back in that capacity.
3       Q    Did it generally depend on who was in
4   departmental leadership?
5       A    We still had the same Police Chief. I think
6   that -- for whatever reason he made that decision, and
7   that was his decision to make.
8       Q    All right. And who was the Chief at this
9   time?
10      A    Mack Sanders.
11      Q    So from 2013 to 2015, you are a Lieutenant
12  slash Patrol Commander on and off?
13      MR. SULLIVAN:  I'll just simply object that
14  he never said the rank of Lieutenant was on and off.
15  So I think the correct answer is he's in the Civil
16  Service rank of Lieutenant during the entire period of
17  time.
18          But the billet of Patrol Commander,
19  there are times where he's filling that billet, and
20  then times where he's not filling that billet.
21          And if -- Chief, correct me if I'm
22  wrong, but can you -- in response to Ms. Samuel's
23  question -- can you try to do your best to break down,
24  from 2013 through, say, 2015, the time period where you
```

```
1   served as a Patrol Commander, if you know.
2           And then if it was during an off period,
3   and you weren't in Patrol Commander, explain what your
4   duties were for the Police Department when you were not
5   Patrol Commander; does that work, Sam?
6       MS. SAMUELS:  Yeah. Thank you.
7       THE WITNESS:  So I don't remember the exact
8   dates and how many times it was on and off. But I
9   served in that capacity from 2013 to 2018.
10      MR. SULLIVAN:  And her question was, when you
11  were not serving as a Patrol Commander, okay --
12      THE WITNESS:  Yes.
13      MR. SULLIVAN:  -- what duties did you
14  perform as Lieutenant for the Markham Police
15  Department.
16      THE WITNESS:  They would have me assigned to
17  the Admin side of the Police Department. Meaning that
18  I was basically dealing with the Civilian work force
19  and the bills and the equipment; I was in charge of
20  that.
21      THE COURT REPORTER:  And excuse me. Counsel,
22  can I get your name, please?
23      MR. SULLIVAN:  My name is Sean, last name
24  Sullivan, S-u-l-l-i-v-a-n, Defense Counsel for Terry
```

```
1   White.
2   BY MS. SAMUELS:
3       Q    And so were you a Lieutenant until 2018?
4       A    Yes up until October 3rd.
5       Q    Okay. So from 2015 to 2018, you were a
6   Lieutenant?
7       A    2013.
8   BY MS. SAMUELS:
9       Q    So from 2005 to 2013, you're a Lieutenant,
10  correct?
11      A    That's correct. I was out of the building at
12  the time though.
13      Q    What do you mean you were out of the
14  building?
15      A    There was a period of time where they had
16  charges against me, and I was basically fighting for my
17  job back.
18      Q    All right. When was that?
19      A    2005.
20      Q    Until when?
21      A    2013.
22      Q    Okay. So for 2005 'til 2013, you were --
23  were you suspended pending an investigation?
24      A    There was charges brought before the Police
```

```
1   and Fire Board to have me terminated.
2       Q    Right. So were you still active duty with
3   all of your Police powers during that period of 2005 to
4   2013?
5       A    No.
6       Q    Okay. Did you have your Police powers during
7   that time?
8       A    No.
9       Q    Okay. So would you consider yourself active
10  duty or suspended during that time?
11      A    Suspended.
12      Q    Okay. And then from 2013 is when you come
13  back as a Lieutenant; is that correct?
14      A    Yes, reinstated fully exonerated.
15      Q    Okay. And from 2013 to 2018 is when you are
16  a Lieutenant and then at -- sometimes you are given the
17  task of being Patrol Commander; is that correct?
18      A    That's correct.
19      Q    All right. What were the allegations against
20  you?
21      A    They accused me of stealing from the bank.
22      Q    Was this purely administrative, or were any
23  criminal charges brought?
24      A    They also brought criminal charges.
```

1  Q    All right. When were the criminal charges
2  dismissed?
3  A    I believe 2011.
4  Q    And what was the nature of the dismissal?
5  A    I believe it was not guilty. I want to say
6  it was directed out, but I think it was definitely not
7  guilty.
8  Q    All right. Did you go to trial?
9  A    We did.
10  Q    Oh, okay.
11       So from 2000 and -- were you -- in 2005,
12  was that when you were indicted?
13  A    Yes.
14  Q    Okay. So from 2005 until 2011 is when
15  there's criminal charges pending against you, correct?
16  A    Yes.
17  Q    Okay. And then from 2011 to 2013 is the
18  Administrative charges?
19  A    The Administrative charges started in 2005.
20  They were held in abeyance.
21  Q    Until your criminal stuff was done, right?
22  A    Correct.
23  Q    Okay. And you had a full hearing on the
24  Administrative charges?

1  A    Yes. Subsequently it went to Administrative
2  Review in Cook County.
3  Q    All right. So when you say Administrative
4  Review to Cook County, do you mean you had to appeal to
5  the Circuit Court?
6  A    Yes, the Police and Fire Board's decision,
7  yes.
8  Q    All right. So Police and Firearm Board found
9  against you; you appealed, and the Circuit Court
10  reversed?
11  A    That's correct.
12  Q    Besides yourself, were any other Markham
13  Police Officers accused with you for this incident?
14  A    No.
15  Q    Okay. 2013, you come back -- excuse me --
16  yeah, no, 2013 is when you are reinstated, correct?
17  A    Yes.
18       MR. SULLIVAN:  He's answered earlier he has
19  fully been exonerated, fully reinstated, returned in
20  2013 at the full rank of Lieutenant.
21       MS. SAMUELS:  Right.
22  BY MS. SAMUELS:
23  Q    And that's when you are on and off as Patrol
24  Commander?

1  A    Yes.
2  Q    And then in 2018 is when you become Chief,
3  correct?
4  A    Yes.
5  Q    How did you become Chief?
6  A    The Chief role is an appointed position.
7  Q    All right. Did you have to apply or did
8  somebody from the Administration just contact you?
9  A    That is a -- the Mayor appoints that with
10  advice and consent from the Counsel.
11  Q    Right. I guess what I'm saying is: Did you
12  go to someone and say, hey, I'm interested in being
13  Chief, or did someone contact you first and say, hey,
14  are you interested in being Chief?
15  A    No, I did not go to anyone to solicit to be
16  that position.
17  Q    All right. So who contacted you first about
18  becoming Police Chief?
19  A    Well, there were several individuals. And
20  then finally the Mayor did come to me and ask me if I
21  would accept that role.
22  Q    All right. And who were the individuals that
23  came to you?
24  A    Mostly citizens in Markham.

1  Q    So prior to the Mayor contacting you about
2  being Police Chief, the only other individuals who had
3  contacted you about the job are citizens of Markham?
4  A    Yes.
5  Q    All right. Nobody else who had a position
6  with the City of Markham contacted you prior to the
7  Mayor?
8  A    I don't believe so, no.
9  Q    All right. Did you know the Mayor before he
10  contacted you?
11  A    Yes.
12  Q    All right. And this would have been Agpawa,
13  correct?
14       THE COURT REPORTER:  I'm sorry. I missed a
15  word?
16       MS. SAMUELS:  Agpawa.
17  BY MS. SAMUELS:
18  Q    I believe it's A-g-p-a-w-a, correct?
19  A    Yes.
20  Q    How do you know Agpawa?
21  A    I worked with him.
22  Q    When did you work with him?
23  A    Ever since 1991.
24  Q    Where did you work together in 1991?

```
1    A    He was the Deputy Fire Chief.
2    Q    Where?
3    A    In Markham.
4    Q    Okay.  So he was Deputy Fire Chief at the
5  same time you were a Police Officer for Markham?
6    A    Yes.
7    Q    All right.  And you guys, I guess, knew each
8  other through work?
9    A    Yes.  We had several projects that we were
10 assigned to throughout the years.  One of the major
11 ones was to bring the 911 Center to the City of
12 Markham.
13   Q    So there's a -- just so you know where I'm
14 trying to gong with this line of questioning.  I'm
15 trying to make sure I understand the Departmental
16 structure of the Markham Police Department in/or around
17 2018.
18        So you would have been the Chief,
19 correct?
20   A    Yes.
21   Q    Directly under you, is there a Deputy Chief?
22   A    Yes.
23   Q    All right.  One or two?
24   A    One.
```

```
1    Q    All right.  At the time -- so say you were
2  appointed, like, in -- some time in October 2018,
3  correct?
4        MR. SULLIVAN:  What's the exact date, Chief?
5        THE WITNESS:  October 3, 2018.
6  BY MS. SAMUELS:
7    Q    All right.  So October 1st, who is Deputy
8  Chief?
9    A    Jack Genius(Phonetic) and James Walker.
10   Q    Okay.  And who was Chief October 1st?
11   A    Mack Sanders.
12   Q    All right.  And then below the Deputy Chiefs,
13 were there still Lieutenants?
14   A    Just one Lieutenant.
15   Q    All right.  Who is that Lieutenant?
16   A    That would be me.
17   Q    Okay.  And then is the rank immediately below
18 Lieutenant Sergeant?
19   A    Yes.
20   Q    All right.  Do you recall how many Sergeants
21 there were at that time?
22   A    I believe there was six.
23   Q    All right.  Can you identify them?
24   A    I'll try.  Sergeant Jones, Sergeant Wilkins,
```

```
1  Sergeant DeSean Walker, Sergeant Dean, Sergeant
2  Courtney Howl White.  And did I miss somebody?  Did I
3  say Sergeant Wilkins?
4    Q    Yes.
5    A    Okay.  Who else?
6    Q    Is there a -- so I have -- do you want me to
7  run back the names?
8    A    Yes.
9    Q    Okay.  So I have Sergeant Jones, Sergeant
10 Wilkins, Sergeant DeSean Walker, Sergeant Dean,
11 Sergeant Courtney Howl White?
12   A    It seems like there should be somebody else.
13   Q    Well, if you think of it at a later time just
14 let me know, okay?
15   A    Okay.
16   Q    Okay.  And so that would have been sort of
17 the personnel in charge right before you became Chief,
18 correct?
19   A    Yes.
20   Q    Okay.  And then when you become Chief there's
21 only one Deputy Chief?
22   A    Yes.
23   Q    Okay.  And that was -- I'm sorry.  Who was
24 that?
```

```
1    A    That's Jack Genius.
2    Q    Okay.  And what happens with James Walker?
3    A    James Walker went back to his Civil Service
4  Rank of Sergeant.
5    Q    Okay.  Were there any Lieutenants?
6    A    I'm the only Civil Service Lieutenant for the
7  City of Markham.
8    Q    Okay.  So October -- we'll say October 4th,
9  how many Sergeants are there?
10   A    I believe that it's the five I named.  I
11 still think there might be another one I'm missing.
12 I'm not sure.  But I have to say five.
13   Q    So the five you named, and then James Walker,
14 correct?
15   A    Yes.  So that makes six then for sure.
16   Q    Okay.  How often -- as Chief, do you have,
17 like, meetings with your Command staff?
18   A    Yes.
19   Q    All right.  How often?
20   A    At least once a week.
21   Q    All right.  And did that include Sergeants,
22 Lieutenants and your Deputy Chiefs, or who is included
23 in that?
24   A    The Deputy Chiefs, and I have two appointed
```

1 Lieutenants as well.
2    Q   All right. Who are the two appointed?
3    A   Eric Bloom and Samuel Harris.
4    Q   All right. And so I take it that an
5 appointed Lieutenant is different than, I think you
6 referred to as like a Civil Service Rank Lieutenant?
7    A   That's correct.
8    Q   All right. Can you describe the difference?
9    A   An appointed position is a position appointed
10 by the Mayor. You do not take a test, a Civil Service
11 Exam to earn that rank; someone gave it to you.
12    Q   Okay. And what position can you --
13 besides -- no, let me ask it another way.
14           What position can be appointed where you
15 don't need to take a --
16    A   I remember now, Sergeant Harris, Sam Harris
17 was the sixth Sergeant's name I couldn't remember.
18    Q   Gotcha. Thank you.
19    A   I'm sorry. What was your question?
20    Q   So what positions can be appointed where you
21 don't need to take a test?
22    A   You can be a Temporary Sergeant. They don't
23 call those appointed Sergeants. They call them
24 Temporary Sergeants.

1           You can be an appointed Lieutenant. You
2 can be appointed as a Deputy Chief, and of course you
3 can be appointed as --
4    Q   All right. And is this the general practice
5 of all Police Departments, or is this just how Markham
6 works?
7    A   No, this is nationwide.
8    Q   Okay. So what determines when you would have
9 to take a test to become a Lieutenant?
10    A   The needs of the Police Department will have
11 them generate a Civil Service Exam for the position.
12    Q   Okay. So hypothetically speaking, if a
13 Lieutenant retire then is that one of those instances
14 where you would have to take the test?
15    A   If the City offered it, you would have to
16 take a test.
17    Q   Okay. Let me ask this: When you say the
18 needs of the Police Department determines whether or
19 not you take the test, can you be more specific about
20 what that means?
21    A   Well, the -- remember in the past they tried
22 to eliminate the position of Lieutenant. And they said
23 that -- they actually passed an Ordinance and said that
24 the Lieutenants will now become Deputy Chiefs. So, in

1 effect, me holding the last Lieutenant spot, they could
2 not eliminate the Lieutenant's position.
3           So if they determine that we need two
4 Lieutenants to -- one on the Admin side of the Police
5 Department and one on the Command Patrol side, then
6 they would create two positions.
7    Q   And when you say "if they determine," are you
8 talking about, like, City Counsel or something?
9    A   The City Counsel, correct.
10    Q   And is that the same way it would work for
11 Sergeants?
12    A   Yes.
13    Q   Okay. And correct me if I'm misinterpreting
14 this wrong. Is it like the City Counsel budgets out
15 for a certain number of Lieutenants or a certain number
16 of Sergeants, and then if there's a need, they fill it;
17 if it's not, then there would be no need to have those
18 tests or examinations?
19    A   Yes. They would get the request from the
20 Police Department.
21    Q   Okay.
22    A   I need additional manpower. I need a command
23 Staff person. They would take that into consideration,
24 take a look at the budget, see if, you know, we could

1 do that, and then they would do it.
2    Q   Okay. And is that the same with -- and
3 that's whether or not to offer the test, correct?
4    A   That's to even due the appointed position,
5 not necessarily with the test. If the need is there
6 for two Lieutenants, they can appoint two Lieutenants
7 without offering the test.
8    Q   Okay. Ultimately, who is responsible for
9 determining the work schedules of Patrol Officers?
10    A   It starts with who is ever serving in the
11 capacity of Patrol Commander.
12    Q   All right. And then where does it go from
13 Patrol Commander?
14    A   To the Chief's Office.
15    Q   All right. And then I guess you give the
16 final approval?
17    A   Yes.
18    Q   Do you have any military background?
19    A   Yes.
20    Q   All right. What's that?
21    A   United States Marine Corp.
22    Q   When did you join the Marines?
23    A   I'm not entirely sure. It is part of a
24 delayed entry program.

1    Q   I'm sorry. You said delayed entry program?

2    A   Correct.

3    Q   Can you give me a general timeframe?

4    A   In the 80s.

5    Q   All right. After high school?

6    A   The delayed entry program starts while you're

7 in high school.

8    Q   Okay. And then after -- well, I guess --

9        What was the highest rank you achieved

10 in the Marine Corp?

11    A   A Private.

12    Q   And how long were you a Marine?

13    A   I don't have the exact dates of that.

14    Q   Can you give me a general timeframe?

15    A   I guess a year.

16    Q   All right. Were you discharged?

17    A   Yes.

18    Q   Honorably?

19    A   I'm not entirely sure. It was a medical

20 issue. So I don't know. I don't remember.

21    Q   And then you were discharged due to a medical

22 issue?

23    A   Yes.

24    Q   Where did you go for basic training?

1    A   San Diego, California.

2    Q   Do you remember the base?

3    A   San Diego, California.

4    Q   That was the name of the base?

5    MR. SULLIVAN:  The name of the base is the

6 Marine Corp. Recruit Depot, San Diego, California. So

7 it's called MCRD for short, San Diego.

8 BY MS. SAMUELS:

9    Q   And then after basic, you were discharged due

10 to some medical issue?

11    A   Yes.

12    Q   All right. Was it related to your physical

13 or mental health?

14    A   Physical.

15    Q   Okay. Do that issue -- but that issue

16 doesn't affect you being a Police Officer?

17    A   No.

18    Q   How long have you known Kyung Palmer?

19    A   I'd have to say since 2013.

20    Q   All right. How did you first meet her?

21    A   I'm not entirely sure. I just remember

22 encountering her.

23    Q   Was it through work?

24    A   Yes.

1    Q   Okay. Did you ever work directly with

2 Ms. Palmer?

3    A   I can't say that I have.

4    Q   Before you became Chief of Police, did you

5 have any opinion on her fitness to be a Police Officer?

6    A   When you say "opinion," what do you mean?

7    Q   Like, did you have any thoughts or beliefs on

8 her fitness to be a Police Officer?

9    MR. SULLIVAN:  And her question was, before

10 you became Chief of Police. So she's asking for the

11 period prior to October 3, 2018, whether you had an

12 opinion about her, if that makes sense; do you

13 understand the question?

14    THE WITNESS:  Not really, no.

15    MR. SULLIVAN:  Okay. Ms. Samuels, can you

16 just go ahead repeat your question?

17    MS. SAMUELS:  Sure.

18 BY MS. SAMUELS:

19    Q   I guess sort of as, like, a setup: Do you

20 think that there are certain qualities that an

21 individual has or should have in order to be an

22 effective Police Officer?

23    A   I think that there's training, and then I

24 think that there's your will to do the job to do the

1 very best job you can.

2    Q   All right. And prior to becoming Chief of

3 Police, did you think that Ms. Palmer was adequately

4 trained to be a Police Officer?

5    A   I think she had training sufficient enough to

6 be a part-time Police Officer.

7    Q   All right. And prior to becoming the Chief

8 of Police, do you believe that Ms. Palmer had the

9 adequate will to be a Police Officer?

10    A   I think that she could have applied herself

11 more as a Police Officer.

12    Q   All right. And when you said she had the

13 training to be a part-time Police Officer, I take it

14 you mean that as a distinction between a full-time

15 Police Officer?

16    A   Yes.

17    Q   And can you explain what additional training

18 would have made her more apt to be a good full-time

19 Police Officer?

20    MR. SULLIVAN:  Well, I'm just going to

21 interject an objection that you are asking him to

22 speculate.

23    And are we still -- just -- so I

24 understand the question as Counsel, are we still in the

period of time before Chief White became the Chief of
Police; is that what we are talking --
        I just want to know what time period we
are talking about when you ask him.
    MS. SAMUELS:  Yes.
    THE WITNESS:  I think that if she had
undergone the training, and most full-time Police
Officers did, and then she applied that training to her
every-day function, then she certainly would have been
operating at that level.
BY MS. SAMUELS:
    Q   All right.  What training do full-time Police
Officers get that part-time Police Officers don't have?
    A   Well, they go to a full-time Police Academy.
    Q   Okay.  Is there anything else you can think
of?
    A   No.  The training after your part-time
Academy and your full-time Academy after those entities
are the same for everybody.
    Q   Okay.  I'm sorry, you said they are or they
aren't?
    A   They are the same.  The only difference is --
    MR. SULLIVAN:  What he said was the same was
after --

    MS. SAMUELS:  Can you let him explain,
please?
    MR. SULLIVAN:  Okay.  Well, you got to
clarify that.  You are talking about training that
occurs after.
    THE WITNESS:  After your part-time Academy or
your full-time Academy.  The training after that is the
same.
BY MS. SAMUELS:
    Q   Okay.  And so in, say October 1, 2018, were
there certain things that a part-time Police Officer
with the City of Markham could do -- excuse me --
    Were there certain things that a
full-time Police Officer with the City of Markham could
do that a part-time Police Officer could not do?
    A   So part-time Police Officers can never be in
command of a full-time Police Officer.
    Q   Okay.  I guess -- so in relation to execution
of their police power, were there certain limitations
that a part-time Police Officer had that a full-time
Police Officer did not?
    A   No.
    Q   Okay.  Was the only material distinction
between a part-time and a full-time Police Officer the

number of hours that they worked?
    MR. SULLIVAN:  I'm going to object to the
term material distinction as undefined and a lack of
foundation.
    You can -- if you can --
    THE WITNESS:  Okay.  So the part-time Police
Officers are at will employees without the benefit of a
Union contract.  Full-time Police Officers have a Union
contract and enjoy the benefits of it.
BY MS. SAMUELS:
    Q   Okay.  So what I want to concentrate is sort
of the execution of your police powers.  When I say
"police powers," do you understand what I mean by that?
    A   You mean the authority to take someone's
liberty temporarily.
    Q   Yes, so like traffic stops, arresting people,
things like that.
    A   Correct.
    Q   Were there certain things that a full-time
Police Officer could do with the City of Markham that a
part-time Police Officer couldn't do when it came to
exercising their police powers?
    A   No.  It was all the same.
    Q   So -- and then you also said at the time,

that you thought she could have applied herself more?
    A   Yes.
    Q   All right.  And can you give me an example of
what you mean by that?
    A   There's encounters with citizens, other staff
members, that she, basically, did not fulfill her
duties on as a Police Officer.  When people come to you
for help, it's actually our duty to help them as best
we can.
    MR. SULLIVAN:  Ms. Samuels, we are coming up
to just about an hour.  Can we take a five-minute
break?  I just need to use the -- could we just take a
five-minute personal break?
    MS. SAMUELS:  Yeah, no problem.
    (WHEREUPON, off the record.)
BY MS. SAMUELS:
    Q   Chief White, did you have a chance to confer
with your attorney during that break?
    A   No, I didn't.
    Q   All right.  You mentioned that you thought
that she could have applied herself better in
encounters -- excuse me.
    You mentioned that you believe
Ms. Palmer could have applied herself better in

1 encounters with citizens and staff members?

2     A   Yes.

3     Q   Okay. Is there an example you could provide?

4     A   I think the -- probably the very first ones

5 when she was working at the senior building as

6 security, she got into it with some residents. She got

7 into it with a couple of CNA nurses.

8             Secondly, there was an incident where

9 she was to be in court, and somehow I got assigned to

10 that internal investigation.

11             What she did was falsified a time sheet

12 that she was in court. And she went over into

13 Hazelcrest to fight a parking ticket that she had in

14 her uniform.

15             Those officials over there called the

16 Police Department and complained, and that's what

17 generated the internal. There was incidents at the

18 roller rink with the Juvenile parents, staff members

19 there. There is incidents at City Hall, not letting

20 City Hall personnel in on time.

21             There's quite a bit of incidents.

22 BY MS. SAMUELS:

23     Q   The incident regarding the senior building do

24 you know if she was ever disciplined for that?

1     A   I don't remember. I'd have to try to look at

2 the paperwork and see what happened, but there were

3 several episodes at the senior building.

4     Q   All right. The incident regarding the

5 tickets, do you know if she was disciplined for that?

6     A   I remember writing up the recommendation for

7 discipline. I don't know if she actually served it or

8 not.

9     Q   Do you know if she was written up for any

10 incidents at the roller rink with her interactions

11 regarding patrons?

12     A   I believe she was.

13     Q   And do you know if she was disciplined for

14 any incidents at City Hall regarding not letting people

15 in on time?

16     A   I believe the way Sanders, Chief Sanders

17 dealt with that was he removed her from that detail and

18 placed her back on the streets in Patrol.

19             The incident concerning her and Rachael

20 Dawson, we sent them both out for counseling,

21 separately at first, and then together. And I'm not

22 entirely sure of the end outcome of that, whether both

23 or one or neither were disciplined for that.

24     Q   Okay. After you became Police Chief, did

1 your opinion change with regard to Ms. Palmer's fitness

2 to be a Police Officer?

3     A   I don't think that my opinion changed. I

4 think that her work still suffered before and after.

5     Q   All right. After you became Chief, can you

6 explain how her work continued to suffer?

7     A   She continued to get citizens' complaints.

8 Her report writing skills were not where they should

9 have been. Her ticket writing skills were not where

10 they were supposed to be.

11             She had an assignment of viewing the red

12 light camera violations. There were times when she

13 would just press the button and not really view the

14 cameras to see if there was an actual violation.

15             There was one citizen's complaint where

16 she placed a female passenger in the back of the squad

17 car and drove, according to the Complainant,

18 recklessly. There's just -- there's incidents.

19     Q   Was she disciplined for any of those

20 complaints?

21     A   I'm not entirely sure what happened sitting

22 here right now. I'd have to look at the documents.

23     Q   Did you ever write her up after you became

24 Chief of Police for any of her deficiencies as a Police

1 Officer?

2     A   After I became Chief?

3     Q   Yeah.

4     A   Yeah, that's -- so the Chief of Police don't

5 actually do writeups like that. That would be some

6 member of the Command Staff.

7     Q   Did you ever have any members of your Command

8 Staff write her up for her deficiencies as a Police

9 Officer?

10     A   I believe I did see some documents to that

11 effect.

12            MR. SULLIVAN: Ms. Samuels' question was

13 whether you had -- in other words, did you direct

14 anybody to write her up?

15            That's how I understood your question,

16 and I apologize, Ms. Samuels if I'm incorrect.

17            She didn't ask you if you saw write-ups

18 from others. I think her question was: As a Chief,

19 did you direct any of your Command Staff to write her

20 up?

21         THE WITNESS: No, I wouldn't direct anyone to

22 write anyone up.

23         MR. SULLIVAN: Okay.

24

BY MS. SAMUELS:

Q   So if you see an Officer engage in misconduct, as a Chief of Police, what are your recourses?

MR. SULLIVAN:  Well, I'm going to -- objection as to the undefined term of misconduct.

But you can answer.

THE WITNESS:  If I personally witness it, I would address that with the Police Officer , and then I would report that in reverse order of the chain of command.

BY MS. SAMUELS:

Q   And so are you -- can you only do oral reports, or can you do a written complaint?

A   Can I, as the Chief of Police, do that?

Q   Yeah.

A   It's not common for a Police Chief to write up a subordinate. That's what your Command Staff is for.

Q   All right. Is there anything that stopped you from being able to?

A   I -- it's a para-military organization. It's just not done. I'm not aware of any Police Department across the nation that would do that.

Q   So just to take it to the end degree. So say you see a Police Officer plant a gun on somebody, right, clearly a violation; in those circumstances, would you be able to write them up?

A   So that would not be the Police Chief's function. The Police Chief's function would be to, in reverse command order, to go to the Deputy Chief, report that.

I would, of course, stop that Officer right there, before the violation continued. I would report it to the Deputy Chief. That Deputy Chief, would then, in turn, do the internal on it.

And then all of that paperwork that's now being investigated, compiled and then returned back to the Chief's office.

Q   And so when you see -- is that what you mean when you said reverse report -- or a report in reverse order --

A   Yes.

Q   So you tell the Deputy Chief they would be responsible for administering the administrative investigation and all that, and then you make the final determination?

A   Yes.

Q   Gotcha. Did you play any role in taking Ms. Palmer off of the City Hall duty?

A   No, I did not. And that's not really a duty. That's a day-to-day assignment.

Q   All right. Are Officers generally assigned to cover a specific location or area?

A   That's right.

Q   Did you play any role in removing Ms. Palmer from the roller rink assignment?

A   No, I did not.

Q   Did you play any roll in removing Ms. Palmer from the Senior Building assignment?

A   No, I did not.

Q   Do you know who would have been responsible for making those decisions?

A   Chief Sanders, to my understanding, removed her from the Senior Building. Chief Sanders, from my understanding, removed her from the City Hall detail.

Palmer herself did not want to work at the roller rink on the weekends. She even submitted a to/from that she was not available on Saturdays. But no, I did not remove her from the roller rink detail at all either.

Q   All right. So you believe Chief Sanders was

responsible for the City Hall and Senior Building changes of assignment. And then roller rink, she was unable to work on weekends, which essentially meant she couldn't work there?

A   She didn't want to work there.

Q   All right. Was the roller rink assignment only for weekends?

A   Yes.

Q   All right. If there was a change in assignment while you are Chief of Police, would you oversee that or would you have responsible for -- would you be responsible for confirming that?

A   If there was a change in assignment, would I have to confirm that assignment?

Q   Yes, sir.

A   Only in the aspect of the managing of the day-to-day operations.

Q   Okay. How was it first brought to your attention the number of hours a part-time Patrol Officer can work?

A   I would have to say in 2013.

Q   All right. What happened?

A   I made myself aware of the policies and procedures that I had missed, the ordinances and State

laws.

Q   All right.  While you were a Patrol Commander, did you have any role in setting schedules?

A   So Chief Sanders and his assistant basically did the schedule.

Q   So is that no?

A   That's a no.

Q   Okay.  And then when you became Chief, was it a priority for you to ensure that, I guess, part-time Patrol Officers were abiding by the statutory requirements?

A   I wouldn't call it a priority, but yes, it was definitely a function to obey all the rules and regulations and policies and ordinances and the laws, yes.

Q   All right.  Are part-time Patrol Officers eligible for overtime?

A   No.

Q   After you became Chief of Police, are you aware of any part-time Patrol Officers getting overtime?

A   No.

Q   Do you make a recommendation -- let me back up.

---

When it comes to setting the Police Office -- the Police Department's annual budget, do you make recommendations for staffing?

A   No.

Q   Just so I'm clear, when I say recommendation for staffing, I mean, we need X number of Patrol Officers or we need this number of Sergeants.

A   I have been asked that question by the Council members.

Q   How did the elimination of part-time Police Offers come about?

A   I have no idea.

Q   How did you first become aware of it?

A   I was told that the Council with the Treasurer's office decided that they could no longer fund the Part-Time Police Officer Program, and that it would be eliminated.

Q   Were you ever asked to provide your input on whether or not it should be eliminated?

A   No.

Q   Did you voluntarily provide any input on whether or not they should be eliminated?

A   No.

Q   At the time -- at the time you became Chief,

---

how many part-time Police Officers were there?

A   I believe four; maybe five.

Q   Were all of the part-time Police Officers terminated at the same time?

A   Yes.  It was not terminated.

Q   All right.  What happened to them?

A   The program was eliminated.  They were not fired.

Q   Did any of them remain with the Department?

A   Not as a part-time Officer, no.

Q   Did any of them remain in any other capacity with the Police Department?

A   There was one Officer who, through an agreement with the Department of Human Rights, was restored back to full-time status.

Q   And when was this?

A   In July 2019.

Q   Okay.  And so it sounds like -- this Police Officer was full-time before he was part-time?

A   That's correct.

Q   And then you made him full-time again?

A   I did not make him full-time.

Q   And then he was made full-time again?

A   Correct.

---

Q   Was that Gerald Jackson?

A   Yes.

Q   What allegations did he make with the Department of Human Rights?

MR. SULLIVAN:   If you know.

THE WITNESS:   I'm not entirely sure.  I really wasn't privileged to that.  I was called downtown to testify on what I did know, but it wasn't much.

BY MS. SAMUELS:

Q   So what did you testify about?

A   That there appeared to be something about Gerald Jackson that the former administration was at odds with him on.  And I still don't know what that was about.

Q   When were the part-time positions eliminated?

A   I believe that was July of 2019.

Q   Besides Gerald Jackson, were any other Officers offered a full-time position?

A   Gerald Jackson wasn't offered it.  It was part of a settlement agreement.  But no, no one else.

Q   In 2019, were any -- were there any openings for Full-Time Police Officers?

A   I don't know, sitting here now, if there was

1  or not.
2  Q  In 2019, were there any openings for
3  Sergeants?
4  A  I don't think it was.
5  Q  In 2019, were there any openings for
6  Lieutenants?
7  A  I don't think that there was.
8  Q  To the best of your knowledge, were any
9  Officers within the Markham Police Department elevated
10  to the position of Sergeant or Lieutenant during the
11  calendar year 2019?
12  A  I'm trying to think when Bloom was appointed
13  Lieutenant. I'm not entirely sure when that happened.
14  It might have happened in 2019; I'm not sure.
15           Sergeant Sam Harris was appointed -- it
16  probably was -- it was definitely later than Lieutenant
17  Bloom. So it could have been 2019 also. I just don't
18  have those dates in front of me.
19  Q  When someone is appointed to a position, does
20  that come with a pay raise?
21  A  Yes.
22  Q  At the time you became Chief, do you know how
23  many -- how many women were in the Markham Police
24  Department? Yeah, let's ask that.

1  A  Let's see. I believe five.
2  Q  Can you identify them?
3  A  Sergeant Courtney White, Sergeant Wilkins,
4  Monique Woods, Kyung Palmer, Roshonda Lewis, Dominica
5  Tolbert. That's six.
6  Q  And did they all have Police power?
7  A  Yes.
8  Q  When an Officer makes an allegation of
9  discrimination with an outside agency, whether it be
10  the Department of Human Rights or EEOC, does the Police
11  Department also investigate it?
12  A  I believe that Human Resources would be
13  responsible for that.
14  Q  Okay. And is Human Resources -- are you
15  talking about --
16           Is there a Human Resources Department
17  within the Police Department, or are you talking about
18  Human Resources for the city of Markham?
19  A  The Human Resources for the city of Markham.
20  Q  Okay. Were you asked to participate in any
21  investigation into Gerald Jackson's allegations of
22  misconduct by anybody for the Human Resources
23  Department for the city of Markham?
24           MR. HAYES:  I'll object to a lack of

1  foundation, calls for speculation. It misstates the
2  record.
3           Chief, you can answer if you can.
4           THE WITNESS:  I don't remember an allegation
5  against Gerald Jackson.
6  BY MS. SAMUELS:
7  Q  I'm sorry. An allegation by Gerald Jackson.
8           MR. HAYES:  Same objection.
9           THE WITNESS:  I believe I wasn't in the
10  building when Gerald Jackson raised that allegation.
11  BY MS. SAMUELS:
12  Q  So is that no?
13  A  That would be a no, I wasn't --
14           MR. SULLIVAN:  Do you understand what her
15  question was?
16           THE WITNESS:  I believe she's asking me if I
17  knew about Gerald Jackson's allegations against the
18  city.
19           MR. SULLIVAN:  No, I thought --
20           Your question was did Chief White
21  participate in the investigation of Gerald Jackson's
22  allegations; is that right?
23           MS. SAMUELS:  Right. So -- let me give you a
24  preface, and then I'll ask the question again, just on

1  that relevancy page. Right.
2  BY MS. SAMUELS:
3  Q  And so your understanding is when someone
4  makes -- when a Police Officer makes a complaint with
5  an outside agency like, The Department of Human Rights
6  or the EEOC, then HR for the city of Markham is
7  responsible for investigating; that's your
8  understanding, correct?
9  A  That's my understanding.
10  Q  All right. And so what I'm asking is:
11  Knowing that Gerald Jackson had made such a complaint,
12  do you recall whether or not anybody for HR with the
13  city of Markham ever asked you to provide a statement
14  or any evidence or anything like that pursuant to their
15  investigation?
16  A  I was not in the building when Gerald Jackson
17  made that allegation, so no.
18           MR. SULLIVAN:  You've got to listen to her
19  question. Her question is: Do you recall whether
20  anyone from HR asked you for a statement or -- you
21  know, a written statement or were you interviewed?
22           So that's what her question is. So
23  if -- you know, you got to do your best to recall and
24  answer that particular question.

1　　　THE WITNESS: So the answer is no, because I
2　wasn't there when he made the allegation.
3　　　MR. SULLIVAN: Yeah, I just want to make sure
4　you understood the question. The question wasn't
5　whether you were there. The question was did anybody
6　from HR ask you to provide a statement as part of the
7　HR inquiry if there was --
8　　　THE WITNESS: So the answer is no one asked
9　me anything.
10　　　MS. SAMUELS: Okay. Thank you, sir.
11　BY MS. SAMUELS:
12　　Q　Courtney White, what was her job title at the
13　time you became Chief?
14　　A　Sergeant.
15　　Q　Okay. Is she still a Sergeant?
16　　A　No, she is since retired.
17　　Q　Okay. Sergeant Wilkins, what was her job
18　title at the time you became Chief?
19　　A　Sergeant.
20　　Q　All right. Is she still a Sergeant?
21　　A　Yes.
22　　Q　Monique Woods, what was her job title at the
23　time you became Chief?
24　　A　Patrol.

1　　Q　Is she still Patrol?
2　　A　Yes.
3　　Q　Okay. Kyung Palmer, she was Part-Time Patrol
4　Officer at the time you became Chief?
5　　A　Yes.
6　　Q　All right. And then she's no longer with the
7　Department?
8　　A　That's correct.
9　　Q　Actually, let me ask this question, because
10　how would you consider -- how would you classify her no
11　longer being with the Police Department?
12　　　MR. SULLIVAN: I'm --
13　BY MS. SAMUELS:
14　　Q　Do you get what I'm trying to ask?
15　　　MR. SULLIVAN: Well, I do not. This is
16　Counsel. I'll ask that -- if you can clarify that
17　question.
18　BY MS. SAMUELS:
19　　Q　Right. So I guess what I'm saying is: You
20　don't consider that the part-time Police Officers were
21　terminated, correct?
22　　A　That's correct.
23　　Q　Right. Would you consider it that they
24　resigned or what -- how would you -- or just like their

1　contract wasn't renewed?
2　　A　They don't have a contract. Their job was
3　eliminated.
4　　Q　Okay. So it's just the position was
5　eliminated?
6　　A　Yes.
7　　　MR. SULLIVAN: Yeah, as -- in --and that's
8　what you testified earlier; is that right?
9　　　THE WITNESS: That's correct.
10　　　MR. SULLIVAN: Okay. Got it.
11　BY MS. SAMUELS:
12　　Q　All right Roshonda Lewis, what was her job
13　title at the time you became Chief?
14　　A　She was a Patrol Officer.
15　　Q　What's her current job title?
16　　A　She is one of my detectives.
17　　Q　All right. And Dominica Tolbert, what was
18　her job title at the time you became Chief?
19　　A　She was one of the detectives.
20　　Q　What's her current job title?
21　　A　She's terminated.
22　　Q　Have you ever commented on the personal
23　relationships of any of the Officers that worked for
24　you?

1　　A　No.
2　　Q　Have you ever made any negative or
3　disparaging comments about Ms. Palmer?
4　　A　No.
5　　　MR. SULLIVAN: Well, I'll just then interject
6　for the record, an objection to the lack of foundation
7　as to what negative or disparaging remarks you are
8　referring to.
9　BY MS. SAMUELS:
10　　Q　Have you ever called Ms. Palmer stupid?
11　　A　Never.
12　　Q　Have you ever said she shouldn't be a Police
13　Officer?
14　　A　No.
15　　Q　Have you ever said women shouldn't be a
16　Police Officer or words to that effect?
17　　A　No.
18　　Q　Have you ever said words to the effect that
19　you intended to make female Police Officers' jobs --
20　excuse me the Female Police Officers who work for you,
21　their jobs difficult or unbearable?
22　　A　I have never said that.
23　　Q　Have you ever been accused of sexual
24　harassment or sexual discrimination?

1    A   Yeah.

2    Q   Besides by Ms. Palmer, by who?

3    A   I believe --

4    MR. HAYES: Chief, I'm sorry. Let me state

5 an objection or at least see a clarification.

6    Are you talking about name as a party in

7 such a claim?

8    MS. SAMUELS: No, I'm talking about anybody

9 who has accused him of sexual harassment or

10 discrimination.

11    MR. SULLIVAN: So you are just asking, in

12 general, has anybody ever came up and said you sexually

13 harassed me.

14    MS. SAMUELS: I'm asking him if he has

15 knowledge whether anybody's complained that he has

16 sexually harassed them or has discriminated against

17 them on the basis of their sex.

18    THE WITNESS: So I never got accused of

19 sexual harassment. But they are accusing me of sexual

20 discrimination based on their gender.

21 BY MS. SAMUELS:

22    Q   Okay. Who was that?

23    A   That would be Monique Woods, Kyung Palmer. I

24 believe Dominica Tolbert alluded to that somewhere in

LIGHTFOOT COURT REPORTING, P.C.
(312) 701-1090
lightfootpc@sbcglobal.net

1 the past, but that's about it.

2    Q   All right. Besides those three, you are

3 unaware of any other allegations of sex discrimination

4 or harassment that have been made against you?

5    A   Correct.

6    Q   If an Officer writes a to/from complaining

7 about treatment by a superior Officer, how is that -- I

8 guess, is that investigated?

9    A   Yes, it is.

10    Q   And can you just sort of lay out the

11 investigation procedure for how it would go from the

12 writing of the to/from?

13    A   So the writing of the to/from, depending on

14 the nature of it, gets routed through the chain of

15 command. And it usually lands with one of the --

16 either the Patrol Commander, which is a Lieutenant or

17 the Deputy Chief.

18    One or both of them would then go to the

19 Chief with the allegation and then an internal

20 investigation is conducted.

21    If it's of a subject that's more

22 extreme, then that would be routed to HR, and then

23 there would be some type of joint investigation.

24    Q   Okay. If an Officer makes a verbal complaint

LIGHTFOOT COURT REPORTING, P.C.
(312) 701-1090
lightfootpc@sbcglobal.net

1 to their supervisor, is there a standard practice or a

2 policy procedure with how that supervisor is supposed

3 to handle it?

4    MR. SULLIVAN: I will object as to lack of

5 foundation with regard to the nature and extent and

6 severity of what the verbal complaints of the matter

7 is.

8    Chief, you can answer if you can.

9    THE WITNESS: The same procedures would

10 follow.

11 BY MS. SAMUELS:

12    Q   Okay. What role do you play in -- well, let

13 me ask this:

14    When did you learn that Ms. Palmer had

15 been hired by a different Police Department?

16    A   I'm not sure what date, but it was some time

17 after.

18    Q   When you mean some time after, you mean,

19 like, a matter of months or you just know it was after

20 she was already a Police Officer with this Department?

21    A   Oh yeah, it was much later. It was months

22 later. I don't think nobody knew from Markham.

23    Q   All right. How did you come to find out?

24    A   I think one of the Patrolman told me they saw

LIGHTFOOT COURT REPORTING, P.C.
(312) 701-1090
lightfootpc@sbcglobal.net

1 her over there.

2    Q   Do you recall which Patrolman it was?

3    A   No.

4    Q   As Chief of Police, do you -- is there a

5 standard procedure for when there is an employment

6 verification of former Markham Police Officers?

7    A   I don't think that there's a standard

8 procedure. But, generally, you will not have a

9 conversation unless there's a document that's signed

10 off for release of information.

11    Q   And when you say you wouldn't have a

12 conversation; what do you mean?

13    A   So if somebody was to call the Markham Police

14 Department and inquire about one of our former

15 employees, you don't have that conversation with them.

16 The first thing that would come to you with is a

17 document that's a signed release for information.

18 Other than that, no one would have a conversation with

19 you.

20    Q   Did you ever have any personal contact with

21 anyone regarding Ms. Palmer's subsequent employment

22 with the Police -- with the Harvey Police Department?

23    A   No.

24    Q   Do you know the Chief who was in charge of

LIGHTFOOT COURT REPORTING, P.C.
(312) 701-1090
lightfootpc@sbcglobal.net

1 Harvey at that time?
2     A    I did not know him personally.
3     Q    And you understand that she's alleging that
4 you contacted her Chief, essentially, to disparage her?
5     A    I'm aware of that allegation.
6     Q    And it's fair to say you deny that?
7     A    I do deny that.
8     Q    What is an Officer in Charge?
9     A    An Officer in Charge is, for all intents and
10 purposes, the most experienced Police Officer on that
11 shift.
12     Q    Is that in, like, an official job title, or
13 is that just a reference?
14     A    That is an official job title for what would
15 be considered the most knowledgeable, most experienced
16 Police Chief -- I'm sorry -- Police Officer that's
17 actually supervising that shift without a Sergeant.
18     Q    All right.  When did that position begin?
19     A    That position existed before I became Police
20 Officer.
21     Q    To the best of your recollection, when did
22 that position begin?
23           MR. SULLIVAN:  If you know.
24           THE WITNESS:  I -- that's -- that supercedes

1 me even becoming a Police.  That's tradition in the
2 Police Department.
3 BY MS. SAMUELS:
4     Q    Okay.  And so is it -- does an Officer in
5 Charge, is that only for shifts where there's no
6 Sergeant available to work that shift, or is that every
7 shift there's an Officer in Charge?
8     A    That's for shifts that, for whatever reason a
9 Sergeant or Lieutenant is not available to supervise
10 that shift.  So then a OIC will be designated to
11 supervise that shift.
12     Q    And who designates the OIC?
13     A    OICs are designated by the Chief of Police.
14     Q    Is there any reason why an Officer with less
15 seniority would be designated OIC over another Officer?
16     A    Yes.
17     Q    All right.  What's that?
18     A    So the Officer with the most experience would
19 be designated as Officer in Charge.  I often was
20 designated as Officer in Charge when I was a Patrolman
21 for Markham.
22     Q    All right.  When you say most experience,
23 what do you mean?
24     A    You are the most experienced with arrests,

1 how to process arrests, what's the difference between a
2 felony and a misdemeanor.  You know how to control the
3 electronics.  You just have that overall experience
4 that not every Police Officer on that shift has.
5     Q    All right.  And so when you say experience,
6 do you mean years as a Police Officer, years with the
7 Markham Police Department, or are you just talking
8 about depth of knowledge in general?
9     A    So your knowledge and your experience -- for
10 instance, if you served as a Tactical Officer, then
11 obviously, you understand the drug gang.  You know how
12 to process it.
13           You know how to detect it.  You know
14 what to do once you have it.  You know about firearms
15 and illegal firearms; what are they; what can they do;
16 where can they be hidden; you have that knowledge.
17           And then the processing in especially
18 smaller suburban towns, you take their offender from
19 beginning to end.  You're rolling the fingerprints.
20 You're doing all the documentation.  Not every
21 Patrolman knows how to process their arrest.  Sometimes
22 you have to get help.  So this Officer in Charge would
23 be that all well-rounded Officer to handle that shift.
24     Q    All right.  So hypothetically speaking, say

1 you have an Officer who has been a Patrolman for ten
2 years, but they've only been a Patrolman and you have
3 another Officer who has been an Officer for five years,
4 but they've been Tact, they've been a Detective,
5 they've been SWAT, they've been Patrol; you would say
6 Officer 2 has the experience to be an Officer in Charge
7 over Officer 1?
8     A    Yes.
9     Q    Got you.  Have you ever -- while you were --
10 no.  Since -- I apologize.
11           Give me your date of -- when did you
12 become Chief again, October 3rd?
13     A    October 3, 2018.
14     Q    Since October 3, 2018, have you heard any
15 Police Officer make disparaging comments regarding any
16 female Officers in Markham?
17     A    No.
18     Q    Since you became Chief, have you been made
19 aware by any female Officers that they felt like they
20 were being treated differently because of their sex?
21     A    I can't say that I have.
22     Q    Since October 3, 2018, have you ever made any
23 disparaging comments regarding the ability of females
24 to be Police Officers?

1     A   No, I have not.
2     Q   Since you became Chief, have you hired any
3 additional Police Officers to join the Markham Police
4 Department?
5     A   The Police and Fire Board does the hiring,
6 but yes, we have.
7     Q   All right. Do you have -- do you play any
8 role in the hiring of additional Police Officers?
9     A   No.
10     Q   Since you became Chief, how many Police
11 Officers have been hired to join the Markham Police
12 Department?
13     MR. SULLIVAN: If you know.
14     THE WITNESS: I could only give you a rough
15 estimate.
16 BY MS. SAMUELS:
17     Q   All right. Go for it.
18     A   I'm not entirely sure. They've hired maybe
19 three.
20     Q   Can you give me their names?
21     A   They hired Officer Brash. They hired Officer
22 Sheats. Who else is -- they hired Officer McAllister.
23 I think that's all I can remember right now.
24     Q   Okay. Is Officer Brash a male or female?

1     A   Male.
2     Q   Is Officer Sheats a male or female?
3     A   Male.
4     Q   Is Officer McAllister a male or female?
5     A   Male.
6     Q   All right. When is the last time you
7 reviewed the Police Department's Sex Discrimination
8 policy?
9     A   That was probably a month ago.
10     Q   What was the purpose of the review?
11     A   So we have an annual training and I wanted to
12 make sure that I was abreast on the policy on it.
13     Q   Since you've been Chief of Police, have you
14 or any members of your Command Staff reviewed the Sex
15 Harassment Policy to make sure that it's up-to-date
16 and/or see whether it needs any changes?
17     A   I'd want to say we all do it, because we have
18 annual training.
19     Q   All right. And what does annual training
20 consist of?
21     A   Sometimes there's in-person live, with an
22 instructor, and other times, it's online.
23     Q   And so what I'm talking about is have you
24 ever specifically met to go over your policies or your

1 general orders as it relates to your Sex Harassment or
2 Sex Discrimination policy to make sure that it's
3 up-to-date and effective?
4     A   I believe we do that when we go for our
5 annual training.
6     Q   All right. And when you say we, who are you
7 referring to?
8     A   The entire membership of the Police
9 Department.
10     Q   Okay. And same question: Have you and/or
11 any members of your Command Staff met, specifically,
12 just to discuss your EEO policy to make sure that it's
13 up-to-date and/or effective?
14     A   We all -- that policy is inside of the same
15 Sex Harassment Discrimination policy.
16     Q   And so would it be fair to say that you
17 believe that your annual training is -- accomplishes
18 that same purpose?
19     A   Yes.
20     Q   Okay. Who does your annual training?
21     A   That's a third-party testing agency.
22     Q   Do you know the name?
23     A   I don't, offhand.
24     Q   Do you know who schedules it?

1     A   I do not know.
2     MS. SAMUELS: All right. I think I'm pretty
3 much done. Let me get five minutes to look over my
4 notes. But, yeah, I think I'm pretty much done.
5     MR. SULLIVAN: Yeah, no worries. We'll come
6 back in five.
7     MS. SAMUELS: Thank you.
8     (WHEREUPON, off the record.)
9 BY MS. SAMUELS:
10     Q   So just briefly: Are there any rules that
11 determine which Officers are allowed to attend certain
12 trainings?
13     A   No.
14     Q   Are you aware of any limitations on why an
15 Officer might not be allowed to attend an active
16 shooter drill?
17     A   The active shooter drills is an event. It's
18 not a training.
19     Q   So are there any rules on which Officers are
20 allowed to attend an event like the active shooter
21 drill?
22     A   There's no rules about it. It's typically
23 whoever the dayshift would be, because they would be
24 the ones responding to an active shooter at the

schools. But everybody gets training on active shooter drills.

Q   Okay. And are there any, I guess, rules or guidelines for how to determine when an Officer can receive paid time off?

A   That would be with your leave of absence form that you fill out and per the contract.

Q   Is there -- like, so say I want -- let me ask -- hold on. I'm not gonna -- I'm trying to think of the best way to formulate this question.

Is there a timeframe that you have to put in a request for leave of absence or paid time off for it to be approved?

A   Yes. That is governed by the Teamster Contract for Full-Timers and by the Policy and Procedure Book.

Q   All right. What about a Part-Time Officer?

A   They do not have such a thing.

Q   What do you mean?

A   So they are allowed to fill out leave of absence --

Q   Uh-huh.

A   -- but they have -- there's no real -- they don't have the benefits of a full-time employee.

Q   Okay. And so if -- so back when there were Part-Time Officers, if a Part-Time Officer put in for a leave of absence or paid time off, what would happen?

A   So they had -- when I took over, they were all claiming that they had this magical time on the books. So we did an in-depth research to try to figure out if, in fact, that happened.

So the Part-Timers mostly would say, oh, I have, you know, 40 hours bank time, just to throw a number out there, we would research that. If we found that, then we would let you take those 40 hours whenever you wanted to, if that's what you wanted.

There was no restrictions on that. There are certain things in the contract that would bare Full-Timers from doing it, but Part-Timers, we would just let them take it.

If you just fill out your leave of absence, that way, the City has a record of it, then you are off.  Now, if you don't have any time on the books, then you have no time.

Q   All right.  And so when you say banked time, are you talking about overtime that a Part-Time Officer might have served?

A   Part-Time Officers cannot generate overtime.

What would happen is if they occasionally worked over, a late arrest, something, you simply deduct those hours from your next duty time. There's no overtime.

Q   So when you say banked time, in reference to Part-Time Officers, what is that referring to?

A   So when I took over, they -- most of them were claiming that they had this magical time on the books, which is -- it's impossible to have.

But I allowed it, and I let people have their time off that they claimed that they had.  I didn't want to short anyone.

Q   What I'm getting to is -- okay, so say I'm an Officer, I've got banked time, right; what is your understanding of where that banked time came from?

A   No Part-Timer should have banked hours, none. The Full-Timers would that because, per contract, you have to have 40 hours of banked time.

That's a cushion in case something happens and you run out of your City benefits. Part-Timers don't have that.

Q   Right.  I understand that.  But what I'm saying is when a Part-Timer claimed to have banked time, right?  And you are saying, well, you shouldn't, and they are saying well, I have it because of X, Y and

Z, right?

A   Right. Yeah.

Q   What was the X, Y and Z, where they are saying this is why I think I have banked time?

MR. SULLIVAN:  Well, I'm just going to interject an objection with regard to a lack of foundation and specificity with regard to which particular Part-Time Officer the question is directed to.  I mean, this is --

Well, that's my objection.  This is so general that each individual Part-Time Officer would have very different specific facts to the Chief's analysis. So go ahead and answer her question as well as you can.

THE WITNESS:  So in terms of the Part-Timers claiming that they had this time, as I said, we check it and see from the documents that were looked over from the Sanders administration.  And then I let them have that time.  If they claimed it, I let them have it.

But there was no way for them to generate, going forward, any time on the books.

BY MS. SAMUELS:

Q   Right. So I get all that, right. My source

of confusion, right. So if I went up to my boss, was
like, you owe me 40 hours, right. They would say
why -- why do you think I owe you this time, right.

And so what I'm getting at is: When you
are saying these Part-Time Officers are claiming banked
time, I'm trying to figure out where they think those
hours come from; do you get what I'm trying to say?

MR. SULLIVAN: Well, first of all, I'll
object with regard to the fact that you're asking to
speculate as to where the Part-Time Officers may think
that bank time is coming from.

But I think part of Ms. Samuels'
question is -- relates to: What did you do as the
Chief of Police to inquire into or to validate that if
a Part-Time Officer said they had banked time, 30
hours, as a hypothetical, what steps did you take to
try to inquire into or validate that 30-hour period
that they were claiming?

Is that -- Ms. Samuels, is that --
BY MS. SAMUELS:

Q    What I'm trying to get at is: What is the
banked time referring to? I get that they are saying,
I've got this extra time that I should be -- that
should be accounted for, right.

My question is: Where did that extra
time come from? What are they saying this justified
that number?

A    The only explanation I got from them was that
Sanders gave them this time. That was it. There was
no explanation.

Q    So did every Part-Time Officer just have a
certain number of hours?

A    No. No, they did not. The only one that
claimed they had hours was Palmer.

Q    And where did she -- to your understanding,
where did these hours allegedly come from?

A    Nobody knows. But I gave it to her. I gave
her what she said she had.

Q    And no other Part-Time Officer claimed they
had banked time?

A    That's correct.

Q    And as you sit here today, you don't know
what that banked time is referring to?

A    No.

Q    Okay. All right. So completely leaving
banked time out of it, was there a process for
Part-Time Officers to request paid time off relief?

A    No.

MR. SULLIVAN: That's asked and answered.
BY MS. SAMUELS:

Q    And this was both -- this was -- excuse me.

And so with regard to there not being a
process for Part-Time Officers to request time off
relieved, that was while you were the Chief, correct?

A    That's at any time. They don't have benefits
like that.

Q    So what would happen if a Part-Time Officer
couldn't work a certain day?

A    They wouldn't be on the schedule.

Q    So they would just inform their supervisor, I
can't work X day and they just wouldn't be on that day?

A    I'm a little confused. So they put in their
availability.

Q    Right.

A    We set a schedule. So we will know when you
are expected to be at work or not.

Q    Right.

A    If something else happens, they would make
that phone call, I'm not coming today. That's fine.
Yes. So the standard leave of absent form would apply
in that sense.

But there's no paid time off for

Part-Timers. That's a benefit enjoyed by Full-Timers.

Q    Okay. And so would you say, to your
knowledge, paid time off for Part-Timers was a custom
under the previous administration --

MR. SULLIVAN: Objection. He never said it
was a custom.

MS. SAMUELS: I'm asking the question.
Right.
BY MS. SAMUELS:

Q    And so -- and when you became Chief, there's
no contract that accounts for a paid time off, and so
that custom ended?

MR. SULLIVAN: Objection. This -- the
deponent has never said --

MS. SAMUELS: Let him answer the question.
If the answer is no, then the answer is no.

MR. SULLIVAN: I have to raise an objection
to your question. Your question, mischaracterizes his
previous testimony. He never testified --

MS. SAMUELS: Sir, sir. So you can say it
mischaracterizes his prior testimony.

MR. SULLIVAN: All right.
MS. SAMUELS: Let him answer.
MR. HAYES: City joins in the objection.

1  MS. SAMUELS: Okay.
2  BY MS. SAMUELS:
3  Q So, again, for the record: Is it your
4  understanding that under the prior administration, it
5  was a custom for Part-Timers to have paid time off.
6  And when you became Chief, there was no basis for that
7  because they didn't have a contract so that custom
8  ended?
9  A There was no custom.
10  Q Okay. So to your understanding, Part-Timers
11  never had paid time off at any time while you were a
12  Markham Police Officer?
13  A Not that I'm aware of.
14  MS. SAMUELS: Okay. All right. Those are
15  all my questions. Thank you, sir.
16  EXAMINATION
17  BY MR. HAYES:
18  Q Chief, on behalf of the City, I have some
19  follow-up questions for you. Can you hear me okay?
20  A Yes.
21  Q And forgive me. I'll probably jump around
22  here as I go through my notes going back to what issues
23  I wanted to raise here.
24  But first off, with respect to

1  Plaintiff, regarding any employment decision or action
2  that affected Plaintiff in which you were personally
3  involved, did you ever base that decision or action on
4  Plaintiff's sex or the fact that she was a woman?
5  A No.
6  Q Again, with respect to Plaintiff and any
7  employment decision or action involving her in which
8  you were personally involved, did you ever make that
9  decision or take that action based on retaliation
10  because the Plaintiff had filed a claim or made a claim
11  of sex discrimination or harassment?
12  A No.
13  Q And I wanted to go back over some of the
14  processes that you were asked about earlier. And,
15  again, we may jump around a little bit here. But with
16  respect to the Civil Service Exam and opening for
17  certain ranks, can you describe for me how that process
18  worked, whether it was a Sergeant position or a
19  Lieutenant position?
20  Can you just generally go through the
21  Civil Service testing and examination process,
22  generally?
23  A So the Civil Service ranks are from Patrol
24  and up. The Patrolmen that come in entry level are

1  supposed to take a Civil Service Exam, pass it and then
2  be vetted by the Police and Fire Board and hired by the
3  Police and Fire Board.
4  The set number of Patrolmen that the
5  City would get is determined by the Council.
6  And when we start falling short of that
7  number, they simply turn to the Police and Fire Board
8  and determine if they are going to hire somebody off
9  the list or not that's an eligible list.
10  The positions of Sergeants is also
11  controlled by the Council, how many. We fall below
12  that number, it's up to them to decide if they are
13  going to put somebody else in or not.
14  The same thing with the Lieutenant
15  structure and of course the Deputy Chief and the Chief.
16  Q So the Civil -- excuse me, the City Council,
17  that Markham City Council can determine how many Civil
18  Service, either Sergeant or Lieutenant positions the
19  City has available; is that right?
20  A Yes.
21  Q Okay. And if there's an opening in one of
22  those positions, existing position or they create a new
23  one, the City would contact the Board of Fire and
24  Police Commissioners regarding testing for that

1  position?
2  A Testing or appointments, because your
3  Commission comes through that Board.
4  Q And is there a separate Civil Service Exam
5  test for each Civil Service Rank, Patrol, Sergeant,
6  Lieutenant?
7  A Yes, there is.
8  Q And who makes the decision about when the
9  testing goes -- when they handle testing, or how often
10  they do testing for a particular rank?
11  A So that -- the Civil Service Exams are
12  governed by the State statutes.
13  So there must be an existing list for
14  entry Patrolman just as it is now. This list is
15  exhausted, so they are going to start testing again.
16  That's totally out of Police Chiefs and
17  everybody's hands. That's all Police and Fire
18  Commission and the Council.
19  Now, once that new list gets
20  established, it's up to the Council to decide if they
21  are going to hire Policemen, or if they are just going
22  to leave the compliment as it is.
23  The Sergeant's exam, we have not put on
24  because of the Covid crisis. Immediately after that's

1 lifted, then we'll be having a Sergeant's exam.
2           But again, it has nothing to do with the
3 rank structure of the Police Department. That's
4 totally up to the Police and Fire Board.
5      Q   And does a notice go out to all Department
6 members, or is there a publication somewhere when an
7 exam is coming up?
8      A   Yeah, that's per contract. The notifications
9 and length of time that they get for notification and
10 the study material.
11      Q   And so depending on which rank is being
12 tested for, there's a list created based on the scores
13 that were achieved through that testing?
14      A   That's correct.
15      Q   How long does that list last?
16      A   Two years.
17      Q   And is that the same for a Patrol Rank as
18 well as Sergeant Rank and Lieutenant Rank following the
19 respective tests?
20      A   Well, the Patrol and Sergeants are governed
21 by the contract. Lieutenants don't have a contract.
22 So -- and they are considered an exempt rank. So they
23 are not allowed to join a Union or to unionize.
24           So that testing is not governed by State

1 statutes. The City can offer it or not offer it.
2      Q   And is that the City Council that makes that
3 determination with respect to Lieutenants?
4      A   That's correct.
5      Q   And you were asked earlier in the deposition
6 about the difference between Part-Time Officers and
7 Full-Time Officers, and what authority -- respective
8 authorities each position has; do you remember those
9 questions, generally?
10      A   Generally, yes.
11      Q   Is there a particular government body or
12 agency that defines Full-Time Officers and Part-Time
13 Officers and the minimum requirements for those
14 positions?
15      A   That would be the Illinois Training and
16 Standards Board, they govern that.
17      Q   And off the top of your head anyway, or based
18 on your experience, do you know, are there any primary
19 differences as defined by the Illinois Training and
20 Standards Board between a Full-Time Officer and a
21 Part-Time Officer?
22      A   Yes, there is.
23      Q   And can you list some of those differences as
24 you know them in any way, or as you are able to recall

1 them?
2      A   The one that's most prevalent is that no
3 part-timer can ever command a Full-Time Police Officer,
4 no matter what their experience or knowledge is of the
5 job.
6           That's one of the most bigger ones with
7 that. Some of the training is the same. There is a
8 section that allows someone that was a Part-Time Police
9 Officer to go to what's called a 40-hour transition
10 course. There's no refresher course. There's a
11 transition course.
12           But the stipulation to that is you can't
13 lateral in from within your Police Department. You
14 have to lateral in from a different Police Department.
15 It's just rules and guidelines that the training
16 Standards Board have governing difference in part-time
17 and full-time.
18      Q   Are you aware of whether there's a maximum
19 number of hours per week that full-time versus
20 part-time officers can work for an Illinois Police
21 Department?
22      A   Yes.
23      Q   And what's your understanding of that?
24      A   That's a 30-hour max per week for Part-Time

1 Police Officers.
2      Q   Thirty hour maximum per week for Part-Time
3 Officers?
4      A   That's correct.
5      Q   And that's a State's restriction or law?
6      A   Yes.
7      Q   And when you became -- were appointed Police
8 Chief on October 3, 2018, did you have to make any
9 adjustments with respect to Part-Time Officer hours and
10 that particular State restriction?
11      A   I brought us into compliance with State Law.
12      Q   And based -- when you became Chief, what was
13 your understanding of what the prior administration had
14 been doing with respect to Part-Time Officer hours?
15      A   It was my understanding that they were going
16 beyond the 30-hour maximum.
17      Q   And -- do you recall what that understanding
18 was based on? Do you remember anything in particular
19 in terms of documentation or just a narrative or
20 discussions at the Department?
21      A   Not in particular.
22      Q   But -- so I'm clear, I think you mentioned
23 that when you became Chief, you put a limit or enforced
24 that State restriction limit with respect to the

1 Markham Department Part-Time Officers?
2    A    That's correct.
3    Q    And did you enforce that restriction for all
4 Part-Time Officers employed by Markham at that time?
5    A    Yes, I did.
6    Q    And under your administration, was any
7 Part-Time Officer allowed to work more than the 30
8 hours per week?
9    A    No, they were not.
10    Q    And that would include Gerald Jackson ?
11    A    That includes Gerald Jackson.
12    Q    You were asked a series of questions earlier
13 about the Plaintiff, Kyung Palmer and your observations
14 and opinions of her as a Part-Time Police Officer; do
15 you recall those questions generally?
16    A    Yes, generally.
17    Q    Just -- to try to give this some concrete
18 time limits, when you were appointed a Police Chief on
19 October 3, 2018, I believe you said there were four or
20 five Part-Time Officers, including Plaintiff at the
21 time?
22    A    Yes.
23    Q    And based on the same evaluation criteria you
24 described earlier in your deposition, if you were to

1 rank from -- from the best officer, in your observation
2 and opinion the lowest of those Part-Time Officers,
3 where would Plaintiff have fallen among those five when
4 you became Chief?
5    A    She would be ranked among the lowest.
6    Q    The lowest of those Part-Time Officers?
7    A    Correct.
8    Q    And do you know how many Officers were in
9 that Department, including Full-Time Officers at the
10 time you became Chief, generally, give or take -- you
11 know, an Officer or two?
12    A    When you compliment, it would probably be a
13 30.
14    Q    Where would the Plaintiff have ranked overall
15 in terms of most proficient or best Officers, in your
16 opinion, and observation at the top, and the lowest
17 putting proficiency from your observations and opinions
18 high at the bottom, where would Plaintiff have ranked
19 among those?
20    A    Yeah, she definitely would have been the
21 lowest performer of that group.
22    Q    Again, just focusing on the Part-Time
23 Officers and Gerald Jackson, he was one of the
24 Part-Time Officers when you were appointed Chief

1 October 3, 2018?
2    A    Yes.
3    Q    Do you know; how many years had you worked
4 with Gerald Jackson just as a colleague within the
5 Department together at the time of your appointment as
6 Chief?
7    A    Approximately five years.
8    Q    And based on your five years within the
9 Department with Gerald Jackson, what was your opinion
10 on his proficiency as a Part-Time Officer at the time
11 you became Chief?
12    A    He was very aggressive.  He was big on truck
13 enforcement.  He came to work everyday.  He did his
14 job.  If you gave him an assignment, he would go out
15 and do it to the best of his ability.  He -- I want to
16 say, he kind of was in the middle performance wise.
17    Q    Let me just stop you there to clarify that,
18 minimum performance wise among Part-Time Officers or
19 all Officers?
20    A    Among Part-Time Officers.
21    Q    Would you have ranked him ahead of the
22 Plaintiff in terms of proficiency based on the same
23 criteria you talked about earlier in your deposition?
24    A    Yes.

1    Q    In terms of seniority as a Part-Time Officer,
2 do you know who was more senior in the Department
3 between Gerald Jackson and the Plaintiff?
4    A    I believe Gerald Jackson was the most senior
5 of the Part-Timers, at least that's my understanding.
6    Q    And you were asked some questions earlier
7 about Gerald Jackson and a claim he had made involving
8 the City and -- pending before the Illinois Department
9 of Human Rights; do you recall those questions?
10    A    Yes.
11    Q    Okay.  And you mentioned that there was a
12 settlement agreement in place to transition Gerald
13 Jackson at that time to a Full-Time Officer, correct?
14    A    Yes.
15    Q    Do you know if Gerald Jackson ever became a
16 certified Full-Time Officer for the city of Markham?
17    A    So the Council approved that agreement with
18 the Department of Human Rights, however, when I
19 attempted to get him certified through the Training and
20 Standards Board, they rejected his certification.
21    Q    And do you have any personal knowledge why
22 they rejected his Full-Time certification?
23    A    Not really.  I was told that it was some
24 issue with Ford Heights, he had worked there.  And they

1　told him he needed to apply at a different Police
2　Department other than Markham to get his certification,
3　and then he can rejoin the Markham Police Department,
4　but Jackson did not want to do that. So he got -- his
5　position got eliminated as well.
6　　Q　So his Part-Time position --
7　　　　Chief, my understanding is that when the
8　Police and Training Board of Illinois rejected the
9　Full-Time certification for Gerald Jackson, he
10　essentially stayed or remained, technically, a
11　Part-Time Officer for the city of Markham; is that
12　correct?
13　　A　Yeah, but I think around the same time, the
14　program had been eliminated, so he was on the outside
15　of that. So there was no place for him to come back to
16　once the Training Standards Board said no.
17　　Q　So is the end result with no -- his former
18　Part-Time position gone, his employment with the city
19　of Markham also came to an end?
20　　A　Yes.
21　　Q　And that Part-Time position elimination was
22　at the same time that Kyung Palmer's position was let
23　go and all the Part-Time Officers got employed by the
24　city of Markham?

1　　A　That's right. My son was even a Part-Time
2　Police Officer. His position was eliminated as well.
3　　Q　And what's your son's name?
4　　A　Joshua White.
5　　Q　How long had he worked at the Department
6　prior to the Part-Time elimination; do you know?
7　　A　I don't recall sitting here now.
8　　Q　But he lost his Part-Time position at the
9　same time all the other Part-Timers lost theirs?
10　　A　That's correct.
11　　Q　And one more question, at least for the
12　moment on Gerald Jackson, but were you supportive of
13　the idea of the city hiring him or transitioning him to
14　Full-Time Officer if the Training Board had allowed it?
15　　A　Yes.
16　　Q　Why were you supportive of Gerald Jackson in
17　particular coming on as a Full-Time Officer?
18　　A　That Officer applied himself diligently to
19　all of his calls. I was impressed with his
20　performance. He -- he was like any average Police
21　Officer. There were some strengths with him. There
22　were some weaknesses with him, but his overall
23　performance made me consider him for the team.
24　　Q　And do you know whether or not prior in his

1　career with the Markham Police Department Gerald
2　Jackson had tried to transition from a Part-Time
3　Officer to a Full-Time Officer that's prior --
4　　A　With the city of Markham.
5　　Q　-- to July of 2019, that is?
6　　A　Yes.
7　　Q　And do you know the result of that effort,
8　his prior attempts to transition to Full-Time Officer?
9　　A　I know that something happened. I still
10　hadn't gotten to the bottom of what happened, but he
11　did attempt some years back to be transitioning to
12　full-time.
13　　Q　Do you know whether or not that was the issue
14　he raised in his Illinois Department of Human Rights
15　charge?
16　　A　I know he raised that issue, yes.
17　　Q　But beyond that though, you are not familiar
18　with the particulars of what issues were raised and
19　resolved with respect to Gerald Jackson's claim?
20　　A　No.
21　　Q　Prior -- earlier today in your deposition,
22　you were asked a series of questions about some
23　day-to-day assignments for Officers, including the
24　Senior Building, Roller Rink, City Hall, City Courts.

1　　　　I'd like to go through each of those and
2　just get your description of what each of those
3　assignments were.
4　　　　So with respect to the Senior Building,
5　what were Officers assigned to do at the Senior
6　Building? What was that assignment?
7　　A　So that was a day-to-day assignment, 24 hours
8　a day, eight hour shifts. That encompassed Full-Time
9　Police Officers as well as Part-Time Police Officers.
10　　　　We had an Officer that was on desk duty.
11　They would be assigned that on any given day. And it
12　basically was you were a Security Guard for the Senior
13　Building.
14　　　　At night, you would secure that
15　location. And anybody coming in and out, you would
16　certainly take notice of it. It was not like a
17　permanent detail. No one was permanently assigned to
18　that. It's just that that particular day, you would
19　have been assigned to it.
20　　Q　And with respect to Plaintiff working at the
21　Senior Building, I believe you stated that it was Chief
22　Max Sanders or his administration that ended her -- her
23　involvement in getting that assignment; is that
24　correct?

1    A   That's correct.

2    Q   And your understanding is that it was based

3 on some complaints from multiple residents at the

4 Senior Building and perhaps even two or more nurses at

5 the Senior Building; is that correct?

6    A   That's correct.

7    Q   Okay. And did you have any personal

8 involvement in taking any of those complaints? Or how

9 do you know that those complaints were made?

10    A   As they appeared in the lobby of the Police

11 department, is generally where a complaint start, I've

12 heard the two that I've mentioned, discuss the attitude

13 problem with Palmer and some of the unprofessional

14 action that she would take.

15    Now, I wasn't privy to sitting down with

16 them and members of the Command Staff to see what the

17 determination was. But I was there present when some

18 of those complaints came in.

19    Q   Do you recall the time that those complaints

20 were made or even the year?

21    A   It varied between 2013 and 2018.

22    Q   Was it prior to your becoming Chief?

23    A   Yes.

24    Q   And how about the City Court assignment, can

1 describe what that assignment was for Officers?

2    A   So the City Court assignment is not for a

3 Patrol Division. Like, we would use a Patrolman to

4 work security. We are in a south suburban town. When

5 people come there, they are already upset, and they are

6 very unruly. So you need a police officer to help

7 manage that and do some crowd control.

8    Not everybody is happy when they have to

9 pay some money for a fine. So at one point we were

10 using whoever was designated as the City Hall security,

11 and then we chose to eliminate that only because the

12 crowds became so unruly.

13    We needed an aggressive Officer there to

14 kind of control that crowd before it got out of hand.

15    Q   So a separate Officer was assigned there, in

16 addition to having someone at City Hall, correct?

17    A   Yes.

18    Q   And you mentioned that -- well, let me ask

19 you this: How often was the City Court assignment?

20 How often was City Court in session?

21    A   It's once a month, from basically 9:00 until

22 they are done. And then again at 6:00 that evening for

23 the red-light camera.

24    Q   But it only involves one calendar day per

1 month, that assignment?

2    A   Correct.

3    Q   And you mentioned earlier that it's your

4 understanding Plaintiff was removed from ever getting

5 the City Court's assignment, because she had been

6 caught -- or at least charged with time falsification

7 while assigned to City Courts, correct?

8    A   No, no. So I tried to use Palmer in the City

9 Municipal Court, the local ordinance court. And her

10 performance there was just to the point where it was as

11 if she wasn't standing there. It just became out of

12 control, really, really fast.

13    But the situation I explained earlier

14 was the State Court, the Markham 6th District, it's a

15 regular Officer Court Key that she didn't -- she wound

16 up somewhere else, but she falsified some time for.

17    Q   And so for tickets that she issued, she

18 needed to appear in the 6th District Municipal Court

19 from time to time as a witness on those tickets?

20    A   Correct.

21    Q   And you investigated her for a charge of

22 falsifying her time there?

23    A   Yes.

24    Q   By claiming in Department records, she was

1 there while she was off doing something personal for

2 herself?

3    A   That's correct.

4    Q   And concluded that that was founded, that

5 complaint, correct?

6    A   That was founded, yes.

7    Q   But you're not aware of -- my understanding

8 from what you stated whether there was any discipline

9 taken against her at that time?

10    A   They certainly didn't make me aware of it if

11 they did.

12    Q   With specific reference to the City Court's

13 assignment, that one day a month, in the City Hall

14 Police Department building, do you know if Plaintiff

15 was ever prevented from having that assignment at some

16 point?

17    A   After that one incident where the crowd just

18 became out of control, she basically just stood there

19 and watched it, that was it. She was no longer

20 assigned to come in there.

21    Q   And who are made that decision?

22    A   I did.

23    Q   And you made the decision as Chief of Police?

24    A   I believe that had happened before. I'm not

1   entirely sure. I served as a Prosecutor for the City
2   on the local ordinance side. So I was there.
3      Q   So you witnessed that occasion?
4      A   Yes, I did.
5      Q   And based on your position in the Police
6   Department, you were able to declare that Plaintiff
7   would not have that assignment going forward?
8      A   That's correct.
9      Q   And did you ever -- did you ever assign
10   Gerald Jackson to that assignment?
11      A   I did.
12      Q   And was he ever assigned -- given that
13   assignment for the purpose of him earning any type of
14   overtime as a Part-Time Officer?
15      A   No, he couldn't generate overtime, so he did
16   not get paid overtime.
17      Q   How about the roller rink assignment? Can
18   you describe that assignment? I think we established
19   it was only on Saturdays. But can you describe -- give
20   me more detail of that particular assignment for
21   Officers?
22      A   That's a longstanding assignment. And most
23   Officers hated that assignment. When they created
24   Part-Timers, they kind of ushered the Part-Timers for

1   that, because nobody really likes to go there and work
2   with those kids like that.
3      So you basically show up there, I think
4   it starts at 8:00 in the evening. It's about a
5   four-hour little detail. It's bad, because, you know,
6   the parents leave the kids there.
7      There's a lot of fights. It's just bad.
8   We started getting a lot of complaints about Palmer not
9   getting out of the squad car. She would just sit there
10   and park or let things just fall apart.
11      And that's typical the complaints we
12   were getting about Palmer, not really proactive.
13      Q   Who was making those complaints based on your
14   understanding?
15      A   The staff and security of the roller rink
16   would make those complaints. So later on she -- in her
17   to/from, she said she could only work like, Monday,
18   Tuesday and Wednesday, or something to that effect. No
19   Saturdays. So it wasn't like she was removed from
20   that. She didn't want to go.
21      Q   So her not working the roller rink was
22   basically -- so Plaintiff's not working the roller rink
23   assignment was based on her declared unavailability for
24   that assignment; is that correct?

1      A   Yes.
2      Q   And did Gerald Jackson ever get that
3   assignment?
4      A   He did.
5      Q   Okay. Are you aware of complaints being made
6   against Gerald Jackson while he was in that assignment?
7      A   No. They actually would call and request
8   Jackson. They have a nickname for Gerald Jackson in
9   the City. It's called Action Jackson. That's his
10   nickname.
11      So whatever detail is out there, he's
12   that type of Officer that -- you know, he's a forward
13   type guy. He's like aggressive with that; not
14   necessarily physically aggressive, but you know his
15   presence is there. It's there.
16      Q   And who owns the City -- who owns the roller
17   rink by the way?
18      A   Certainly, the City of Markham owns the
19   roller rink.
20      Q   Do you know how long the City has owned it?
21      A   I believe we took that over in 2017 -- 2016,
22   2017. I'm not sure.
23      Q   So all the time you've been the Chief of
24   Police, the City has been the owner and operator of the

1   roller rink?
2      A   Yes.
3      Q   So the people that have called to complain
4   either about Palmer or contacted the Police Department
5   for any reason are City employees among other things?
6      A   Yes. Yes.
7      Q   And has Gerald Jackson ever earned overtime
8   based on his working the roller rink assignment?
9      A   No, we would just adjust his scheduled.
10      Q   And for what purpose? Why would you adjust
11   his schedule?
12      A   So that he would not go over 29 hours.
13      Q   And last, the City Hall assignment. We may
14   have touched briefly on it, but can you describe that
15   assignment for Officers?
16      A   So the City Hall assignment became -- it used
17   to be where they would have a Part-Time Officer sit
18   outside the Mayor's office. It's kind of a security
19   feature. And then it kind of morphed into sitting the
20   Officer downstairs by the Water Department, because
21   when it came time to pay the water bills and shutoff
22   notices, the residents would come in quite angry.
23      And it would only be civilian staff
24   there, so they felt before even threatened, so we

1  wanted a Police Office sitting there.  So somehow
2  that -- they assigned Palmer to that, and that was her
3  routine.
4           And then, of course, there was
5  complaints about her performance there as well.
6      Q    And do you know the timeframe of those
7  complaints?
8      A    It started, to the best of my knowledge,
9  around 2013.
10     Q    And what do you -- you mentioned earlier that
11 you believe Chief Sanders or his administration removed
12 or prevented her from serving in that assignment going
13 forward at some point, correct?
14     A    It was -- the last incident was where she did
15 not let the employees in in time enough to punch in.
16 And they all wrote letters and complained about it.
17          And Sanders -- I think him and Sergeant
18 Wilkins worked together on that or whatever.  And he
19 determined that she would no longer be assigned to the
20 City Hall security detail.  And since then, no one else
21 has been assigned over that.
22     Q    So no Officer replaced her, so to speak?
23     A    No.
24     Q    So that predated your becoming Chief of

1  Police?
2      A    Yes.
3      Q    And I think you mentioned earlier that
4  Plaintiff was placed back in her Patrol position?
5      A    Chief Sanders put her right back into Patrol
6  and mandated that she only work in Patrol.
7      Q    And is it your understanding, for Part-Time
8  Officers, Patrol is part of their expected duties,
9  correct?
10     A    Patrol is everyone's duty there that's a
11 Police Officer, including myself.  Patrol comes first.
12 Everybody there is hired as a Patrol Officer.  You are
13 a Police Officer.
14          Your primary function is the safety of
15 that city.  And that includes answering calls for
16 service, responding to emergencies.  We even respond to
17 fires before the Fire Department gets there.  And
18 that's including me.
19     Q    With respect to these four assignments we
20 just talked about, the Senior Building, the City
21 Courts, the Roller Rink and City Hall; do you know if
22 any of those decisions not to allow Plaintiff to handle
23 those assignments resulted in her losing any pay or
24 benefits of any kind?

1      A    She did not lose any pay.
2      Q    You were asked some questions about the
3  active shooting drills that the City does or activate
4  from time to time; do you recall those questions,
5  generally?
6      A    Yes.
7      Q    And have you made decision to keep the
8  Plaintiff off of an active shooter drill?
9      A    No.
10     Q    And do you know if Plaintiff has ever
11 participated in an active shooter training?
12     A    I don't know that she has prior to me or --
13     Q    I think you testified earlier that the active
14 shooter drills officer is on the day shift at the time,
15 correct?
16     A    Yes.
17     Q    Okay.  Is there any other process for
18 determining which Officers are involved in an active
19 shooter drill when one is scheduled to take place?
20     A    Usually, the last few have all been our SWAT
21 team members, tactical Officers and instructors.
22     Q    And why would that be?  What's the purpose of
23 having those Officers involved?
24     A    For this crew, after I took over, we would be

1  new to the school buildings in trying to lay out an
2  accurate plan.
3           It's kind of like a formate for us,
4  teaching of us.  And it needed to be instructors and
5  SWAT team members and Tact officers and guys of that
6  nature, people with knowledge and experience, how to
7  enter into a situation with multiple wounds, multiple
8  hallways, what's the close quarter combat, best
9  techniques, to me the people with mind to do that.
10     Q    And under your administration, did you ever
11 determine that a woman Officer shouldn't be involved in
12 the active training -- active shooting drill?
13     A    No, they can be involved in it.  They might
14 have to be involved in it when it becomes real.
15     Q    Did you have shouldn't be involved in an
16 active training drill because she's a woman?
17     A    No.
18     Q    Or because as retaliation for her having
19 filed a claim of sex discrimination?
20     A    No.
21     Q    You were asked some questions with respect to
22 part-timers and whether they have, I think, it's been
23 called either bank time or comp time; do you recall
24 that?

1    A  Yes.

2    Q  And Plaintiff has made, as part of her claim,

3  that she was denied on perhaps of the three occasions,

4  use of banked or comp time to take time off; are you

5  aware of those claims?

6    A  Yes.

7    Q  Have you ever been personally involved in the

8  denial of Plaintiff's use of banked or comp time?

9    A  Not personally involved. I became aware that

10  she was requesting time that we had no accounting for.

11    Q  Again, how did you become aware of her

12  requesting that she had no time?

13    A  So as it went on and on, I decided that we

14  had to do a deep dive into the timekeeping records to

15  see. And we discovered that there's no time like that

16  that exist. It doesn't exist anywhere.

17        And so when she wanted -- typically, it

18  was around Christmas holidays and things like that, if

19  you want to be off, be off. If that's what you want,

20  that's fine with me. But there's no paid

21  compensation -- I don't know if she just got confused

22  with what full-timers get. I just -- I don't know.

23    Q  To your understanding, based on any denial of

24  Plaintiff's request for paid time off, it was based on

1  the Department's understanding and records that she

2  didn't have any banked or comp time available to use;

3  is that correct?

4    A  That's correct.

5    Q  Was it ever based on the fact that she's a

6  woman?

7    A  No.

8    Q  Was it ever based on retaliation for her

9  having made a claim of her having filed a sex

10  discrimination?

11    A  No.

12    MR. SULLIVAN: Chief, I think that's all the

13  questions I have. Thank you.

14    THE WITNESS: You are welcome.

15    MR. HAYES: I'll turn it back over to

16  Ms. Samuels.

17    MS. SAMUELS: I don't have any additional

18  questions.

19    MR. SULLIVAN: Yeah, I don't have any

20  questions, chief. At the end of the deposition, you

21  have the right to do what's called a reserve signature

22  in that you want to make sure that you meet with the

23  court reporter to look at the transcript.

24        You can't change your answers. You can

1  just make spelling changes with your name or other

2  names. Or you can do what's called waive signature and

3  it reflects you have trust and confidence in the court

4  reporter to transcribe the questions and answers here

5  today accurately. So do you want to waive signature?

6    THE WITNESS: I'll waive.

7    MR. SULLIVAN: All right. We waive

8  signature. Thanks to all. Please, everyone, have a

9  wonderful and happy new year.

10    MS. SAMUELS: Thanks for your time today,

11  sir.

12        (WHEREUPON, the deposition

13        adjourned.)

14

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS )

2  COUNTY OF C O O K )

3    I, Adrienne M. Lightfoot, Certified Shorthand

4  Reporter No. 084-004276, in and for the County of Cook,

5  State of Illinois, do hereby certify that previous to

6  the commencement of the examination, said witness was

7  duly sworn by me to testify the truth; that the said

8  deposition was taken at the time and place aforesaid;

9  that the testimony given by said witness was reduced to

10  writing by means of my shorthand notes and thereafter

11  transcribed into typewritten form; and that the

12  foregoing is a true, correct and complete transcript of

13  my shorthand notes so taken as aforesaid.

14    The signature of the witness to the

15  foregoing deposition was waived.

16    I further certify that there were present

17  at the taking of the said deposition the persons and

18  parties as indicated on the appearance page made a part

19  of this deposition.

20    I further certify that I am not counsel for

21  nor in any way related to any of the parties to this

22  suit, nor am I in any way interested in the outcome

23  thereof.

24    I further certify that this certificate

1  applies to the original signed and certified
2  transcripts only.  I assume no responsibility for the
3  accuracy of any electronically transmitted or
4  reproduced copies not made under my control or
5  direction.
6      I have set my hand this 22nd day of February
7  2021.
8
9
10 _____
11 ADRIENNE M. LIGHTFOOT
12 No. 084-004276
13
14
15
16
17
18
19
20
21
22
23
24

LIGHTFOOT COURT REPORTING, P.C.
(312)701-1090
lightfootpc@sbcglobal.net